UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

MASSAPEQUA UNION FREE SCHOOL
DISTRICT, MASSAPEQUA UNION FREE
SCHOOL DISTRICT BOARD OF EDUCATION,
and JEANINE CARAMORE, in her capacity as a
Board of Education Member and a Resident/Parent
of the School Community,

                  Plaintiffs,

           v.

NEW YORK STATE BOARD OF REGENTS,
LESTER W. YOUNG, JR., in his official capacity
as Chancellor of the New York State Board of
Regents, JOSEPHINE VICTORIA FINN, in her
official capacity as Vice Chancellor of the New
York State Board of Regents, ROGER TILLES, in
his official capacity as a member of the New York
State Board of Regents, CHRISTINE D. CEA, in
her official capacity as a member of the New York
State Board of Regents, WADE S. NORWOOD, in
his official capacity as a member of the New York
State Board of Regents, KATHLEEN M. CASHIN,
in her official capacity as a member of the New
York State Board of Regents, JAMES E.
COTRELL, in his official capacity as a member of
the New York State Board of Regents, JUDITH
CHIN, in her official capacity as a member of the
New York State Board of Regents, CATHERINE
COLLINS, in her official capacity as a member of
the New York State Board of Regents,
ELIZABETH S. HAKANSON, in her official
capacity as a member of the New York State Board
of Regents, LUIS O. REYES, in his official
capacity as a member of the New York State Board
of Regents, SUSAN W. MITTLER, in her official
capacity as a member of the New York State Board
of Regents, FRANCES G. WILLS, in her official
capacity as a member of the New York State Board
of Regents, ARAMINA VEGA FERRER, in her
official capacity as a member of the New York
State Board of Regents, SHINO TANIKAWA, in

**MEMORANDUM & ORDER**
23-CV-7052 (MKB)

her official capacity as a member of the New York
State Board of Regents, ROGER P. CATANIA,
in his official capacity as a member of the New
York State Board of Regents, ADRIAN I. HALE, in
his official capacity as a member of the New York
State Board of Regents,

Defendants.

-----------------------------------------------------------------

WANTAGH UNION FREE SCHOOL DISTRICT,
WANTAGH UNION FREE SCHOOL DISTRICT
BOARD OF EDUCATION, ANTHONY GRECO,
in his capacity as a Board of Education Member and
a Resident of the School Community,
WYANDANCH UNION FREE SCHOOL
DISTRICT, WYANDANCH UNION FREE
SCHOOL DISTRICT BOARD OF EDUCATION,
and CHARLIE REED, in his capacity as a Board of
Education Member and a Resident of the School
Community,

23-CV-7299 (MKB)

Plaintiffs,

v.

NEW YORK STATE BOARD OF REGENTS,
LESTER W. YOUNG, JR., in his official capacity
as Chancellor of the New York State Board of
Regents, JOSEPHINE VICTORIA FINN, in her
official capacity as Vice Chancellor of the New
York State Board of Regents, ROGER TILLES, in
his official capacity as a member of the New York
State Board of Regents, CHRISTINE D. CEA, in
her official capacity as a member of the New York
State Board of Regents, WADE S. NORWOOD, in
his official capacity as a member of the New York
State Board of Regents, KATHLEEN M. CASHIN,
in her official capacity as a member of the New
York State Board of Regents, JAMES E.
COTRELL, in his official capacity as a member of
the New York State Board of Regents, JUDITH
CHIN, in her official capacity as a member of the
New York State Board of Regents, CATHERINE

COLLINS, in her official capacity as a member of
the New York State Board of Regents,
ELIZABETH S. HAKANSON, in her official
capacity as a member of the New York State Board
of Regents, LUIS O. REYES, in his official
capacity as a member of the New York State Board
of Regents, SUSAN W. MITTLER, in her official
capacity as a member of the New York State Board
of Regents, FRANCES G. WILLS, in her official
capacity as a member of the New York State Board
of Regents, ARAMINA VEGA FERRER, in her
official capacity as a member of the New York
State Board of Regents, SHINO TANIKAWA, in
her official capacity as a member of the New York
State Board of Regents, ROGER P. CATANIA,
in his official capacity as a member of the New
York State Board of Regents, ADRIAN I. HALE, in
his official capacity as a member of the New York
State Board of Regents,

Defendants.

-----------------------------------------------------------------

CONNETQUOT CENTRAL SCHOOL DISTRICT,
CONNETQUOT CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION, and JACLYN
NAPOLITANO-FURNO, in her capacity as a
Board of Education Member and a Resident/Parent
of the School Community,

Plaintiffs,

v.

NEW YORK STATE BOARD OF REGENTS,
LESTER W. YOUNG, JR., in his official capacity
as Chancellor of the New York State Board of
Regents, JOSEPHINE VICTORIA FINN, in her
official capacity as Vice Chancellor of the New
York State Board of Regents, ROGER TILLES, in
his official capacity as a member of the New York
State Board of Regents, CHRISTINE D. CEA, in
her official capacity as a member of the New York
State Board of Regents, WADE S. NORWOOD, in
his official capacity as a member of the New York

23-CV-7696 (MKB)

3

State Board of Regents, KATHLEEN M. CASHIN,
in her official capacity as a member of the New
York State Board of Regents, JAMES E.
COTRELL, in his official capacity as a member of
the New York State Board of Regents, JUDITH
CHIN, in her official capacity as a member of the
New York State Board of Regents, CATHERINE
COLLINS, in her official capacity as a member of
the New York State Board of Regents,
ELIZABETH S. HAKANSON, in her official
capacity as a member of the New York State Board
of Regents, LUIS O. REYES, in his official
capacity as a member of the New York State Board
of Regents, SUSAN W. MITTLER, in her official
capacity as a member of the New York State Board
of Regents, FRANCES G. WILLS, in her official
capacity as a member of the New York State Board
of Regents, ARAMINA VEGA FERRER, in her
official capacity as a member of the New York
State Board of Regents, SHINO TANIKAWA, in
her official capacity as a member of the New York
State Board of Regents, ROGER P. CATANIA,
in his official capacity as a member of the New
York State Board of Regents, ADRIAN I. HALE, in
his official capacity as a member of the New York
State Board of Regents,

Defendants.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.    Background ........................................................................................................ 8

    a.    Factual background ..................................................................................... 8

        i.    Part 123 ................................................................................................... 9

        ii.   Additional guidance ............................................................................. 10

        iii.  Actions taken by each school after Part 123 ........................................ 11

    b.    Procedural history and oral rulings by the Court ..................................... 12

II.   Discussion ....................................................................................................... 13

    a.    Standards of review .................................................................................. 13

        i.    12(b)(1) ................................................................................................. 13

        ii.   12(b)(6) ................................................................................................. 14

b.   Defendants' motion to dismiss..............................................................................15

    i.   School District Plaintiffs' and School Board Plaintiffs' capacity to challenge Part 123 as impermissibly vague and overbroad...............................................15

        1.   Fourteenth Amendment capacity to sue..................................................22

        2.   First Amendment capacity to sue.............................................................25

    ii.  Individual Board Member Plaintiffs' Fourteenth Amendment-based vagueness claims and First Amendment-based overbreadth claims...........................................29

        1.   Individual Board Member Plaintiffs' Fourteenth Amendment-based as-applied vagueness challenge..............................................................29

            A.   Level of scrutiny......................................................................34

            B.   Adequate notice ......................................................................35

            C.   Arbitrary and discriminatory enforcement............................38

        2.   Individual Board Member Plaintiffs' Fourteenth Amendment-based facial vagueness challenge ......................................................................42

        3.   Individual Board Member Plaintiffs' First Amendment-based facial overbreadth challenge to Part 123............................................................44

    iii. Individual Board Member Plaintiffs' First Amendment free speech claims ...........52

        1.   Indigenous names, logos, and mascots as government speech..............................52

        2.   Individual Board Member Plaintiffs' conduct as government speech....................58

    iv.  Constitutional separation of powers claims .........................................................71

c.   Preliminary injunction ...........................................................................................78

    i.   Likelihood of success or sufficiently serious questions going to the merits................80

    ii.  Irreparable harm ...............................................................................................82

    iii. Balance of harms...............................................................................................85

    iv.  Public interest ...................................................................................................87

III.   Conclusion ....................................................................................................................88

Plaintiffs Massapequa Union Free School District ("Massapequa UFSD"), the

Massapequa UFSD Board of Education ("Massapequa Board"), and Jeanine Caramore,

commenced this action on September 22, 2023, and filed an Amended Complaint on January 16,

2024 against Defendants the New York State Board of Regents and Chancellor Lester W. Young,

Jr., Vice Chancellor Josephine Victoria Finn, and members of the Board of Regents Roger Tilles,

Christine D. Cea, Wade S. Norwood, Kathleen M. Cashin, James E. Cotrell, Judith Chin,

Catherine Collins, Elizabeth S. Hakanson, Luis O. Reyes, Susan W. Mittler, Frances G. Wills, Aramina Vega Ferrer, Shino Tanikawa, Roger P. Catania, and Adrian I. Hale (collectively, the "Individual Defendants") (the "Massapequa Matter''). (Complaint ("Compl."), Docket Entry No. 2; Amended Complaint ("Am. Compl."), Docket Entry No. 24.)

Plaintiffs Wantagh Union Free School District ("Wantagh UFSD"), the Wantagh UFSD Board of Education ("Wantagh Board"), Anthony Greco, the Wyandanch Union Free School District ("Wyandanch UFSD"), the Wyandanch UFSD Board of Education ("Wyandanch Board"), and Charlie Reed commenced this action on September 29, 2023, and filed an Amended Complaint on January 16, 2024 against the New York State Board of Regents and Individual Defendants (the "Wantagh/Wyandanch Matter"). (23-CV-7299 Compl., Docket Entry No. 1; 23-CV-7299 Am. Compl., Docket Entry No. 24.)

Plaintiffs Connetquot Central School District ("Connetquot CSD"), the Connetquot CSD Board of Education ("Connetquot Board"), and Jaclyn Napolitano-Furno commenced this action on October 16, 2023, and filed an Amended Complaint on January 16, 2024 against the New York State Board of Regents and Individual Defendants (the "Connetquot Matter").[1] (23-CV-7696 Compl., Docket Entry No. 1; 23-CV-7696 Am. Compl., Docket Entry No. 20.)

Plaintiffs Massapequa UFSD, Wantagh UFSD, Wyandanch UFSD, and Connetquot CSD (collectively, the "School District Plaintiffs"), Plaintiffs Massapequa Board, Wantagh Board,

---

[1]    Plaintiffs Amityville Union Free School District ("Amityville UFSD"), Amityville UFSD Board of Education ("Amityville Board"), and Jeannette Santos (collectively, "Amityville Plaintiffs") commenced an action on October 26, 2023, and amended their Complaint on January 16, 2024 against Defendants the New York State Board of Regents and Individual Defendants (the "Amityville Matter"). (23-CV-8011 Compl., Docket Entry No. 1; 23-CV-8011 Am. Compl., Docket Entry No. 20.) On October 14, 2024, Amityville Plaintiffs filed a notice of discontinuance, (23-CV-8011 Notice of Voluntary Dismissal, Docket Entry No. 42), and, on October 15, 2024, the Court granted the notice of discontinuance and terminated the Amityville Matter, (23-CV-8011 Order dated Oct. 15, 2024).

Wyandanch Board, and Connetquot Board (collectively, the "School Board Plaintiffs"), and Plaintiffs Caramore, Greco, Reed, and Napolitano-Furno (collectively, the "Individual Board Member Plaintiffs") challenge Part 123 of Title 8 of the Regulations of the Commissioner of Education in the Official Compilation of Codes, Rules and Regulations of the State of New York.[2]  N.Y. Comp. Codes R. & Regs., tit. 8 ("8 NYCRR"), §§ 123.1–123.5 ("Part 123").  In the Amended Complaint, Plaintiffs allege (1) pursuant to Article 78 of the New York Civil Practice Law and Rules ("CPLR"), Part 123 should be nullified because its adoption did not adhere to the rulemaking requirements set forth in the State Administrative Procedure Act ("SAPA"); (2) pursuant to Article 78 of the CPLR, Part 123 should be nullified because in passing Part 123, the New York State Education Department ("SED") exceeded its rulemaking authority in violation of SAPA; (3) Part 123 violates the separation of powers doctrines of the United States and New York State Constitutions; (4) Part 123 is impermissibly vague and overbroad under the First and Fourteenth Amendments; and (5) Part 123.5 impermissibly restricts Individual Board Member Plaintiffs' speech in violation of the First Amendment and Article I, Section 8, of the New York State Constitution by prohibiting them from displaying, on school grounds or at school functions, a prohibited Indigenous team name, logo, and mascots.

Defendants separately move to dismiss Plaintiffs' claims, and Plaintiffs move for a preliminary injunction.[3]  For the reasons set forth below, the Court grants Defendants' motion to dismiss the Amended Complaint and denies Plaintiffs' motion for a preliminary injunction.

---

[2]  Except as to Individual Board Member Plaintiffs' First Amendment free speech claims, the Court interprets Plaintiffs' Amended Complaint as a challenge to Part 123 in full.

[3]  Although the parties filed individual motion papers in each matter, because the briefings are similar, the Court cites to the motion papers filed in the Massapequa Matter (23-CV-7052) unless otherwise indicated.  (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 40; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 40-1; Background &

## I.  Background

### a.  Factual background

In April of 2001, then-SED Commissioner Richard Mills released a memorandum to all public school districts in the State of New York that discussed a study conducted by the SED regarding the impact of New York public schools' use of Native American names, symbols, and mascots, and requested that boards of education in New York end the use of Native American mascots as soon as possible and agree to discuss the matter if they were not ready to act immediately.[4]  (Am. Compl. ¶ 73; 2001 Mills Memo 2.)

In 2010, the New York State Legislature enacted the Dignity for All Students Act ("DASA").  N.Y. Educ. L. §§ 10–18. (Am. Compl. ¶ 58.)  "DASA prohibits bullying[,] harassment, discrimination, and cyberbullying against students in school or at school functions based on their actual or perceived membership in a protected class."  (*Id.* ¶ 59.)

---

Frequently Asked Questions Regarding Part 123 of the Reguls. of the Comm'r of Educ. Relating to Prohibiting the Use of Indigenous Names, Mascots, & Logos by Pub. Schs. (May 2023) ("FAQ Guidance"), annexed to Defs.' Mem. as Ex. 1, Docket Entry No. 40-3; Mem. from Richard P. Mills to Presidents of Bds. of Educ. & Superintendents of Schs. (Apr. 5, 2001) ("2001 Mills Memo"), annexed to Defs.' Mem. as Ex. 4, Docket Entry No. 40-6; Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 41-13; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 42; Defs.' Suppl. Mem. in Supp. of Defs.' Mot. ("Defs.' Suppl. Mem."), Docket Entry No. 52; Pls.' Suppl. Mem. in Opp'n  to Defs.' Mot. ("Pls.' Suppl. Mem."), Docket Entry No. 54; Defs.' Suppl. Reply in Supp. of Defs.' Mot. ("Defs.' Suppl. Reply"), Docket Entry No. 56.)  Similarly, although the parties filed individual motion papers in each matter, because the preliminary injunction briefings are similar, the Court cites to the motion papers filed in the Massapequa Matter (23-CV-7052) unless otherwise indicated.  (Letter Mot. for Prelim. Inj. & Summ. J. ("Pls.' Conf. Mem."), Docket Entry No. 43; Defs.' Mem. in Opp'n to Pls.' Mot. ("Defs.' Conf. Mem."), Docket Entry No. 45; Pls.' Suppl. Mem. in Supp. of Pls.' Mot. ("Pls.' Inj. Mem."), Docket Entry No. 53; Defs.' Suppl. Mem. in Opp'n to Pls.' Mot., ("Defs.' Inj. Mem."), Docket Entry No. 55; Pls.' Suppl. Mem. in Reply to Defs.' Suppl. Inj. Mem. ("Pls.' Inj. Mem. Reply"), Docket Entry No. 58.)

[4]  The Court assumes the truth of the factual allegations in the Amended Complaints for the purpose of deciding Defendants' motion to dismiss and Plaintiffs' motion for a preliminary injunction.

On November 17, 2022, SED Senior Deputy Commissioner for Education Policy, James Baldwin, released a memorandum referencing the development of regulations that would clarify a new policy prohibiting public school districts from using Indigenous team names, imagery, and mascots.  (*See id.* ¶¶ 76–77.)  Two weeks later, on December 1, 2022, the Board of Regents announced that the proposed regulation would be presented for permanent adoption at the April of 2023 Regents meeting and become effective after publication of the proposed amendment and the subsequent sixty-day mandatory public comment period.  (*Id.* ¶ 80.)  On December 28, 2022, the SED released a draft of the regulation, Part 123, which triggered the SAPA-mandated sixty-day public comment period.  (*Id.* ¶¶ 80, 82.)  On April 18, 2023, the Board of Regents voted to adopt Part 123, and Part 123 became effective on May 3, 2023.  (*Id.* ¶ 85.)

### i.    Part 123

Part 123 provides that "no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction."  8 NYCRR § 123.2.  Part 123 defines "Indigenous name, logo, or mascot" as "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such schools['] sports teams."  *Id.* § 123.1.  The regulation "does not [apply to] a public school, school building, or school district named after an Indigenous tribe."  *Id.*

Part 123 required boards of education in New York to "commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022–[20]23 school year."  *Id.* § 123.3(a).  These resolutions were required to "identify a plan to eliminate all use of the prohibited name, logo, or mascot within a reasonable time" which could be "no later

than the end of the 2024–2025 school year." *Id.*  The deadline for these resolutions was June 30, 2023.  (Am. Compl. ¶ 86.)  Part 123 further requires public schools to "prohibit school officers and employees when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot."  8 NYCRR § 123.5.

Part 123 permits several exceptions.  First, it allows New York public schools to utilize an Indigenous name, logo, or mascot if "a written agreement exist[ed] prior to the effective date of [Part 123] between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe."  *Id.* § 123.4(b).  Second, it allows recognized tribal nations to "choos[e] to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including . . . a tribal school or intramural league."  *Id.* § 123.4(a).  Third, it allows "any school officer or employee who is a member of a tribal nation" to "utiliz[e] or promot[e] an Indigenous name, logo, or mascot of such tribal nation."  *Id.* § 123.5.

### ii.   Additional guidance

In May of 2023, SED issued further guidance in the form of a frequently asked questions document.[5]  (FAQ Guidance 3; 23-CV-7696 Am. Compl. ¶ 130; 23-CV-7299 Am. Compl. ¶

---

[5]  Defendants provided the FAQ Guidance as an exhibit to their motion.  On a motion to dismiss, "the district court is normally required to look only to the allegations on the face of the complaint" but "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice."  *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (holding that courts may consider on a motion to dismiss "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" and other documents "integral" to the complaint (first quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); and then quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111

159.)  *See also https://www.nysed.gov/sites/default/files/programs/indigenous-education/indigenous-mascot-regulation-background-and-faq.pdf.*  The FAQ Guidance clarified that districts that never used Indigenous imagery in connection with their team name, logo, or mascot would not be required to change it, but that districts that have at any time associated with Indigenous imagery would have to implement changes under Part 123.  (FAQ Guidance 6; 23-CV-7696 Am. Compl. ¶ 130; 23-CV-7299 Am. Compl. ¶ 159.)  The FAQ Guidance also provided an email address through which questions could be sent to the SED Office of Indigenous Education.  (FAQ Guidance 4.)

### iii.  Actions taken by each school after Part 123

The Massapequa, Wantagh, and Wyandanch Boards of Education each passed resolutions in accordance with Part 123 to eliminate their use of Indigenous names, mascots, or logos by the end of the 2024–2025 school year.  (Am. Compl. ¶¶ 87–88; 23-CV-7299 Am. Compl. ¶¶ 102–05, 124–25.)  The Connetquot School District did not pass a resolution pledging to eliminate their use of Indigenous names, mascots, and logos in adherence with Part 123, but did issue a resolution setting forth what actions the Board of Education would take if the district were ultimately required to comply with the regulation.  (23-CV-7696 Am. Compl. ¶¶ 109–12.)

---

(2d Cir. 2010))); *see also, e.g.*, *Glob. Network Commc'ns., Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (finding reversible error where the district court considered defendant's submission of a trial transcript in an unrelated proceeding and relied on it to "make a finding of fact that *controverted* the plaintiff's own factual assertions set out in its complaint").  The FAQ Guidance is referenced in Amended Complaint for the Connetquot and Wantagh/Wyandanch Matters, (23-CV-7696 Am. Compl. ¶ 130; 23-CV-7299 Am. Compl. ¶ 159), and Plaintiffs cite to the document in its opposition, (*see* Pls.' Opp'n 6).  The Court therefore considers the FAQ Guidance as integral to the Amended Complaints.

### b. Procedural history and oral rulings by the Court

On September 6, 2024, Defendants moved to dismiss all actions for failure to state a claim, lack of capacity, and lack of jurisdiction. (Defs.' Mot 2.) On September 13, 2024, Plaintiffs sought a pre-motion conference to move for summary judgment and a preliminary injunction, (Pls.' Conf. Mem. 1), which Defendants opposed, (Defs.' Conf. Mem. 1–3).

On October 22, 2024, the Court heard oral arguments from the parties regarding Defendants' motion to dismiss and Plaintiffs' proposed motions for summary judgment and a preliminary injunction. (Min. Order dated Oct. 22, 2024.) During the conference, the Court also partially ruled on Defendants' motion to dismiss. For the reasons discussed on the record, the Court declined to exercise supplemental jurisdiction over Plaintiffs' claims under Article 78 of the CPLR that (1) Part 123 should be nullified because its adoption did not adhere to the rulemaking requirements set forth in SAPA, and (2) in passing Part 123, the SED exceeded its rulemaking authority in violation of SAPA, and dismissed both claims without prejudice.[6] (*Id.*)

The Court reserved decision on Plaintiffs' claims that (1) Part 123 is impermissibly vague and overbroad under the First and Fourteenth Amendments; (2) Part 123.5 impermissibly restricts Individual Board Member Plaintiffs' speech in violation of the First Amendment and Article I, Section 8, of the New York State Constitution because it prohibits them from displaying, on school grounds or at school functions, a prohibited Indigenous team name, logo, and mascots;[7] and (3) Part 123 violates the separation of powers doctrines of the United States

---

[6] As discussed on the record, the Court determined that the Article 78 proceedings were time-barred. (Tr. of Mot. Hr'g ("Hr'g Tr.") 28:14–29:12.) However, at Plaintiffs' request, the Court declined to exercise supplemental jurisdiction over Plaintiffs' claims. (Min. Order dated Oct. 22, 2024; Hr'g Tr. 29:13–30:12.)

[7] The Court also found that there was no basis for Plaintiffs to move for summary judgment because the legal issues Plaintiffs sought to present on summary judgment were the

and New York State Constitutions.  (*Id.*)  The Court directed the parties to file briefing on any additional legal arguments regarding Plaintiffs' motion for preliminary injunction.  (*Id.*)

On November 5, 2024, Plaintiffs filed a supplemental memorandum in support of their motion for preliminary injunction.  (Pls.' Inj. Mem.)  On November 19, 2024, Defendants filed a supplemental memorandum in opposition to Plaintiffs' motion for preliminary injunction, (Defs.' Inj. Mem.), and on December 6, 2024, Plaintiffs filed a reply to Defendants' supplemental memorandum in opposition to Plaintiffs' motion for preliminary injunction, (Pls.' Inj. Mem. Reply).

## II.  Discussion

### a.  Standards of review

#### i.  12(b)(1)

A district court may dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure when the court "lacks the statutory or constitutional power to adjudicate it."  *Huntress v. United States*, 810 F. App'x 74, 75 (2d Cir. 2020) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova*, 201 F.3d at 113); *Shabaj v. Holder*, 718 F.3d 48, 50 (2d Cir. 2013) (per curiam) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)).  "'[C]ourt[s] must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting

---

same legal issues presented in the motions to dismiss, (Hr'g Tr. 30:22–31:24, 62:6–9), and therefore denied Plaintiffs' request to move for summary judgment, (Min. Order dated Oct. 22, 2024; Hr'g Tr. 61:12–13).

it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted) (first quoting *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006); and then quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)), *aff'd*, 561 U.S. 247 (2010). Ultimately, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *Makarova*, 201 F.3d at 113); *see also Suarez v. Mosaic Sales Sols. US Operating Co.*, 720 F. App'x 52, 53 (2d Cir. 2018) ("[T]he party asserting subject matter jurisdiction must demonstrate its existence by a preponderance of the evidence." (citing *Morrison*, 547 F.3d at 170)); *Clayton v. United States*, No. 18-CV-5867, 2020 WL 1545542, at *3 (E.D.N.Y. Mar. 31, 2020) (quoting *Tandon*, 752 F.3d at 243); *Fed. Deposit Ins. Corp. v. Bank of N.Y. Mellon*, 369 F. Supp. 3d 547, 552 (S.D.N.Y. 2019) (quoting *Tandon*, 752 F.3d at 243).

### ii.   12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the Complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009)); *see also Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting

*Matson*, 631 F.3d at 63); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d

Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations contained in the complaint

are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678;

*Roe*, 91 F.4th at 651 ("Although all factual allegations contained in the complaint are assumed to

be true, this rule does not extend 'to legal conclusions.  Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice.'" (quoting *Iqbal*, 556

U.S. at 678)).

> **b.   Defendants' motion to dismiss**

Defendants move to dismiss Plaintiffs' remaining claims: (1) Part 123 is impermissibly

vague and overbroad under the First and Fourteenth Amendments; (2) Part 123 impermissibly

restricts Individual Board Member Plaintiffs' speech in violation of the First Amendment and

Article I, Section 8, of the New York State Constitution by prohibiting them from displaying, on

school grounds or at school functions, a prohibited Indigenous team name, logo, and mascots;

and (3) Part 123 violates the separation of powers doctrines of the United States and New York

State Constitutions.  Before addressing each claim, the Court first addresses Defendants'

argument that School District Plaintiffs and School Board Plaintiffs lack capacity to sue.

> **i.   School District Plaintiffs' and School Board Plaintiffs' capacity to
> challenge Part 123 as impermissibly vague and overbroad**

Defendants argue that School District Plaintiffs and School Board Plaintiffs lack capacity

to sue New York state officials for violations of the First Amendment or Fourteenth Amendment

because they are municipal entities.  (Defs.' Mem. 17–18, 24–25.)  First, Defendants argue that

none of the first three exceptions to New York's capacity-to-sue rule — express statutory

authority, proprietary interest, and interference with a municipality's home rule powers — apply.

(*Id.* at 18.)  Defendants argue these exceptions are inapplicable because "Plaintiffs assert no statutory right to sue," "do not have a proprietary interest in a specific fund of monies," and "assert [no] claim that Part 123 violates the home rule provision of the New York Constitution." (*Id.*)  Second, Defendants contend that the fourth exception — the constitutional proscription exception — is inapplicable because "complying with Part 123 would not force Plaintiffs to violate any constitutional proscriptions."  (*Id.*)  In support, Defendants argue that the constitutional proscription exception to the capacity-to-sue rule is inapplicable because "the [S]chool [D]istrict Plaintiffs and [S]chool [B]oard Plaintiffs do not allege that [sections] 123.1 through 123.4 offend the First Amendment," rather, the First Amendment "claim is asserted only by the [I]ndividual [Board Member] Plaintiffs, in their personal capacity."  (Defs.' Reply 10–11.) Defendants also argue that, "even if school districts' compliance with [section] 123.5 could force them to violate the First Amendment rights of school officials and employees," School District Plaintiffs and School Board Plaintiffs would still lack capacity to sue because they do not allege that the provisions they challenge force them to violate the First Amendment.  (*Id.*)  Third, Defendants argue that School District Plaintiffs and School Board Plaintiffs lack capacity to bring a Fourteenth Amendment-based vagueness claim because "municipalities and municipal officials are not 'persons' within the meaning" of the Fourteenth Amendment.[8]  (Defs.' Mem. 24–25.)

---

[8]  Defendants do not challenge Individual Board Member Plaintiffs' personal capacity to sue under the separation of power doctrines of the United States or New York State Constitutions, the First Amendment, or the Fourteenth Amendment.  (*See generally* Defs.' Mem. 16–29; Hr'g Tr. 20:24–21:8.)  The Court therefore does not address their personal capacity to sue in this Memorandum and Order, and Individual Board Member Plaintiffs' arguments made in their personal capacity are addressed on the merits.  In addition, although Defendants make no argument as to Individual Board Member Plaintiffs' capacity to sue in their official capacity, the Court finds that, as municipal officials, Individual Board Member Plaintiffs "lack capacity to

Plaintiffs acknowledge that municipal entities "generally lack capacity to attack actions by the State and its Legislature on constitutional grounds," (Pls.' Opp'n 21–23), but argue that the fourth exception to the capacity-to-sue rule — the constitutional proscription exception — applies to their claims for violations of the First and Fourteenth Amendments, (*id.* at 22).[9]  In support, Plaintiffs argue that while municipal entities "may not assert a *substantive* claim for protection of their rights under the Fourteenth Amendment," municipal entities "can [still] challenge a state regulation under the Fourteenth Amendment."  (*Id.* at 22–23.)  Plaintiffs further argue that complying with Part 123 "would result in a violation of school officials and employees' First Amendment rights" or require them to "face draconian penalties" such as "the withholding of State Aid and/or removal of school officers."[10]  (*Id.* at 22.)

---

mount constitutional challenges to acts of the State and State legislation" in their official capacity.  *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig. ("In re World Trade Ctr. I")*, 846 F.3d 58, 63 (2d Cir. 2017) ("[M]unicipalities and . . . their officers lack capacity to mount constitutional challenges to acts of the State and State legislation."  (quoting *City of New York v. State of New York*, 86 N.Y.2d 286, 291 (1995))); *Blakeman v. James*, No. 24-CV-1655, 2024 WL 3201671, at *12 (E.D.N.Y. Apr. 4, 2024) ("Municipal officials . . . suffer the same lack of capacity to sue the State with the municipal corporate bodies they represent." (quoting City of New York, 86 N.Y.2d at 291)).

[9]  School District Plaintiffs and School Board Plaintiffs only rely on the fourth exception — the constitutional proscription exception — to New York's capacity-to-sue rule, and the Court therefore only addresses this exception.

[10]  Defendants further contend that School District Plaintiffs and School Board Plaintiffs lack capacity to sue New York state officials for violations of a separation of powers doctrine under the United States Constitution.  (Defs.' Opp'n 16–18.)  Plaintiffs fail to make any argument in support of School District Plaintiffs' and School Board Plaintiffs' capacity to sue under the United States Constitution separation of powers doctrine.  Plaintiffs also cite no cases where the federal separation of powers doctrine has been used to support municipal capacity to sue, and the Court is not aware of any.  The Court therefore does not address this unsupported claim as asserted by the School District Plaintiffs, School Board Plaintiffs, and Individual Board Member Plaintiffs in their official capacity.  The Court does address the separation of powers claim brought under the United States Constitution by Individual Board Member Plaintiffs in their personal capacity.  (*See infra* n.27.)

Legal capacity is governed by Federal Rule of Civil Procedure 17(b). *See La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 95 (2d Cir. 2014). "Rule 17(b) of the Federal Rules of Civil Procedure provides . . . that state law governs whether a party has capacity to be sued."[11] *Id.* "Rule 17(b) [of the Federal Rules of Civil Procedure] provides rules for determining the capacity to sue or be sued of 'an individual,' 'a corporation,' and 'all other parties.'" *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 97 (2d Cir. 2021) (quoting Fed. R. Civ. P. 17); *La Russo*, 747 F.3d 90, 95 (2d Cir. 2014) ("Capacity to sue or be sued is determined as follows: . . . (3) for all other parties [other than an individual or corporation], by the law of the state where the court is located . . . ." (quoting Fed. R. Civ. P.

---

[11] Rule 17(b) does not expressly address municipalities/local governments, but the Court of Appeals for the Tenth Circuit, Eleventh Circuit, and district courts in the Second Circuit have interpreted Rule 17(b)(3) to include government agencies and municipalities. *See Turner v. Homestead Police Dep't*, 828 F. App'x 541, 544 (11th Cir. 2020) ("As to the police department, its ability to sue or be sued is 'determined by the law of the state in which the district court is held.'" (quoting *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992))); *Dean*, 951 F.2d at 1214 (quoting Fed. R. Civ. P. 17(b)(3)); *Brodzki v. Topeka Police Dep't*, 437 F. App'x 641, 643 (10th Cir. 2011) (determining that, under Rule 17(b), Kansas state law governed a party's capacity to sue or be sued in federal court, including parties such as "subdivisions, agencies, or departments of governmental entities" (citations omitted)); *Town of Babylon v. James*, 707 F. Supp. 3d 213, 221 (E.D.N.Y. 2023) (explaining that under Rule 17(b) "the capacity of a governmental entity to sue or be sued is a question of state law" (quoting *Orraca v. City of New York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995)); *Callahan v. City of New Haven Dep't of Hum. Res.*, No. 18-CV-488, 2019 WL 1052181, at *1 (D. Conn. Mar. 5, 2019) (finding that a municipality has capacity to sue or be sued after determining that Rule 17(b)(3) applies); *Yonkers Comm'n on Hum. Rts. v. City of Yonkers*, 654 F. Supp. 544, 551 (S.D.N.Y. 1987) ("The capacity of the Commission to sue or be sued must be determined by the law of the State of New York, in accordance with Rule 17(b) . . . ."); *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 393 (4th Cir. 2014) (explaining that "the law of the state in which the district court sits determines an entity's capacity to be sued," including entities such as the city state's attorney's office (citing Fed. R. Civ. P. 17(b))); *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 38 (1st Cir. 2008) (analyzing a town conservation commission's capacity to be sued under 17(b)(3)); *Streit v. Cnty. of Los Angeles*, 236 F.3d 552, 565 (9th Cir. 2001) ("Under Rule 17(b) of the Federal Rules of Civil Procedure, the Police Department's capacity to be sued in federal court is to be determined by the law of California." (quoting *Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 604 (9th Cir. 2001)).

17(b))); *see also Town of Babylon v. James*, 707 F. Supp. 3d 213, 221 (E.D.N.Y. 2023) ("Legal

capacity is governed by Federal Rule of Civil Procedure 17(b)." (quoting *Centro De La*

*Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 954 F. Supp. 2d 127, 136

(E.D.N.Y. 2013), *aff'd*, 868 F.3d 104 (2d Cir. 2017))); *Blakeman v. James*, No. 24-CV-1655,

2024 WL 3201671, at *11 (E.D.N.Y. Apr. 4, 2024).  Under Rule 17(b), state law governs

whether municipal entities have capacity to sue.  *See La Russo*, 747 F.3d at 95 ("[S]tate law

governs whether a party [other than an individual or corporation] has capacity to be sued.");

*Town of Babylon*, 707 F. Supp. 3d at 221 (explaining that under Rule 17(b) "the capacity of a

governmental entity to sue or be sued is a question of state law" (quoting *Orraca v. City of New*

*York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995))); *see, e.g.*, *Hartke ex rel. Est. of Hartke v.*

*Bonhams & Butterfields Auctioneers Corp.*, No. 24-258, 2024 WL 4380315, at *1–2 (2d Cir.

Oct. 3, 2024) (applying New York state law to affirm a judgment that the plaintiff lacked

capacity to sue on behalf of her uncle's estate); *In re World Trade Ctr. Lower Manhattan*

*Disaster Site Litig.* ("*In re World Trade Ctr. I*"), 846 F.3d 58, 60 (2d Cir. 2017) (applying New

York law "to determine whether . . . a public benefit corporation[] has the capacity to challenge a

New York State claim-revival statute as unconstitutional under the New York State

[C]onstitution"); *Blakeman*, 2024 WL 3201671, at *1, *12 (applying New York law to determine

whether a municipality and municipal executive "lack[ed] the capacity to sue [the New York

State d]efendants for the equal protection claim pled in the [c]omplaint" under the U.S.

Constitution); *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 393 (4th Cir. 2014)

(determining that, under Rule 17(b), Maryland state law governed a party's capacity to sue the

state's attorney's office); *Brodzki v. Topeka Police Dep't*, 437 F. App'x 641, 643 (10th Cir.

2011) (determining that, under Rule 17(b), Kansas state law governed a party's capacity to sue or

be sued in federal court, including parties such as "subdivisions, agencies, or departments of governmental entities" (citations omitted)); *Dean v. Barber*, 951 F.2d 1210, 1214–15 (11th Cir. 1992) (determining that, under Rule 17(b), Alabama state law governed a party's capacity to sue a county sheriff department).

New York law provides that "municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." *City of New York v. State of New York*, 86 N.Y.2d 286, 289 (1995). *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.* ("*In re World Trade Ctr. II*"), 892 F.3d 108, 110–11 (2d Cir. 2018) (explaining that a "public benefit corporation is treated like any other state entity and is subject to the 'general rule' that 'state entities lack capacity to challenge the constitutionality of a state statute'" (quoting *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.* ("*In re World Trade Ctr. III*")*,* 30 N.Y.3d 377, 383, 387 (2017))); *see also Aguayo v. Richardson*, 473 F.2d 1090, 1101 (2d Cir. 1973) ("The City lacks standing to assert constitutional claims against the State."); *Blakeman*, 2024 WL 3201671, at *11 ("Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing" (quoting *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 267 (S.D.N.Y. 2019))). Municipal entities are "purely creatures or agents of the State" and "cannot have the right to contest the actions of their principal or creator affecting them in their governmental capacity or as representatives of their inhabitants." *Town of Babylon*, 707 F. Supp. 3d at 222 (quoting *City of New York*, 86 N.Y.2d at 289–90); *see also Slattery v. Hochul*, 61 F.4th 278, 287 n.1 (2d Cir. 2023) ("The Supreme Court has held that the Fourteenth Amendment incorporates the protections of the First Amendment against state governments."); *City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973) ("[A] municipal corporation, created by a

state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." (quoting *Williams v. Mayor & City Council of Balt.*, 289 U.S. 36, 40 (1933))); *City of New Rochelle v. Town of Mamaroneck*, 111 F. Supp. 2d 353, 364 (S.D.N.Y. 2000) ("It has long been the case that a municipality may not invoke the protections of the Fourteenth Amendment against its own state." (citing *City of Newark v. New Jersey*, 262 U.S. 192, 196 (1923)).  "This rule 'flows' from the recognition that 'municipal corporate bodies — counties, towns[,] and school districts — are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as its agents.'"  *Blakeman*, 2024 WL 3201671, at *12 (quoting *City of New York*, 86 N.Y.2d at 289); *In re World Trade Ctr. I*, 846 F.3d at 63 ("This rule is also a 'necessary outgrowth of the separation of powers doctrine'" and similarly "expresses the extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivisions." (citing *City of New York*, 86 N.Y.2d at 296)).  Municipal officials, like the municipal entities they represent, lack of capacity to sue the State.  *In re World Trade Ctr. I*, 846 F.3d at 63 (explaining that "[municipal] officers lack capacity to mount constitutional challenges to acts of the State and State legislation." (citing *City of New York*, 86 N.Y.2d at 289)); *Merola v. Cuomo*, 427 F. Supp. 3d 286, 291 (N.D.N.Y. 2019) ("[M]unicipalities, and, by extension, their officers, lack capacity to sue because they 'are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as its agents.'" (quoting *City of New York*, 86 N.Y.2d at 290)); *Blakeman*, 2024 WL 3201671, at *12 ("Municipal officials . . . suffer the same lack of capacity to sue the State with the municipal corporate bodies they represent." (quoting *City of New York*, 86 N.Y.2d at 291)); *City of New York*, 86 N.Y.2d at 291 ("Municipal officials and

members of municipal administrative or legislative boards suffer the same lack of capacity to sue the State with the municipal corporate bodies they represent." (citing *Williams*, 289 U.S. at 40)).

The New York Court of Appeals has recognized four "narrow" exceptions to the general rule that municipalities and municipal officials lack capacity to mount constitutional challenges to State action and legislation:

> (1) where a public corporation has express statutory authorization to bring suit; (2) where the legislation adversely affects a public corporation's proprietary interest in a specific fund of moneys; (3) where the statute impinges upon 'Home Rule' powers of a public corporation constitutionally guaranteed under article IX of the New York State Constitution; and (4) where the public corporation asserts that, if it is obliged to comply with the statute, that very compliance will force the corporation to violate a constitutional proscription.

*In re World Trade Ctr. I*, 846 F.3d at 63–64 (citing *City of New York*, 86 N.Y.2d at 291–92); *Town of Babylon*, 707 F. Supp. 3d at 222 (quoting *In re World Trade Ctr. I*, 846 F.3d at 63); *see also In re World Trade Ctr. III*, 30 N.Y.3d at 387 (emphasizing "that the exceptions we have recognized to date are narrow.").

### 1. Fourteenth Amendment capacity to sue

Plaintiffs' arguments in support of School District Plaintiffs' and School Board Plaintiffs' capacity to sue under the Fourteenth Amendment, (Pls.' Opp'n 21–23), are meritless.[12]

The law is well-established that municipal entities lack capacity to sue their State creators under the Fourteenth Amendment. *See City of Newark*, 262 U.S. at 196 ("The city cannot invoke the protection of the Fourteenth Amendment against the state."); *Richardson*, 473 F.2d at 929 (holding that "[p]olitical subdivisions of a state may not challenge the validity of a state statute

---

[12] The Court first addresses the capacity of School District Plaintiffs and School Board Plaintiffs to sue under the Fourteenth Amendment and subsequently addresses their capacity to sue under the First Amendment.

under the Fourteenth Amendment"); *City of New Rochelle*, 111 F. Supp. 2d at 364 (explaining that "[i]t has long been the case that a municipality may not invoke the protections of the Fourteenth Amendment against its own state" (citing *City of Newark*, 262 U.S. at 196)); *Town of Babylon*, 707 F. Supp. 3d at 218, 227 (finding the municipal "[p]laintiffs lack capacity under New York state law to bring this action, and this court thus lacks jurisdiction to hear any dispute" where the plaintiffs challenged a New York mental hygiene for, *inter alia*, substantive due process and equal protection violations); *Blakeman*, 2024 WL 3201671, at *1, *12 (finding that Nassau County and the Nassau County Executive, as municipal entities, lack capacity to sue New York state for a Fourteenth Amendment violation); *see also City of New York*, 86 N.Y.2d at 289 ("Despite their contrary claims, the traditional principle throughout the United States has been that municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation."); *Cmty. Bd. 7 of Borough of Manhattan v. Schaffer*, 84 N.Y.2d 148, 155–56 (1994) ("Being artificial creatures of statute, [governmental] entities have neither an inherent nor a common-law right to sue"); *Vill. of Arlington Heights v. Reg'l Transp. Auth.*, 653 F.2d 1149, 1152 (7th Cir. 1981) (explaining that the Supreme Court has held that cities cannot invoke Fourteenth Amendment protections against the State and "[t]that principle is well established in the federal courts" (first citing *City of Newark*, 262 U.S. at 196; and then quoting *Richardson*, 473 F.2d at 929)).

Plaintiffs' reliance on *City of New Rochelle* to support their claim that municipal entities may bring constitutional challenges under the Fourteenth Amendment is misplaced.  Plaintiffs assert that while "municipal entities may not assert a *substantive* claim for protection of their rights under the Fourteenth Amendment," they "can challenge a state regulation under the Fourteenth Amendment" and contend that *City of New Rochelle* disposed of the city's Fourteenth

Amendment-based vagueness claim on the merits.  (Pls.' Opp'n 23.)  In *City of New Rochelle*, the court determined that the city, as a municipal entity, lacked standing to challenge another town's ordinance on the basis that the ordinance violated the city's rights to due process and equal protection under the Fifth Amendment and Fourteenth Amendment.  *See City of New Rochelle*, 111 F. Supp. 2d at 364.  Like the city in *City of New Rochelle*, School District Plaintiffs and School Board Plaintiffs are municipal entities challenging the constitutionality of state action under the Fourteenth Amendment.  *See City of New Rochelle*, 111 F. Supp. 2d at 363–64 (explaining that as "a municipal corporation organized under the laws of New York state, . . . [plaintiff] cannot maintain a claim" under the due process and equal protection clauses of the Fifth and Fourteenth Amendments).  Plaintiffs contend that *City of New Rochelle* permits municipal entities to assert a constitutional challenge, but neither *City of New Rochelle* nor any of the other cases cited by Plaintiffs state that a municipal plaintiff may assert a claim against the State under the Fourteenth Amendment.  *See City of New Rochelle*, 111 F. Supp. 2d at 364 ("[W]hile municipalities or other state political subdivisions may challenge the constitutionality of state legislation on certain grounds and in certain circumstances [such as under the Supremacy Clause], these do not include challenges brought under the Due Process or Equal Protection Clauses of the Fourteenth Amendment." (citations omitted)); *see also Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 459 (1982) (addressing the limited issue of "whether an elected local school board may use the Fourteenth Amendment to *defend* its program of busing for integration from attack by the State" — not whether the school board had standing or capacity to sue the State); *Town of Babylon*, 707 F. Supp. 3d at 221, 227–30 (finding that the municipal plaintiffs lacked standing and capacity to sue New York State under the Fourteenth Amendment and finding it "unnecessary to conduct any further analysis of the question posed by the non-

controlling decision in *City of New Rochelle*" because "its analysis [was] inapplicable to the instant case"). Moreover, neither School Districts Plaintiffs nor School Board Plaintiffs are "persons" under the Fourteenth Amendment. *See County of Chautauqua v. Shah*, 6 N.Y.S.3d 334, 337 (N.Y. App. Div. 2015) ("conclud[ing] that '[m]unicipalities cannot challenge state action on federal constitutional grounds because they are not "persons" within the meaning of the Due Process Clause'" (second alteration in original) (quoting *City of E. St. Louis v. Circuit Ct. for Twentieth Jud. Circuit, St. Clair County, Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993))), *aff'd sub nom. County of Chemung v. Shah*, 28 N.Y.3d 244 (2016); *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017) ("Constitutional limits on the personal jurisdiction of the courts do not protect entities that are not covered by the Due Process Clause, and the language of the Clause speaks only of 'persons.'" (citing U.S. Const. amend. V)); *Vill. of Arlington Heights*, 653 F.2d at 1152 ("Municipal governmental entities have never been held to be 'persons' within the meaning of the [Fourteenth] amendment, which was intended to guard the liberty and property of natural persons and corporations." (quoting *People v. Valentine*, 50 Ill. App. 3d 447, 452 (Ill. App. Ct. 1977)). Thus, School District Plaintiffs and School Board Plaintiffs lack capacity to sue under the Fourteenth Amendment and cannot bring a Fourteenth Amendment-based as-applied or facial vagueness claim.

## 2. First Amendment capacity to sue

The Court finds that School District Plaintiffs and School Board Plaintiffs also lack capacity to sue for violations of the First Amendment because they have not alleged that, if obliged to comply with Part 123, they would violate the constitutional rights of school officials

and employees.  Although the First Amendment contains a constitutional proscription,[13] the only First Amendment-based claim of School District Plaintiffs and School Board Plaintiffs challenges Part 123 for being impermissibly broad — not for requiring them to violate a constitutional proscription.[14]  (Am. Compl. ¶¶ 134–49 (alleging that Part 123 "creates an unnecessary risk of chilling the speech and expression of school employees, and the school community at large, in violation of the First Amendment" overbreadth doctrine)); *In re World Trade Ctr. I*, 846 F.3d at 63–64 ("[W]here the public corporation asserts that, if it is obliged to comply with the statute, that very compliance will force the corporation to violate a constitutional proscription" (citing *City of New York*, 86 N.Y.2d at 292)); *Town of Babylon*, 707 F. Supp. 3d at 222 (noting that the fourth exception to New York's capacity-to-sue rule requires that a public corporation assert that "compliance will force the corporation to violate a constitutional proscription" (quoting *In re World Trade Ctr. I*, 846 F.3d at 63)); *Blakeman*, 2024 WL 3201671, at *12 (explaining that "the capacity-to-sue rule has been applied to bar . . . public entities from challenging a wide variety of state actions" including, *inter alia*, "special

---

[13]  *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the Freedom of Speech"); *Merola v. Cuomo*, 427 F. Supp. 3d 286, 292 (N.D.N.Y. 2019) (explaining that there was "[n]o proscription evident" in the Supremacy Clause "unlike, for example, the First Amendment[]").

[14]  Defendants argue that the constitutional proscription exception to the capacity-to-sue rule is inapplicable because "the [S]chool [D]istrict Plaintiffs and [S]chool [B]oard Plaintiffs do not allege that [sections] 123.1 through 123.4 offend the First Amendment," rather, the First Amendment "claim is asserted only by the [I]ndividual [Board Member] Plaintiffs, in their personal capacity."  (Defs.' Reply 10–11.)  However, the Court notes that Plaintiffs do not specify which section numbers of Part 123 they are challenging on overbreadth grounds.  (*See generally* Am. Compl. ¶¶ 134–49.)

exemptions from local real estate tax assessments" and "laws mandating that counties make

certain expenditures" (quoting *In re World Trade Ctr. III.*, 30 N.Y.3d at 387)).[15]

School District Plaintiffs and School Board Plaintiffs rely on *Herzog v. Board of*

*Education of Lawrence Union Free School District* and *New York State Coalition of Public*

*Employers v. New York State Department of Labor* to argue that they have capacity to sue for

constitutional violations of state statutes under the constitutional proscription exception.  (Pls.'

---

[15] The Court notes that, although School District Plaintiffs and School Board Plaintiffs contend they can challenge the constitutionality of Part 123 under the First Amendment-based overbreadth doctrine, (Pls.' Opp'n 23–27), several courts have expressed doubt that the First Amendment provides protections to government entities.  *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 206 (2014) ("The whole point of the First Amendment is to afford individuals protection against [laws that restrict free speech].  The First Amendment does not protect the government . . . '"  (citations omitted)); *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 (1973) (Stewart, J., concurring) ("The First Amendment protects the press from governmental interference; it confers no analogous protection on the government."); *see also Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 599–602 (S.D.N.Y. 2010) (noting that "some courts have expressed doubt that the First Amendment's protections apply at all to government actors," but finding that "government actors are afforded some measure of protection under . . . the First Amendment to petition when they lawfully do so"); *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222, 264 n.34 (S.D.N.Y. 2006) ("[T]he Court notes that public libraries, as government entities, hold a somewhat different position vis-a-vis the First Amendment than do NGOs.  Indeed, there is a significant question as to whether a government entity may invoke the protections of the First Amendment at all."  (citation omitted)), *aff'd*, 651 F.3d 218 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 133 (2013); *Libin v. Town of Greenwich*, 625 F. Supp. 393, 396 (D. Conn. 1985) ("Although there is little law on the subject, it must be obvious that a state actor does not have a First Amendment right of free expression . . ." (citing Mark G. Yudoff, *When Government Speaks: Politics, Law, and Government Expression in America* 42–50 (1983))); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999) (explaining that "the First Circuit has expressed doubt [that local governments have First Amendment rights], holding that a legal services office of a state university lacks such rights, and saying that 'a state entity[] itself has no First Amendment rights'" (quoting *Student Gov't Ass'n v. Bd. of Trustees,* 868 F.2d 473, 481 (1st Cir. 1989) (alteration in original))), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363 (2000); *Warner Cable Commc'ns, Inc. v. City of Niceville,* 911 F.2d 634, 638 (11th Cir. 1990) (finding that a government "speaker is not itself protected by the [F]irst [A]mendment"); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1038 (5th Cir. 1982) (noting that the plaintiffs' argument that the First Amendment does not confer any rights on governments "may be essentially correct").

Opp'n 22 (first citing *Herzog v. Bd. of Educ. of Lawrence Union Free Sch. Dist.*, 652 N.Y.S.2d 473 (1996); and then citing *New York State Coal. of Pub. Emps. v. New York State Dep't of Lab.*, 441 N.Y.S.2d 878 (N.Y. Sup. Ct. 1981), *modified*, 456 N.Y.S.2d 465 (N.Y. App. Div. 1982), *aff'd*, 60 N.Y.2d 789, (1983)).  However, these cases are distinguishable as neither involved a First Amendment-based overbreadth challenge to a state statute.  *Herzog*, 652 N.Y.S.2d at 477–78 (finding that, while the respondent school district had capacity to challenge the constitutionality of a retirement law on the grounds that it violated a constitutional proscription against making a gift, the retirement law was constitutional); *New York State Coal. of Pub. Emps*, 441 N.Y.S.2d at 880 (finding that school districts had standing to challenge a statute because section 27-a of the Labor Law "specifically authorizes persons adversely affected to commence an [a]rticle 78 proceeding," the school districts were "entities directly affected by the promulgation of the standards," and because the challenge involved "neither the validity of the statute, nor a limitation on municipal powers").[16]  Accordingly, School District Plaintiffs and School Board Plaintiffs lack capacity to sue for First Amendment violations and therefore cannot bring a First Amendment-based overbreadth claim.

---

[16]  School District Plaintiffs and School Board Plaintiffs argue that they have capacity to sue because all Plaintiffs "have plausibly alleged the enforcement of Part 123 would result in a violation of school officials and employees' First Amendment rights."  (Pls.' Opp'n 22.) However, as discussed *infra*, (*see infra* sections II.b.ii–iii), Individual Board Member Plaintiffs have failed to state a First Amendment-based overbreadth challenge to Part 123 or a First Amendment free speech challenge.

### ii.   Individual Board Member Plaintiffs' Fourteenth Amendment-based vagueness claims and First Amendment-based overbreadth claims

Defendants argue that the Court should grant their motion to dismiss Individual Board Member Plaintiffs'[17] facial and as-applied vagueness and overbreadth challenges for failing to state a claim under the Fourteenth and First Amendments.  (Defs.' Mem. 25–29; Defs.' Reply 18–22; Defs.' Suppl. Reply 4–5.)  The Court addresses each of these arguments below.[18]

### 1.   Individual Board Member Plaintiffs' Fourteenth Amendment-based as-applied vagueness challenge

Defendants argue that Individual Board Member Plaintiffs fail to state a plausible as-applied vagueness challenge.  (Defs.' Mem. 26–27; Defs.' Reply 19.)  As a threshold matter, Defendants argue that the vagueness doctrine is ordinarily applied to criminal legislation and a "less exacting vagueness scrutiny" is merited in civil cases.  (Defs.' Mem. at 26 (quoting *Arriga v Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008)).)  Defendants contend that Part 123 "is subject to an even less exacting standard" because the "parties 'have the ability to clarify the meaning of the regulation by [their] own inquiry'" through the "FAQ Guidance" and accompanying email

---

[17]   Because the Court finds that Individual Board Member Plaintiffs lack capacity to sue in their official capacity, (*see supra* n.8), the Court only addresses the merits of Individual Board Member Plaintiffs' First and Fourteenth Amendment claims in their personal capacity.

[18]   Before addressing Individual Board Member Plaintiffs' facial vagueness challenge, the Court first addresses Individual Board Member Plaintiffs' as-applied vagueness challenge.  *See Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) (explaining that "[b]ecause the permissibility of a facial challenge sometimes depends upon whether the challenged regulation was constitutional as applied to the plaintiff, '[a] court should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law.'" (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982))); *Hoffman Estates*, 455 U.S. at 497 (explaining that "the [plaintiff] must demonstrate that the law is impermissibly vague in all of its applications" to succeed on a facial vagueness); *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) (explaining that, to succeed on a facial challenge, "the challenger must establish that no set of circumstances exists under which the [a]ct would be valid.'" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))).  The Court addresses Individual Board Member Plaintiffs' Fourteenth Amendment-based vagueness challenges before their First Amendment-based overbreadth challenge.

address. (*Id.* at 27–28 (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)); FAQ Guidance 5–11.) In addition, Defendants contend that, even under a stricter vagueness standard, Part 123 adequately notifies a person of reasonable intelligence that any symbol depicting "actual or stereotypical aspects of Indigenous cultures" is prohibited. (Defs.' Mem. 27.) Defendants also argue that "no regulation is obligated, under any standard, to provide certainty to persons or entities to whom the regulation is aimed." (Defs.' Reply 19 (quoting *Williams v. Korines*, 966 F.3d 133, 140 (2d Cir. 2020)).) In support of their challenge to Individual Board Member Plaintiffs' as-applied claims, Defendants first argue that Part 123 "contain[s] adequate definitions" to "notify a person of reasonable intelligence" as to what constitutes a prohibited use of an Indigenous name, symbol, or image, even under a stricter vagueness standard. (Defs.' Mem. 26–27 (citing *VIP of Berlin*, 593 F.3d at 186); Defs.' Reply 19–20.) Second, Defendants argue that Part 123 is not enforced arbitrarily because Part 123's provision permitting schools "to continue use of an Indigenous name or image where the district already, at the time of the promulgation of Part 123, had an agreement with a tribe" merely "declines to interfere with . . . agreements" between a tribe and school district that existed prior to the promulgation of Part 123. (Defs.' Reply 20–21.) As to each team name, Defendants argue that Individual Board Member Plaintiffs fail to demonstrate an as-applied challenge because, Plaintiffs in the Massapequa Matter are "well aware that the Chiefs name and imagery are unambiguously prohibited by Part 123." (*Id.* at 21.) Defendants argue Plaintiffs in the Wantagh/Wyandanch and Connetquot Matters merely disagree with the prohibition against continued use of names such as "Thunderbirds" and "Warriors." (*Id.*)

Individual Board Member Plaintiffs argue that Part 123's definitions and exceptions provisions are unconstitutionally vague as-applied to Plaintiffs. (Am. Compl. ¶¶ 141–44.) In

support, Plaintiffs argue that Part 123 fails to provide adequate notice because the regulation "does not adequately define what constitutes an Indigenous 'name,' 'symbol,' or 'image'" and does not distinguish between different depictions of Indigenous culture.  (*Id.* ¶ 141–42; Pls.' Opp'n 27–33.)  Plaintiffs also argue that Part 123 fails to account for uses of Indigenous imagery that are in honor of Indigenous persons, as opposed to those that are derogatory.  (Am. Compl. ¶ 142; Pls.' Opp'n 27–33.)  Further, Plaintiffs contend that Part 123 leads to arbitrary enforcement because it "would allow one school district to maintain a particular team name, logo, or mascot, while prohibiting another school district from doing the same simply because it could not secure written approval from a federally or state-recognized Indian tribe."  (Am. Compl. ¶ 144; Pls.' Opp'n 27–33.)

Plaintiffs in the Massapequa Matter argue that "the Massapequa Chiefs name and logo present a prime example of how Part 123's lack of narrow tailoring to Defendants' purported goal results in an unconstitutionally overbroad regulation that if enforced will burden a substantial amount of protected First Amendment activity."  (Pls.' Opp'n 33.)  Plaintiffs argue that "Defendants' ability to enforce Part 123 against the Massapequa Plaintiffs (or any school district for that matter) depends on its ability to prove the use of the Chiefs name and logo somehow constitutes an abuse of discretion by creating an unsafe learning environment for Massapequa students," but argue that their name and logo has "never prompted a single DASA complaint."  (*Id.*)  Plaintiffs also note the Massapequa community's "strong ties to Native American culture."  (*Id.*)

Plaintiffs in the Wantagh/Wyandanch Matter argue that "Part 123's application to the Warriors name also reveals the regulations' inherent vagueness and overbreadth" because the prohibition against the Warriors name is only covered by the FAQ Guidance's clarification about

31

historical uses of Native imagery — not Part 123 itself — and applies even though Wantagh and Wyandanch only recently "committed to retiring any Native American imagery" associated with their schools.  (*Id.* at 32–33.)  In support, Plaintiffs argue that "[e]ven the Chairman of the Shinnecock Nation . . . publicly commented that the name 'Warrior' is not exclusive to native culture and that he would be in favor of school districts keeping their Warriors team name."  (*Id.* at 33.)  Plaintiffs also argue the fact that the Wantagh/Wyandanch Plaintiffs would be prohibited from using the Warriors name, while SED allows other school districts to maintain their Warriors name and logo, illustrates the regulation's arbitrary and discriminatory enforcement.  (*Id.* at 30.)

Plaintiffs in the Connetquot Matter argue that "it is wholly unclear how the Connetquot CSD's Thunderbird name, mascot, and/or logo could possibly violate DASA," because "[w]hile thunderbirds are part of Native American folklore, the belief in bird-like and other mythological creatures, including thunderbirds specifically, traces to various other cultures and is not unique to the Americas" and because the mascot "is more akin to an eagle or other real-life bird, than a mythological literary creature."  (*Id.* at 31.)  Plaintiffs contend that the U.S. Air Force selected the name "Thunderbirds" for its Air Demonstration Squadron in honor of the "power, protection, and strength" that the mythological creature represents, and that the Connetquot student body's "selection of the name Thunderbird cannot constitute a DASA violation."  (*Id.* at 32.)  Plaintiffs also contend that the "'T-Bird' nickname . . . bears no connection to a Native American name, symbol, or image" and is more commonly associated with "a classic Ford vehicle or John Travolta's character . . . from the movie classic *Grease*."  (*Id.* at 31.)

"A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory

enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)); *see Brokamp v. James*, 66 F.4th 374, 403 (2d Cir. 2023) ("A statute is unconstitutionally vague in violation of the Due Process clause if it (1) 'fails to provide a person of ordinary intelligence fair notice of what is prohibited,' or (2) 'is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18 (2010))); *Kissel v. Seagull*, 552 F. Supp. 3d 277, 285–86 (D. Conn. 2021) (quoting *Hill*, 530 U.S. at 732) (same); *Muchmore's Cafe, LLC v. City of New York*, No. 14-CV-5668, 2016 WL 11469539, at *17 (E.D.N.Y. Sept. 29, 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006)) (same); *see also Farrell*, 449 F.3d at 485 ("[A]ll vagueness challenges — whether facial or as-applied — require us to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement.").  "In reviewing a statute's language for vagueness, 'we are relegated . . . to the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, and perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.'" *VIP of Berlin*, 593 F.3d at 186 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)); *see also Keepers, Inc. v. City of Milford*, 944 F. Supp. 2d 129, 150–51 (D. Conn. 2013) (same), *vacated in part and remanded on other grounds*, 807 F.3d 24 (2d Cir. 2015).

"When a statute 'is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.'" *VIP of Berlin*, 593 F.3d at 186 (quoting *Farrell*, 449 F.3d at 485) (alteration in original).  However, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 187 (quoting *Grayned*, 408 U.S. at 110); *see also Cunney v. Bd. of Trs. of*

*Grand View*, 660 F.3d 612, 621 (2d Cir. 2011) (quoting *Grayned*, 408 U.S. at 110) (same);

*Farrell*, 449 F.3d at 485 ("Where a statute's literal scope, unaided by a narrowing state court

interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine

demands a greater degree of specificity than in other contexts.") (quoting *Smith v. Goguen*, 415

U.S. 566, 573 (1974))).  "Rather, regulations may embody 'flexibility and reasonable depth,' . . .

and 'satisfy due process as long as a reasonably prudent person, familiar with the conditions the

regulations are meant to address and the objectives the regulations are meant to achieve, has fair

warning of what the regulations require.'"  *Cunney*, 660 F.3d at 621 (first quoting *Grayned*, 408

U.S. at 110; and then quoting *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir.

1999)).

## A.   Level of scrutiny

As a threshold matter, Plaintiffs and Defendants dispute which level of scrutiny the Court

should apply to determine whether Part 123 is unconstitutionally vague as-applied or facially.

(Defs.' Mem. 26 n.10; Pls.' Opp'n 27–28.)  Defendants argue that a more stringent vagueness

standard is inapplicable because School District Plaintiffs and School Board "Plaintiffs do not

allege that First Amendment rights are implicated by the provisions Plaintiffs challenge on

vagueness grounds," and because "[t]he First Amendment claim, [which] . . . is only asserted by

the [Individual] [B]oard [M]ember Plaintiffs in their personal capacity . . . challenges only

[section] 123.5." (Defs.' Reply 18.)  Plaintiffs argue that "because Part 123 implicates First

Amendment rights, the [vagueness] doctrine demands a greater degree of specificity."  (Pls.'

Opp'n 28 (alteration in original).)  Because Individual Board Member Plaintiffs have alleged that

Part 123's implementation provision raises First Amendment concerns, (Am. Compl. ¶¶ 157–

71), the Court finds that the appropriate test is whether Part 123 "reaches a substantial amount of

constitutionally protected conduct." *Dorman v. Satti*, 862 F.2d 432, 436 (2d Cir. 1988) (quoting *Hoffman Estates*, 455 U.S. at 494); *see also Farrell*, 449 F.3d at 496 ("Facial vagueness challenges may go forward only if the challenged regulation 'reaches a substantial amount of constitutionally protected conduct.'" (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983))).

## B.   Adequate notice

Defendants argue that Part 123 "contain[s] adequate definitions" to "notify a person of reasonable intelligence" as to what constitutes a prohibited use of an Indigenous name, symbol, or image.  (Defs.' Mem. 26–27.)

Plaintiffs argue that Part 123 fails to provide adequate notice because the regulation "does not adequately define what constitutes an Indigenous 'name,' 'symbol,' or 'image'" and "fail[s] to . . . differen[tiate] between a stereotypical aspect of Indigenous culture, as opposed to a representation that is accurate and respectful."  (Am. Compl. ¶¶ 141–42; Pls.' Opp'n 27–33.)

A statute provides adequate notice when its "language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Cunney*, 660 F.3d at 621 (quoting *Rubin v. Garvin,* 544 F.3d 461, 467 (2d Cir. 2008) (internal quotation marks omitted)); *VIP of Berlin,* 593 F.3d at 187 ("Animating this first vagueness ground is the constitutional principle that individuals should receive fair notice or warning when the state has prohibited specific behavior or acts." (quoting *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007))).  A statute will "satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require."  *Cunney,* 660 F.3d at 621 (quoting *Rock of Ages,* 170 F.3d at 156); *see Grayned,* 408 U.S. at 110 (explaining

that an ordinance "marked by 'flexibility and reasonable breadth'" is constitutional so long as "it is clear what the ordinance as a whole prohibits").

In reviewing the regulation's definitions, Part 123 does not specifically define "name, symbol, or image." 8 NYCRR § 123.1. However, the regulation defines "Indigenous name, logo, or mascot" as "a name, symbol or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs symbols, or traditions . . . used to represent a public school." 8 NYCRR § 123.1. An "Indigenous name, logo, or mascot" includes both "actual or stereotypical aspects of Indigenous cultures, used to represent a public school." *Id.*

Neither Plaintiffs nor Defendants cite to decisions from any court interpreting the definition of "Indigenous name, logo, or mascot," or defining an Indigenous "name, symbol or image," nor is the Court aware of any. However, the Second Circuit has upheld laws with less precise definitions in the First Amendment context. *See VIP of Berlin,* 593 F.3d at 182–83, 187; *Farrell*, 449 F.3d at 490–93 (finding that, while the term "pornography" may be "inherently vague," the publication the defendant possessed "fit[] within any reasonable understanding of the term" and "that the no-pornography condition [of defendant's parole] was not vague" in relation to a special condition prohibiting an individual from possessing "pornographic materials"). For example, in *VIP of Berlin*, the "sexually oriented business" ordinance provided that "adult-oriented stores" were subject to a zoning ordinance and defined "adult-oriented store" as any store having "a 'substantial or significant portion' of its stock in trade in adult merchandise." *VIP of Berlin,* 593 F.3d at 182–83, 187. The Second Circuit concluded that the "plain meaning and stated purpose" of the ordinance provided adequate notice to the plaintiff, whose proposed stock consisted of approximately twelve percent of adult items, that the business qualified as an adult-oriented store because it had a "substantial or significant portion of its stock" in adult

merchandise. *Id.* at 187, 189, 190–91 (explaining that a "substantial or significant portion of its stock" only required "'part' of [a business's] stock in trade [to be] devoted to adult merchandise" and that the merchandise "is of 'considerable quantity' and 'of a noticeably or measurably large amount'" (citations omitted)). Like *VIP of Berlin*'s definition of "adult-oriented stores," a reasonable person would have notice that the definition of an Indigenous name, logo, or mascot includes any Indigenous name, symbol, and imagery that "depicts or refers to Indigenous persons," regardless of the intention behind such a reference. *Id.* at 182–83, 187; 8 NYCRR § 123.1.

Accordingly, Plaintiffs have not plausibly alleged that they had insufficient notice that these names, symbols, and images were covered by Part 123. In the Massapequa Matter, Plaintiffs acknowledge the Massapequa Chiefs name and logo reference and "depict[] Sachem Tackapausha himself." (Am. Compl. ¶ 47.) Similarly, in the Wantagh/Wyandanch Matter, Plaintiffs were equally on notice of the pre-existing history tying the Warriors' name to actual or stereotypical aspects of Indigenous peoples. (Pls.' Opp'n 32–33; 23-CV-7299 Am. Compl. ¶¶ 54, 63 (explaining that "the name Warrior is not exclusive to native culture," but noting that "[t]he 'Wantagh Warriors' name and logo, . . . depicts the profile of a Native American in full headdress").) In the Connetquot Matter, the "Thunderbirds" name is covered by Part 123 because, as Plaintiffs acknowledge, "thunderbirds are part of Native American folklore." (Pls.' Opp'n 31; 23-CV-7696 Am. Compl. ¶¶ 70–81 (explaining that the student body chose the name "Thunderbirds" in order "to select a name that honored the Indian culture of the area").) Part 123's prohibition on any references to "Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures" covers

the names, symbols, and images that Plaintiffs acknowledge have ties to Indigenous persons.  8 NYCRR § 123.1.

### C.   Arbitrary and discriminatory enforcement

Defendants argue that the FAQ Guidance "demonstrates the absence of opportunities for arbitrary enforcement" and "clearly answers" Plaintiffs' core question of whether public schools must retire names such as "Warriors" and "Thunderbirds."  (Defs.' Mem. 28.)

Plaintiffs argue that Part 123 leads to arbitrary enforcement because it "would allow one school district to maintain a particular team name, logo, or mascot, while prohibiting another school district from doing the same simply because it could not secure written approval from a federally or state-recognized Indian tribe."  (Am. Compl. ¶ 144; Pls.' Opp'n 27–33.)  In support, Plaintiffs argue that the fact that the Wantagh/Wyandanch Plaintiffs would be prohibited from using the Warriors name, while Part 123 "allow[s] other schools, like Chenango Valley Central School District to[] continue to use the Warriors name," (Pls.' Opp'n 32),  and "allow[s] the Salamanca City Central School District to maintain its Warriors name *and logo* depicting a Native American male" illustrates the regulation's arbitrariness, (*id.* at 30).  Plaintiffs argue that "Part 123's inherent vagueness is exacerbated by the fact that Part 123 is a self-policing regulation" and that the FAQ Guidance creates "blatant inconsistenc[ies]" that in turn create "incurable void-for-vagueness concerns."  (*Id.* at 28–29.)  Plaintiffs contend that, "[d]espite being a self-policing regulation," Part 123 contains no "standards or criteria for school districts to determine the meaning, scope and application of the regulation and its prohibition[s]."  (*Id.* at 28.)  Plaintiffs also contend that the FAQ Guidance's prohibition on "any name, logo, or mascot that bore any connection to Native American culture at any point in time" is an "impermissible

expansion of the definition of 'Indigenous name, logo, or mascot' as set forth in Part 123" and is inconsistent with the regulation itself. (*Id.* at 29.)

A statute provides explicit standards when "either: (1) the 'statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement;' or (2) 'even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute.'" *VIP of Berlin*, 593 F.3d at 191 (quoting *Farrell,* 449 F.3d at 494); *Cunney*, 660 F.3d at 622 (explaining that determining whether an ordinance provides explicit standards involved a two-part inquiry into whether (1) the ordinance provides sufficiently clear enforcement standards, and (2) the conduct falls within the core of the of the ordinance's prohibition (quoting *Farrell*, 449 F.3d at 494)). A statute authorizes or encourages discriminatory enforcement when it fails to "provide explicit standards for those who apply" the statute. *Cunney,* 660 F.3d at 621 (citing *Grayned*, 408 U.S. at 108–09); *Thibodeau*, 486 F.3d at 66 (explaining that the vagueness "doctrine does not require 'meticulous specificity' from every statute" because "language is necessarily marked by a degree of imprecision" (first quoting *Grayned*, 408 U.S. at 110, and then quoting *Farrell*, 449 F.3d at 485)).

Part 123 provides the following exceptions for schools and their employees:

> (a) Tribal Use. Nothing in this section shall be construed to prohibit a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation from choosing to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including a tribal school or intramural league.

> (b) Tribal Approval. This Part shall not apply where a written agreement exists prior to the effective date of this part between a

> federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe. A public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement. The tribal nation shall have the right and ability to revoke any such agreement at any time. Upon termination of such an agreement, the public school shall have the remainder of the school year in which such agreement is revoked and one additional school year to discontinue its use of an Indigenous name, logo, or mascot.

8 NYCRR § 123.4.

The Court finds that these challenged provisions are not arbitrary or discriminatory as-applied to Individual Board Member Plaintiffs because the definitions provide sufficiently clear standards to determine whether a specific schools name, logo, or mascot is prohibited by Part 123. The court in *VIP of Berlin* similarly found that enforcement of the adult-oriented business provision was not arbitrary or discriminatory "[f]or the same reasons that it gave [the business] adequate notice," namely that "[t]he plain meaning of the ordinance . . . is not vague" and therefore "does not encourage or authorize arbitrary enforcement." *VIP of Berlin*, 593 F.3d at 191–93 (explaining that "twelve percent of its stock in trade . . . falls 'within any reasonable understanding of the [ordinance's language]'" that applied zoning restrictions to businesses that had a substantial portion of adult merchandise as its stock in trade (quoting *Farrell*, 449 F.3d at 490)); *see also Farrell*, 449 F.3d at 476, 483 (finding that a special condition prohibiting an individual from possessing "pornographic materials" had "provided adequate standards for the parole officers to determine whether" a parolee could possess a certain publication); *Dickerson v. Napolitano*, 604 F.3d 732, 746–49 (2d Cir. 2010) (finding that the defendants' misuse of fake police badges struck at the "core concern" of New York City statute criminalizing possession without authority of "insignia or emblem in any way resembling that worn by members of the

police force," and therefore enforcement of the statute was not arbitrary and capricious "despite the unfortunate breadth of the statute" and challenges in interpreting the literal meaning of the statute). Like the "substantial or significant" language in *VIP of Berlin*, Part 123's definition of prohibited Indigenous cultural reference provides clear standards through which schools can determine whether their names, logos, and mascots are prohibited Indigenous cultural references. Moreover, neither the "Tribal Use" nor the "Tribal Approval" exceptions lead to arbitrary or discriminatory enforcement. *See United States v. Farhane*, 634 F.3d 127, 142 (2d Cir. 2011) (finding that "the statutory exemption of 'medicine' from the definition of 'material support'" that can be provided to a terrorist did not render the statute unconstitutionally vague); *Rubin*, 544 F.3d at 465, 470 (providing that Medicaid charging regulations that had "unwritten exceptions" in practice for "ongoing contracts or for discounted rates for prompt billing" was not void-for-vagueness as applied to the petitioner because "exceptions do not render the regulation vague as applied"); *see also J & J Sports Prods., Inc. v. Patin*, 358 F. Supp. 3d 318, 323 (S.D.N.Y. 2019) (finding that a statute defining "cable system" which included "stated exceptions" was "neither so vague that people of ordinary intelligence would not understand them, nor encourage arbitrary and discriminatory enforcement"); *Maages Auditorium v. Prince George's Cnty., Maryland*, 681 F. App'x 256, 263–64 (4th Cir. 2017) (finding that a zoning code's "special exception" provision, which allowed adult entertainment businesses to remain in non-conforming locations, was not unconstitutionally vague because "the terms challenged here all have readily ascertainable meanings based on context and dictionary definitions, which sufficiently guide zoning officials in the exercise of their authority"). Further, although Individual Board Member Plaintiffs argue that Part 123's FAQ Guidance "raises incurable void-for-vagueness concerns" by expanding the definitions of what the regulation prohibits, (Pls.' Opp'n 29), the additional guidance actually

remedies their void-for-vagueness concerns because the FAQ Guidance answers questions regarding how to determine whether a school's team name, logo, or mascot has been associated with Indigenous peoples and where to submit further inquiries. *See Hoffman Estates*, 455 U.S. at 498 (recognizing that economic regulation may be subject to a lower standard where parties "have the ability to clarify the meaning of the regulation by [their] own inquiry, or by resort to an administrative process"); (FAQ Guidance 5–11). Accordingly, the Court finds that Part 123 is constitutional as-applied to Individual Board Member Plaintiffs. The Court therefore grants Defendants' motion and dismisses Individual Board Member Plaintiffs' as-applied vagueness claims.

### 2. Individual Board Member Plaintiffs' Fourteenth Amendment-based facial vagueness challenge

Because Individual Board Member Plaintiffs have failed to state a plausible as-applied vagueness claim to Part 123, (*see supra* section II.b.ii.1), the Court grants Defendants' motion to dismiss their facial vagueness claim.

"When considering a facial challenge to the . . . vagueness of a statute as measured against the [F]irst [A]mendment, 'a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *Dorman*, 862 F.2d at 436 (quoting *Hoffman Estates*, 455 U.S. at 494); *see also Farrell*, 449 F.3d at 496 ("Facial vagueness challenges may go forward only if the challenged regulation 'reaches a substantial amount of constitutionally protected conduct.'") (quoting *Kolender*, 461 U.S. at 358 n.8 (1983)); *Helms Realty Corp. v. City of New York*, 320 F. Supp. 3d 526, 533 (S.D.N.Y. 2018) (finding that "[w]hether [the plaintiff] can mount a facial challenge to [the challenged law] depends . . . on whether it reaches constitutionally protected speech, which in turn requires a [c]ourt to examine the (ambiguous and unambiguous) scope of the statute").

To decide whether a statute reaches a substantial amount of constitutionally protected conduct, the Court "must first determine whether the [ordinance at issue] will have a substantial chilling effect on protected conduct." *Farrell*, 449 F.3d at 497 (citing *United States v. Loy*, 237 F.3d 251, 259 (3d Cir. 2001)). "In determining whether a regulation reaches substantial protected conduct, [a court] must consider everything that falls within the ambiguous scope of the" challenged regulation. *Id.* (citing *Hoffman Estates*, 455 U.S. at 494 n.6); *see also Helms Realty Corp.*, 320 F. Supp. 3d at 533 (same (quoting *Farrell*, 449 F.3d at 497)). "Because the permissibility of a facial challenge sometimes depends upon whether the challenged regulation was constitutional as applied to the plaintiff, '[a] court should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law.'" *Farrell*, 449 F.3d at 485 (quoting *Hoffman Estates*, 455 U.S. at 495). This is because, to succeed on a facial vagueness challenge, "the [plaintiff] must demonstrate that the law is impermissibly vague in all of its applications." *See Hoffman Estates*, 455 U.S. at 497; *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) ("A facial challenge is 'the most difficult challenge to mount successfully' because, as a general matter 'the challenger must establish that no set of circumstances exists under which the Act would be valid.'" (quoting *Salerno*, 481 U.S. at 745)).

Individual Board Member Plaintiffs have failed to state a facial vagueness claim. As discussed *supra*, (*see supra* section II.b.ii.1), Part 123 is constitutional as-applied to Individual Board Member Plaintiffs. Thus, Individual Board Member Plaintiffs have not "establish[ed] that no set of circumstances exists under which" the regulation would be valid. *Copeland*, 893 F.3d

43

at 110 (quoting *Salerno*, 481 U.S. at 745); *see also Holder*, 561 U.S. at 20 ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (quoting *Hoffman Estates,* 455 U.S. at 495)); *Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir. 2008) ("Because plaintiffs have failed to plead facts establishing that Article 65 is unconstitutional as applied to them, they necessarily fail to state a facial challenge, which requires them to 'establish that no set of circumstances exists under which the [statute] would be valid.'" (alteration in original) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.,* 318 F.3d 105, 110 (2d Cir. 2003))).

Accordingly, the Court finds that Individual Board Member Plaintiffs have not plausibly alleged that Part 123 is facially vague and grants Defendants' motion to dismiss their facial vagueness claims.

### 3. Individual Board Member Plaintiffs' First Amendment-based facial overbreadth challenge to Part 123

Defendants contend that Individual Board Member "Plaintiffs' overbreadth claim fails on all fronts." (Defs.' Mem. 29.) In support, Defendants argue that the regulation's prohibition on school district employees displaying Indigenous names or imagery while on school property or at school functions (1) is narrow, and (2) does not implicate the First Amendment. (*Id.*) Defendants emphasize that the FAQ Guidance "removes any doubt that Section 123.5 is limited to its narrow confines." (*Id.*)

Plaintiffs contend that Part 123 as a whole is facially overbroad "because a substantial number of its applications are unconstitutional, judged in relation to its purported legitimate sweep." (Pls.' Opp'n 25.) Plaintiffs argue that the regulation "lacks any tailoring to Defendants' purported goal, which is to prevent DASA violations," and "creates a sweeping policy-based determination that strays far beyond the scope of the allegedly enabling statute of DASA." (*Id.*

at 26.)  In support, Plaintiffs emphasize that Part 123 "purports to end discrimination and harassment in school districts it has not even demonstrated existed in the first place."  (*Id.*)  Plaintiffs argue that Part 123's broad sweep "creates an unnecessary risk of chilling the speech and expression of school employees, and the school community at large, in violation of the First Amendment."  (*Id.*)

"A law is unconstitutionally overbroad if it punishes a substantial amount of protected free speech, judged in relation to its plainly legitimate sweep."  *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 127 n.8 (2d Cir. 2014) (quoting *Farhane*, 634 F.3d at 136); *United States v. Thompson*, 896 F.3d 155, 163 (2d Cir. 2018) ("[T]o be struck as overbroad, the statute must be overbroad 'not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.'" (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)), *cert. denied,* 139 S. Ct. 2715 (2019); *Adams v. Zenas Zelotes*, 606 F.3d 34, 38 (2d Cir. 2010); *see also Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) ("There are two quite different ways in which a statute or ordinance may be considered invalid 'on its face' — either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'"); *Sorrell*, 758 F.3d 127 (describing the two "different ways in which a statute may be considered invalid 'on its face'" (quoting *Taxpayers for Vincent*, 466 U.S. at 796)); *see also United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019) ("Overbreadth challenges are a form of First Amendment challenge and an exception to the general rule against third-party standing . . . . Thus, '[a]ll overbreadth challenges are facial challenges'") (citing *Farrell*, 449 F.3d at 498); *Farrell*, 449 F.3d at 498 ("All overbreadth challenges are facial challenges, because an overbreadth challenge by its

nature assumes that the measure is constitutional as applied to the party before the court.").[19]

The Supreme Court has described an overbreadth challenge as "limited" and has noted that its

force weakens as the regulated behavior at issue "moves from 'pure speech' toward conduct and

that conduct — even if expressive — falls within the scope of otherwise valid criminal laws."

*Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973); *Farhane*, 634 F.3d at 136–37 (noting that

"invalidat[ing] *all* enforcement of a challenged law . . . is 'strong medicine'" (quoting *Williams*,

553 U.S. at 292)); *see also Gospel Missions of Am. v. City of Los Angeles*, 419 F.3d 1042, 1050

(9th Cir. 2005) ("[T]he overbreadth doctrine's concern with 'chilling' protected speech

attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from

'pure speech' toward conduct." (alteration in original) (quoting *Virginia v. Hicks*, 539 U.S. 113,

124 (2003))); *United States v. Richards*, No. 13-CR-818, 2014 WL 3765712, at *3 (S.D.N.Y.

July 29, 2014) (quoting *Broadrick*, 413 U.S. at 615).

"[T]he first step in overbreadth analysis is to construe the challenged statute; it is

impossible to determine whether a statute reaches too far without first knowing what the statute

covers." *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quoting *Williams*, 553 U.S. at 293).

---

[19] Plaintiffs contend — and Defendants do not disagree — that the overbreadth doctrine is an exception to the rule against third-party standing. (Defs.' Mem. 29; Pls.' Opp'n 24–25.) Because Defendants have not challenged Plaintiffs' third-party standing, the Court considers the claims of hypothetical third parties in its evaluation of Individual Board Member Plaintiffs' overbreadth challenge. However, because School District Plaintiffs, School Board Plaintiffs, and Individual Board Member Plaintiffs suing in their official capacity lack capacity to assert a First Amendment violation, the Court does not address their overbreadth claims. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 382 (2d Cir. 2021) ("Capacity to sue addresses only whether a person or company that possesses an enforceable right may act as a litigant." (citing *Horowitz v. 148 S. Emerson Assocs. LLC*, 888 F.3d 13, 19 n.4 (2d Cir. 2018))); *Town of Babylon*, 707 F. Supp. 3d at 221 (explaining that "[c]apacity, unlike standing, is ordinarily not a jurisdictional issue . . . a party must maintain its capacity to sue throughout litigation, and lack of capacity is grounds for dismissal." (quoting *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 267 (S.D.N.Y. 2019) (internal quotation marks and citations omitted))).

The second step is to determine whether the statute, as construed by the court, "prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 292; *see also Adams*, 606 F.3d at 38 (noting that determining whether the statute as construed "reach[es] 'a substantial amount of protected expressive activity'" is the "second step in an overbreadth analysis" (quoting *Williams*, 553 U.S. at 297)). "[I]n considering facial challenges we must 'vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.'" *Adams*, 606 F.3d at 38 (quoting *Williams*, 553 U.S. at 292).

"The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)); *see Radwan v. Manuel*, 55 F.4th 101, 115 (2d Cir. 2022) ("The protections of the First Amendment are not limited to spoken words, but rather include gestures and other expressive conduct, even if vulgar or offensive to some."). "To determine whether conduct is expressive and entitled to constitutional protection requires an inquiry into whether activity is 'sufficiently imbued with the elements of communication to fall within the scope of the First . . . Amendment[].'" *Muchmore's Cafe, LLC*, 2016 WL 11469539, at *11 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (holding that burning a flag in protest is expressive conduct protected under the First Amendment)). To determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," a court must analyze "whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (alterations in original) (quoting *Johnson*, 491 U.S. at 404). "[A]n activity need not necessarily embody 'a narrow, succinctly articulable message,' . . . but the reviewing court must

find, at the very least, an intent to convey 'a particularized message' along with a great likelihood that the message will be understood by those viewing it." *Zalewska v. County of Sullivan*, 316 F.3d 314, 319 (2d Cir. 2003) (citation omitted) (first quoting *Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995); and then quoting *Johnson*, 491 U.S. at 404).

However, that "something is in some way communicative does not automatically afford it constitutional protection. For purposes of the First Amendment, the Supreme Court has repeatedly rejected the view that 'an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends . . . to express an idea.'" *Muchmore's Cafe, LLC*, 2016 WL 11469539, at *11 (quoting *Zalewska*, 316 F.3d at 319); *see also Stevens*, 559 U.S. at 468 (stating that the First Amendment "permit[s] restrictions" on some types of speech, including obscenity, defamation, fraud, incitement, and "speech integral to criminal conduct"). "Therefore, a court determining whether 'an activity [i]s sufficiently imbued with elements of communication to fall within the scope of the First . . . Amendment[],' must examine the 'nature' of the activity 'combined with the factual context and environment in which it was undertaken.'" *Muchmore's Cafe, LLC*, 2016 WL 11469539, at *11 (alterations in original) (quoting *Spence v. Washington*, 418 U.S. 405, 409–10 (1974)); *see also Lebowitz v. City of New York*, 606 F. App'x 17, 17 (2d Cir. 2015) ("We agree with the [Occupy Wall Street] plaintiffs that their act of lying down in Zuccotti Park under the circumstances presented likely demonstrated '[a]n intent to convey a particularized message . . . [and] the likelihood was great that the message would be understood by those who viewed it,' such that they engaged in protected expressive conduct." (second alteration in original) (quoting *Johnson*, 491 U.S. at 404)); *Zalewska*, 316 F.3d at 320 ("The Supreme Court has been careful to distinguish between

48

communicative activity with a clear contextual message, such as the wearing of a black armband in protest during the Vietnam War, compared with other types of activity, like choosing what to wear in the ordinary course of employment." (citing *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 507–08 (1969))).

In construing whether First Amendment protected activity is covered by Part 123, "[t]he language of the [l]aw itself is . . . the proper starting point." *Muchmore's Cafe, LLC*, 2016 WL 11468539, at *8; *see also New York v. Mountain Tobacco Co.*, 942 F.3d 536, 546 (2d Cir. 2019) ("The plain meaning [of a statute] is best discerned by 'looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'" (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003))); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 155 (2d Cir. 2013) (stating that statutory analysis begins with a "review [of] the statutory text, considering . . . the placement and purpose of those words in the statutory scheme") (quoting *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir. 2009)), *cert. dismissed*, 569 U.S. 1040 (2013).

Part 123 prohibits the use of Indigenous names, logos, or mascots.  8 NYCRR §§ 123.1–123.5.  The regulation states that "no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction."  8 NYCRR § 123.2.  Part 123 defines "Indigenous name, logo, or mascot" as:

> [A] name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such schools sports teams. It does not include a public school, school building, or school district named after an Indigenous tribe.

*Id.* § 123.1.  The language of Part 123 appears to directly implicate expressive activity in the form of using an Indigenous name, logo, or mascot in schools or at school functions.  *Id.*  The

regulation does not expressly distinguish between uses that honor Indigenous cultures and uses that are derogatory, but the regulation does permit public schools to continue using an Indigenous name, logo, or mascot with permission from a recognized tribe. *See, e.g.*, *id.* § 123.4(b) (permitting the use of Indigenous imagery "where a written agreement exists prior to the effective date of this part between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school"). Although the regulation prohibits school officers and employees from "utilizing or promoting any Indigenous name, logo, or mascot" while "on school property or at school function[,]" it contains no similar prohibition for members of the public. *See id.* § 123.5. The language of "utilizing or promoting" suggests that public school officers and employees are prohibited from wearing team apparel when it displays an Indigenous name, logo, or mascot.

Neither Plaintiffs nor Defendants cite any decisions of other courts that have examined Part 123 or a similar regulation in an effort to determine its scope and sweep, and the Court is not aware of any. The regulation of a public school's use of Indigenous names, logos, and mascots is an emerging issue in the First Amendment context. In one case involving the use of Indigenous symbols for a university sports team, the court found that the action implicated First Amendment rights. *See Crue v. Aiken*, 204 F. Supp. 2d 1130, 1134 (C.D. Ill. 2002), *aff'd*, 370 F.3d 668 (7th Cir. 2004). In *Crue*, the University of Illinois implemented a preclearance directive which required "all faculty, staff and students at the University" to obtain the university's permission before contacting prospective student athletes. *Id.* The plaintiffs sought to inform prospective students regarding the "concerns of Native Americans with respect to the Chief Illiniwek [mascot] controversy," and challenged the university's "preclearance directive" on overbreadth grounds. *Id.* at 1134–35. The court found that the preclearance directive

50

implicated the faculty and students' rights under the First Amendment to engage in expressive speech. *Id.* at 1142–46.

Similar to the preclearance directive in *Crue* that prohibited communications from all students, faculty, and employees, Part 123.5 prohibits all "school officers and employees" from using any Indigenous name, logo, mascot.[20]  However, Individual Board Member Plaintiffs only make a bare assertion that Part 123.5 "reaches a substantial amount of constitutionally protected First Amendment activity through viewpoint and/or content-based restrictions" that subsequently chills free speech.  (Am. Compl. ¶¶ 148, 158.)  Although Plaintiffs assert the regulation implicates Individual Board Member Plaintiffs' "expressive conduct through wearing [team] apparel" in violation of the First Amendment, (*id.* ¶ 158), as discussed *infra*, (*see infra* section II.b.iii.2.), Individual Board Member Plaintiffs have failed to plead sufficient facts to support their claim that the conduct of such school officials and employees is on a matter of public concern and therefore within the scope of the First Amendment's protection.  *See Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 200, 207–08 (2d Cir. 2004) (finding no First Amendment implications where the "element [of a uniform] has no independent or incremental expressive value" in a case where Ku Klux Klan members challenged New York's anti-mask law); *Zalewska,* 316 F.3d at 319–20 (holding that a female employee's choice to wear a skirt, while expressive, "d[id] not constitute the type of expressive conduct which would allow her to invoke the First Amendment" because "no particularized communication can be divined simply from a woman wearing a skirt").  Because Plaintiffs have not sufficiently alleged that such conduct of school officials and employees implicates protected speech, the Court does not reach

---

[20]  Individual Board Member Plaintiffs make no argument as to the First Amendment implications of Part 123.1–4.  (Am. Compl. ¶¶ 150–171.)

the question of whether Part 123 is a substantial burden on free speech. The Court therefore grants Defendants' motion to dismiss the overbreadth claim for failure to state a claim and grants Individual Board Member Plaintiffs leave to amend their Complaints to allege sufficient facts supporting their overbreadth claim.

### iii. Individual Board Member Plaintiffs' First Amendment free speech claims

Defendants argue that the Court should grant their motion to dismiss Individual Board Member Plaintiffs' free speech claims for failing to state a claim under the First Amendment because they are barred by the government speech doctrine. (Defs.' Mem. 30–36.) First, Defendants argue that the Indigenous team names, logos, and mascots themselves are government speech because such symbols (1) "have a long history of communicating government messages to students as well as the public at large," (2) "are perceived as closely identified with the schools they represent," and (3) school districts' choices in team names, logos, and mascots are subject to the "final approval authority" of New York State. (*Id.* at 31–32.) Second, Defendants argue that Individual Board Member Plaintiffs' conduct of wearing team apparel on school grounds and at school functions is government speech because (1) they are speaking as government employees, and (2) they are not speaking on a matter of public concern. (*Id.* at 33–36.) The Court addresses each argument below.

### 1. Indigenous names, logos, and mascots as government speech

Defendants argue the Indigenous team names, logos, and mascots "are quintessential government speech, and 'therefore [are] not subject to scrutiny under the Free Speech Clause.'" (Defs.' Mem. 30 (first citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009); and then citing *Bank v. N.Y. State Dep't of Ag. & Markets*, No. 21-CV-642, 2022 WL 293812, at *5 n.2 (N.D.N.Y. Feb.1, 2022)); Defs.' Reply 22–30.) In support, Defendants argue, first, that

"school team names, logos, and mascots have a long history of communicating government messages to students as well as the public at large."  (Defs.' Mem. 31; Defs.' Suppl. Reply 1.) Second, Defendants argue that the "school team names, logos, and mascots are perceived as closely identified with the schools they represent."  (Defs.' Mem. 31; Defs.' Suppl. Reply 1.) Defendants argue that Massapequa Plaintiffs' allegations that "you will see most people [at school events] are sporting 'Chiefs' apparel" and "the phrase 'Once a Chief, always a Chief' can be heard throughout the schools and community at large" show that the team names, logos, and mascots "convey[] some message on the school's behalf."  (Defs.' Mem. 31 (brackets omitted) (citing *Pleasant Grove*, 555 U.S. at 471); Defs.' Suppl. Reply 1–2.)  Third, Defendants argue that "the choice of team names and imagery is nevertheless government speech because it is effectively controlled by school districts, subject to the 'final approval authority' of the State." (Defs.' Mem. 32 (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015)).)  Lastly, Defendants argue that Plaintiffs "sidestep Defendants' demonstration that the school sports teams names and imagery at issue are government speech" by merely asserting that this doctrine is the inappropriate lens for analyzing Individual Board Member Plaintiffs' free speech claims.  (Defs.' Suppl. Reply 1.)

Individual Board Member Plaintiffs argue that "the 'government speech doctrine' is not the appropriate lens through which to analyze the free speech claims."  (Pls.' Suppl. Mem. 1; Pls.' Opp'n 41–44.)  In support, Plaintiffs argue that "Defendants cite factually distinguishable law, all of which applied the government speech doctrine to things like monuments, posters, and license plates."  (Pls.' Opp'n 43.)  Plaintiffs contend that "[w]hile a team logo may constitute government speech when affixed on a school district website, in an official letterhead, or a gymnasium wall," a school community member's expressive clothing worn "off-the-clock"

constitutes activity protected by the First Amendment.  (*Id.* at 43; Pls.' Suppl. Mem. 1.)

Plaintiffs also argue that "unlike posters, banners, and bulletin boards, . . . clothing has long

served as a canvas for an individual's First Amendment-protected express activity."  (Pls.' Opp'n

44.)

"The First Amendment, applicable to the States through the Fourteenth Amendment,

prohibits the enactment of laws 'abridging the freedom of speech.'"  *Reed v. Town of Gilbert*,

576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I); *Raymond v. City of New York*, 715 F.

Supp. 3d 402, 408 (E.D.N.Y. 2024) (quoting *Reed*, 576 U.S. at 163) (same).  However, when a

government "'engag[es] in [its] own expressive conduct, then the Free Speech Clause has no

application' because, while the First Amendment 'restricts government regulation of *private*

speech,' it does not restrict the *government's* speech."  *Women for Am. First v. Adams*, No. 21-

485, 2022 WL 1714896, at *2 (2d Cir. May 27, 2022) (emphasis and alterations in original)

(quoting *Pleasant Grove*, 555 U.S. at 467); *see also Walker*, 576 U.S. at 207 ("[G]overnment

statements (and government actions and programs that take the form of speech) do not normally

trigger the First Amendment rules").  "Thus, when the government speaks for itself, 'it is not

barred by the Free Speech Clause from determining the content of what it says,' and 'is entitled

to favor certain views over others.'"  *Women for Am. First*, 2022 WL 1714896, at *2 (first

quoting *Walker*, 576 U.S. at 207; then quoting *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 34

(2d Cir. 2018)); *Raymond*, 715 F. Supp. 3d at 409 (quoting *Women for Am. First*, 2022 WL

1714896, at *2) (same).

> To determine whether contested speech is government or private,
> the Supreme Court has identified three primary factors: (1) whether
> the medium has historically been used to "communicate messages
> from the States"; (2) whether the medium is "often closely identified
> in the public mind with the State," *i.e.*, whether it is reasonably
> interpreted as "conveying some message on the [government's]

behalf"; and (3) whether the government maintains direct, editorial control over the message's content.

*Women for Am. First*, 2022 WL 1714896, at *2 (quoting *Walker*, 576 U.S. at 210–13, 219); *Raymond*, 715 F. Supp. 3d at 409 (same); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022) (explaining a school coach engaged in private speech, not government speech, when he uttered prayers without his players at midfield); *Shurtleff v. City of Bos.*, 596 U.S. 243, 252 (2022) (explaining that "[t]he boundary between government speech and private expression can blur when . . . a government invites the people to participate in a program" and the court must "conduct a holistic inquiry to determine whether the government intends to speak for itself" in such situations). The Supreme Court exercises "great caution before extending . . . government-speech precedents," because of the risk that "private speech could be passed off as government speech" and "silence[d] or muffle[d]" by "simply affixing a government seal of approval." *Matal v. Tam*, 582 U.S. 218, 219, 237–38 (2017) (finding that registered trademarks are not government speech); *Wandering Dago*, 879 F.3d at 35 (quoting *Matal*, 582 U.S. at 219).

The Court finds that a school district's team names, logos, and mascots when worn on school team apparel is not government speech because, even assuming school team apparel has a history of communicating messages from the states, the display of team names, logos, and mascots on apparel is not "closely identified in the public mind" with New York State. *See Walker*, 579 U.S. at 209–13 (finding that Texas license plate designs are closely associated with Texas because "[e]ach Texas license plate is a government article serving the governmental purposes of vehicle registration and identification"); *Matal*, 582 U.S. at 238 (explaining that "*Walker* . . . likely marks the outer bounds of the government-speech doctrine"); *New Hope Fam. Servs. v. Poole*, 966 F.3d 145, 171 (2d Cir. 2020) (explaining that "the mere fact that government authorizes, approves, or licenses certain conduct does not transform the speech engaged in

therein to government speech."); *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074–76 (11th Cir. 2015) (finding that banners advertising a private business on school grounds are government speech in part because the "banners are hung on school fences, and government property is 'often closely identified in the public mind with the government unit that owns the land.'" (quoting *Pleasant Grove,* 555 U.S. at 472)). Although Defendants argue that the team names, logos, and mascots themselves are government speech, (Defs.' Mem. 31–32), Plaintiffs have only alleged that Part 123 implicates their ability to wear these symbols on the "medium" of school team apparel. (Am. Compl. ¶ 171; 23-CV-7696 Am. Compl. ¶ 193; 23-CV-7229 Am. Compl. ¶¶ 218, 227.) Unlike in *Walker* where the license plates functioned as "essentially, government IDs," apparel with a school's team name, logo, or mascot is merely worn as a source of school pride and to support the school community — not as a method of government identification. (Am. Compl. ¶¶ 161, 166); *see Walker*, 579 U.S. at 212 (finding that license plates are closely associated with Texas because "every Texas license plate is issued by the state," the state name appears "in large letters at the top of every plate," Texas vehicle owners are required to display Texas license plates, Texas "owns the designs on its license plates," and Texas determines how drivers can dispose of unused plates). Further, unlike the license plates in *Walker* that included the state name on the license plate, the logos, team names, and mascots displayed on the school team apparel do not reference "New York." (Am. Compl. ¶ 47; 23-CV-7696 Am. Compl. ¶¶ 73–76; 23-CV-7299 Am. Compl. ¶¶ 54–55); *see Walker*, 579 U.S. at 212 (explaining that the "governmental nature of the plates is clear from their faces" because "the [s]tate places the name 'TEXAS' in large letters at the top of every [license] plate"). Accordingly, these symbols on team apparel do not allow the public to "appreciate the identity of the speaker" as New York State. *Pleasant Grove*, 555 U.S. at 471.

In addition, New York maintains minimal control over usage of the school team apparel with team names, logos, and mascots. *Appeal of McMillan*, 61 Ed. Dept. Rep., Decision No. 18,058 (citing *Appeal of Tobin*, 25 Ed. Dept. Rep. 301, Decision No. 11,591) (discussing how "a board of education generally has discretion to determine 'the propriety of [a sports] team name,'" and "may abuse its discretion if a team name mascot, or logo inhibits the creation of 'a safe and supportive [learning] environment'"); *Walker*, 579 U.S. at 209–13 (finding that Texas's prohibition against the display of the confederate flag on specialty license plates is government speech in part because "Texas maintains direct control over the messages conveyed on its specialty plates" by exercising "final approval authority").  Unlike in *Walker*, where Texas "actively exercised" its authority to have "sole control over the design, typeface, color, and alphanumeric pattern for all license plates," New York only reviews a board of education's choices in team name for an abuse of discretion.  *Walker*, 579 U.S. at 209–13; *Appeal of Tobin*, 25 Ed. Dept. Rep. 301, Decision No. 11,591 ("Such decisions [regarding sports team names, mascots and logos] will only be reversed upon a showing that a board abused its discretion."); *see also Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F. 4th 1266, 1292–93 (11th Cir. 2024) (finding that a school athletic association's denial of a school's request to present a prayer over the announcement system fell outside of the First Amendment because announcements over the public announcement system, including those by private parties, are perceived to be government speech); *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1082 (8th Cir. 2024) (holding that Black Lives Matter posters placed in public schools were not government speech because the school district relinquished control by allowing "private persons, including 'staff and families' in the District" to place posters on school walls); *Shurtleff*, 596 U.S. at 256–57 (finding that a city's flag-raising program was not government speech where the

city did not exercise sufficient control over the program because "[t]he city's practice was to approve flag raisings, without exception" and "ha[d] no record of [previously] denying a request"). Further, in at least one instance, the team apparel bearing the school team name, logo, and mascot is not exclusively provided by New York State or its public schools. (Am. Compl. ¶ 54 ("At any school or community function, you will see most people are sporting 'Chiefs' apparel, which is not only sold in the Massapequa High School Chiefs Apparel Store, but in other privately-owned businesses around town.").) Because school team apparel is not closely associated with the state and there is no indication that the apparel is distributed subject to a "final approval authority," the school districts' team names, logos, and mascots are not government speech when displayed on school team apparel.

### 2. Individual Board Member Plaintiffs' conduct as government speech

Defendants argue, in the alternative, that Individual Board Member Plaintiffs' expressive conduct in wearing team apparel is government speech and that the "First Amendment is inapplicable to 8 NYCRR § 123.5 for the separate and independent reason that any speech related to such symbols is public employee speech." (Defs.' Mem. 33.) First, Defendants argue that Plaintiffs speak as government employees — not private citizens. (*Id.* at 33–34; Defs.' Suppl. Mem. 2.) Defendants contend that, within the "spatial confines" of school grounds and functions, any speech related to the Indigenous names, mascots, and logos, including display of such symbols to "support" the school community, "is inextricably intertwined with their official position as board members." (Defs.' Mem. 34; *see also* Defs.' Suppl. Reply 3.) In support, Defendants emphasize Individual Board Member Plaintiffs' "high level of authority and responsibility" and argue that Part 123 "expressly requires school boards to devise their school districts' plans to eliminate the use of Indigenous names and imagery." (Defs.' Mem. 34–35; *see*

*also* Defs.' Suppl. Mem. 3.)  Second, Defendants argue that Individual Board Member Plaintiffs'

Indigenous team apparel is not speech on a matter of public concern.  (*Id.* at 35.)  In support,

Defendants argue that Plaintiffs "do not allege any broader public statement associated with their

expressive conduct," (*id.* at 36), and any "proposed protest concerning the propriety of their

districts' Indigenous team names and logos would necessarily be 'part-and-parcel' of their

responsibility as board members to choose their districts' team names and logos," (Defs.' Suppl.

Mem. 2).  Defendants argue that "Plaintiffs can assert no First Amendment based claim,

retaliation or otherwise, without first satisfying the strictures of *Garcetti* [*v. Ceballos*, 547 U.S.

410 (2006)]."  (Defs.' Suppl. Reply 2.)  Third, Defendants argue that "[e]ven if the [Individual]

Board Member Plaintiffs had alleged a desire to act as private citizens on a matter of public

concern," Part 123 would pass the *Pickering*/*NTEU*[21] balancing test because "the State's policy

of ensuring a discrimination- and harassment-free learning environment for all students by

prohibiting the use of Indigenous names, mascots, and logos" outweighs Individual Board

Member Plaintiffs' interest in expressing support for their schools.  (Defs.' Mem. at 37–38; *see*

*also* Defs.' Suppl. Reply 3–4.)  Finally, Defendants argue that "Plaintiffs' belated attempt to

revise their claims should be rejected because 'Plaintiff[s] may not amend [their] [Amended]

[C]omplaint[s] through [their] opposition to a motion to dismiss and the Court is constrained in

---

[21] *United States v. Nat'l Treasury Emps. Union* ("*NTEU*")*,* 513 U.S. 454, 468 (1995) (explaining that where a ban "chills potential speech before it happens" that "Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." (first citing *Near v. Minnesota ex rel Olson*, 283 U.S. 697 (1931), and then quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 571 (1968))); *Pickering*, 391 U.S. at 568 (explaining that "[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

determining whether a claim's plausibility by what is contained on the face of the complaint.'" (Defs.' Suppl. Mem. 2 (first, second, and fifth alteration in original) (citing *Lyman v. NYS OASAS*, 928 F. Supp. 2d 509, 527 n.5 (N.D.N.Y. 2013)).)

Plaintiffs argue, first, that they are "not expressing government speech" because they are "engaging in associational activities and viewpoint expression as individuals, parents and members of the school community." (Pls.' Suppl. Mem. 1; *see also* Pls.' Opp'n 42–43 (first citing *Latino Officers Ass'n, N.Y., Inc. v. City of New York*, 196 F.3d 458, 468–69 (2d Cir. 1999); then citing *Kennedy*, 597 U.S. at 528–29).) Plaintiffs also argue that the government speech doctrine is inapplicable to Individual Board Member Plaintiffs because they are volunteer board of education members — not employees. (Pls.' Suppl. Mem. 2–3.) Second, Plaintiffs argue that they are engaged in a matter of public concern because "Individual [Board Member] Plaintiffs wear their team apparel to demonstrate pride in and approval of their respective team names." (Pls.' Opp'n 47.) Third, Plaintiffs argue that, as a prior restraint, Part 123.5 is subject to the more rigorous *NTEU* balancing test, not *Pickering*. (Pls.' Suppl. Mem. 2 (citing *Latino Officers Ass'n, N.Y., Inc.*, 196 F.3d at 464).) In support, Plaintiffs argue that Part 123 is unconstitutional under the *NTEU* balancing test because "Defendants have provided no examples of DASA violations relating to the Massapequa Chiefs, the Wantagh Warriors, the Wyandanch Warriors, . . . or the Connetquot Thunderbirds." (Pls.' Opp'n 48–49.) Finally, Plaintiffs argue that they are not required to "recite every basis for which [P]laintiffs engaged in activity protected by the First Amendment" and that their "[p]leadings must be construed so as to do justice," such as protesting the regulations at issue, in their initial pleadings. (Pls.' Suppl. Mem. 1 n.1 (first citing Fed. R. Civ. P. 8(a); and then quoting Fed. R. Civ. P. 8(e)).)

As the Supreme Court has made clear, public employees do not surrender their First

Amendment rights to comment on matters of public interest because of their employment. *See Garcetti*, 547 U.S. at 417 ("[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." (citations omitted)); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County*, 391 U.S. 563, 568 (1968) (noting that the Supreme Court has "unequivocally rejected" the notion that "teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work"); *see also Wrobel v. County of Erie*, 692 F.3d 22, 27 (2d Cir. 2012) ("Public employees do not surrender their First Amendment rights to comment on matters of public interest by virtue of their acceptance of government employment." (citations omitted)).

The Supreme Court has instructed courts to conduct a two-step inquiry into whether a public employee's speech is entitled to protection:

> The first [step] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question [then] becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Lane v. Franks*, 573 U.S. 228, 237 (2014) (quoting *Garcetti*, 547 U.S. at 418); *Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007) ("If the answer [to the first question] is yes, then the possibility of a First Amendment claim arises." (quoting *Garcetti*, 547 U.S. at 418)).[22] Thus, the

---

[22] Individual Board Member Plaintiffs' free speech claims under Article 1, Section 8 of

First Amendment protects a public employee for the employee's speech only if the employee

speaks "[1] as a citizen [2] on a matter of public concern."  *Singer v. Ferro*, 711 F.3d 334, 339

(2d Cir. 2013) (alterations in original) (quoting *Garcetti*, 547 U.S. at 418); *Specht v. City of New*

*York*, 15 F.4th 594, 600 ("The speech of a public employee is protected by the First Amendment

when the employee speaks as a citizen on a matter of public concern, rather than pursuant to his

employment responsibilities."); *Montero v. City of Yonkers*, 890 F.3d 386, 395 (2d Cir. 2018)

(same); *see also Eyshinskiy v. Kendall*, 692 F. App'x 677, 678 (2d Cir. 2017) ("The first inquiry

encompasses two separate questions: '(1) whether the subject of the employee's speech was a

matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an

employee.  If the answer to either question is no, that is the end of the matter.'" (quoting

*Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015))); *Garcia v. Hartford Police*

*Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) ("[T]he plaintiff must show that . . . the speech at

issue was made as a citizen on matters of public concern rather than as an employee on matters

of personal interest . . . ."); *Best Payphones Inc. v. Dobrin*, 410 F. Supp. 3d 457, 474 (E.D.N.Y.

2019) (same).  When an employee has spoken on a matter of public concern, "a court must

balance 'the employee's interest in expressing herself' against 'any injury the speech could cause

---

the New York State Constitution are subject to the same analysis as their First Amendment
claims.  *See Martinez v. Sanders*, 307 F. App'x 467, 468 & n.2 (2d Cir. 2008) (noting that the
plaintiff's "freedom of speech, political freedom and affiliation, and freedom of association"
claims under Article 1 § 8 of the New York State Constitution were "subject to the same
standards as the First Amendment claims" (citations omitted)); *Carter v. Inc. Vill. of Ocean
Beach*, 693 F. Supp. 2d 203, 212 (E.D.N.Y. 2010), *aff'd,* 415 F. App'x 290 (2d Cir. 2011)
("[F]ree speech claims under Article 1, Section 8 of the New York State Constitution are subject
to the same analysis as free speech claims under the First Amendment[.]"  (citations omitted));
*Hous. Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 199 n.25 (S.D.N.Y. 2001) ("Free speech
claims under the First Amendment and the New York State Constitution are subject to the same
standards[.]").  Because the Court dismisses Individual Board Member Plaintiffs' federal free
speech claims, the Court similarly grants Defendants' motion to dismiss Individual Board
Member Plaintiffs' state free speech claims.

to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Locurto v. Giuliani*, 447 F.3d 159, 172 (2d Cir. 2006) (citation and internal quotation marks omitted); *see Garcetti*, 547 U.S. at 418 (explaining that the court must consider "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public"); *Piscottano*, 511 F.3d at 270 (explaining how courts must consider whether the government "employer has shown that the employee's interest in expressing himself on that matter is outweighed by injury that the speech could cause to the employer's operations" (citations omitted)). The Second Circuit has held that the "public concern" requirement applies to associational conduct in addition to speech. *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004).

A matter of public concern is "is a question of law to be determined based on 'the content, form, and context of a given statement, as revealed by the whole record,'" including "whether the speech . . . had a broader public purpose," and "whether the speech can 'be fairly considered as relating to any matter of political, social, or other concern to the community'" *See Heim v. Daniel*, 81 F.4th 212, 228 (2d Cir. 2023) (first quoting *Connick*, 461 U.S. at 147–48 & n.7; then quoting *Singer*, 711 F.3d at 339; and then quoting *Lane*, 573 U.S. at 241); *Spencer*, 540 F. App'x at 70 ("A matter of public concern is one that relates to any matter of political, social, or other concern to the community." (alteration and internal quotation marks omitted) (quoting *Singer*, 711 F.3d at 339)); *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) ("[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication"). To determine whether speech is a matter of public concern, the Court must take into consideration the "content, form, and context" of the speech. *See Singer*, 711 F.3d at 339 ("Whether an

63

employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983))); *Spencer*, 540 F. App'x at 70 (same); *see also Adams*, 536 F. App'x at 145 ("Whether speech is a matter of public concern is . . . determined by the 'content, form and context of a given statement, as revealed by the whole record.'" (quoting *Connick*, 461 U.S. at 147–48 & n.7)); *Wells v. Saratoga Hosp.*, No. 24-CV-260, 2025 WL 391180, at *7 (N.D.N.Y. Feb. 4, 2025) ("Whether speech is on a matter of public concern is a question of law to be determined based on the content, form, and context of a given statement, as revealed by the whole record" (internal quotation marks omitted) (quoting *Heim*, 81 F.4th at 228)).

The court must also examine whether the speech addresses a personal grievance or has a public purpose. *Spencer*, 540 F. App'x at 70 ("Among the relevant considerations is whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." (quoting *Singer*, 711 F.3d at 339)); *see also Heim,* 81 F.4th at 228 (explaining that courts "look[] to, among other things, 'whether the speech . . . had a broader public purpose" in determining whether speech addresses matter of public concern (quoting *Singer*, 711 F.3d at 339)); *MacFall v. City of Rochester*, 495 F. App'x 158, 160–61 (2d Cir. 2012) (stating that speech is not protected if it is "merely 'calculated to redress personal grievances'" (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008))); *Wells*, 2025 WL 391180, at *7 ("[W]hen assessing whether speech was a matter of public concern, courts consider 'whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose.'" (quoting *Ruotolo*, 514 F.3d at 189)).  Although the court can consider the employee's motive, any such motive is not dispositive of the issue.  *Spencer*, 540 F. App'x at 70 ("The employee's motive for speaking 'surely may be one factor' in determining whether the

speech was on a matter of public concern, but motive 'is not, standing alone, dispositive or conclusive.'" (quoting *Sousa v. Roque*, 578 F.3d 164, 175 (2d Cir. 2009))).  "The fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern."  *Jackler v. Byrne*, 658 F.3d 225, 235–36 (2d Cir. 2011) (citations omitted).

When an employee speaks as a citizen on a matter of public concern, the Court must "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.  In situations involving prior restraints on such speech, "the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government.'"  *NTEU,* 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571); *Latino Officers Ass'n, N.Y., Inc.*, 196 F.3d at 463 (explaining that "the government's burden of justification is 'greater' with respect to . . . *ex ante* restrictions"); *Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998) ("The burden is particularly heavy where, as here, the issue is not an isolated disciplinary action taken in response to one employee's speech, but is, instead, a blanket policy designed to restrict expression by a large number of potential speakers").  The burden is on the government to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *NTEU*, 513 U.S. at 475 (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622,

664 (1994)); *Latino Officers Ass'n, N.Y., Inc.*, 196 F.3d at 463 (explaining that "the government 'must do more than simply posit the existence of the disease sought to be cured'").[23]

While the Court finds that Individual Board Member Plaintiffs spoke as citizens when wearing school apparel at school-affiliated events, Individual Board Member Plaintiffs have failed to allege that they were speaking on a matter of public concern when doing so. Accordingly, Individual Board Member Plaintiffs' speech does not garner First Amendment protections.[24]

---

[23] Plaintiffs argue that the Court must apply the *NTEU* balancing test regardless of whether the government employees have spoken as citizens on public concern. (Pls.' Suppl. Mem. 2.) In support, Plaintiffs primarily rely on the government speech analysis in *Latino Officers Ass'n.* (*Id.*) *See Latino Officers Ass'n, N.Y., Inc. v. City of New York*, 196 F.3d 458, 463, 465 (2d Cir. 1999) (holding that "the District Court properly subjected the defendants to the 'greater' burden of justification set forth in *NTEU*" when government employees challenged an New York Police Department "parade policy restrain[ing] speech 'before it occurs'" (citation omitted)). However, in applying the *NTEU* standard, the Second Circuit in *Latino Officers Ass'n,* examined whether the government employees had spoken on a matter of public concern. *See Latino Officers Ass'n, N.Y., Inc.* 196 F.3d at 466 (discussing how plaintiffs' interest in communicating ethnic pride as members of the NYPD is not necessarily a matter only of private concern when applying the heightened *NTEU* standard); *Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998) (discussing how the plaintiffs each had an interest "in being able to comment on matters of public concern" where the plaintiffs challenged a "prospective regulation" that operated as "a blanket policy designed to restrict expression by a large number of potential speakers"). Thus, contrary to Plaintiffs' argument, the Court finds it is appropriate to first examine whether the government employees have spoken as citizens on a matter of public concern.

[24] Although Plaintiffs contend that the government speech doctrine is inapplicable because they are volunteer board members, as opposed to employees, (Pls.' Suppl. Mem. 2), courts in the Second Circuit have applied the government speech doctrine to volunteers. *See Langton v. Town of Chester*, 168 F. Supp. 3d 597, 604 (S.D.N.Y. 2016) ("The Second Circuit has employed the public employee First Amendment claim analysis specifically with respect to volunteers." (first citing *Gorman–Bakos v. Cornell Co-op Extension of Schenectady Cnty.,* 252 F.3d 545, 549, 551–57 (2d Cir. 2001); and then citing *Monz v. Rocky Point Fire Dist.,* 519 F. App'x 724, 726–27 (2d Cir. 2013))); *see also Gorman–Bakos v. Cornell Co-op Extension of Schenectady Cnty.,* 252 F.3d 545, 549, 551–57 (2d Cir. 2001) (applying a First Amendment retaliation claim analysis to a case involving volunteer leaders for a youth program); *Monz,* 519 F. App'x at 726-27 (applying *Garcetti* to a volunteer firefighter's First Amendment claims);

### A.  Plaintiffs plausibly spoke as citizens

The wearing of team apparel while attending school games and functions is not part of each Individual Board Member Plaintiff's "employment responsibilities," as a school board member.  N.Y. Educ. L. § 1709 (describing how the powers and duties of a board of education member include, *inter alia*, "establish[ing] such rules and regulations concerning the order and discipline of the schools" and "prescrib[ing] the text-books to be used"); *Lane*, 573 U.S. at 237–40 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . . The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." (quoting *Garcetti*, 547 U.S. at 421)).  There is no indication that wearing team apparel is "part-and-parcel" of Individual Board Member Plaintiffs' ability to exercise their "official duties" as school board members.  *Montero*, 890 F.3d at 396 (quoting *Weintraub v. N.Y.C. Bd. of Educ. of City School Dist.*, 593 F.3d 196, 203 (2d Cir. 2010)); *United Veterans Mem'l and Patriotic Ass'n of the City of New Rochelle v. City of New Rochelle*, 72 F. Supp. 3d 468, 478 (S.D.N.Y. 2014) (finding that a veterans' association's display of a historical flag on a city flagpole was government speech that was excluded from First Amendment protections), *aff'd*, 615 F. App'x. 693 (2d Cir. 2015); *see also Kennedy*, 597 U.S. at 512–14, 529 (finding that a high school football coach "offer[ing] a quiet prayer of thanks" at

---

*Morton v. County of Erie*, 335 F. Supp. 3d 449, 452 (W.D.N.Y. 2018) (noting that the court previously dismissed a former elected legislator's First Amendment retaliation claim), *aff'd*, 796 F. App'x 40 (2d Cir. 2019); *Joinnides v. Floral Park-Bellerose Union Free Sch. Dist.*, No. 12-CV-5682, 2016 WL 3841096, at *15 (E.D.N.Y. July 13, 2016) (noting that "courts in th[e] [Second] Circuit have considered civic volunteers to be public employees in the context of First Amendment retaliation claims" and therefore finding framework applicable to plaintiff's conduct while serving on the school board's budget advisory committee).  The Court therefore applies a First Amendment claims analysis to Individual Board Member Plaintiffs' First Amendment free speech claims.

midfield after games was private speech because "he was not engaged in speech 'ordinarily within the scope' of his duties as a coach").  Rather than acting as representatives of the school, Individual Board Member Plaintiffs allege that they wear the school apparel in their roles as a "member of the school community, parent, and/or relative."  (Pls.' Opp'n 42–46; Am. Compl. ¶ 171.)  Plaintiffs therefore plausibly speak as citizens for purposes of First Amendment protection when they wear team apparel to school games and functions.

### B.  Matter of public concern

Each Plaintiff alleges that they wear their school team apparel at school functions to support their school community.  (Am. Compl. ¶ 166; 23-CV-7299 Am. Compl. ¶¶ 226, 230–32; 23-CV-7696 Am. Compl. ¶ 193.)  However, wearing team apparel to support a community does not convey a sufficiently particularized message to constitute a matter of public concern.  *See Roe*, 543 U.S. at 84 (finding that "there is no difficulty in concluding that [plaintiff's] expression does not qualify as a matter of public concern under any view of the public concern test" where the police officer made and sold sexually explicit videos and that because "[h]e fails the threshold test [then] *Pickering* balancing does not come into play"); *Church of Am. Knights of the Ku Klux Klan*, 356 F.3d at 200, 207–08 (holding that when "a statute banning conduct imposes a burden on the wearing of an element of an expressive uniform, which element has no independent or incremental expressive value, the First Amendment is not implicated" in a case where Ku Klux Klan members challenged New York's anti-mask law); *Zalewska,* 316 F.3d at 319–20 (holding that a female employee's choice to wear a skirt, while expressive, "did not constitute the type of expressive conduct which would allow her to invoke the First Amendment" because the message she "intend[ed] to convey [was] not a specific, particularized message, but rather a broad statement of cultural values" and because "the ordinary viewer would glean no

particularized message from [her] wearing of a skirt rather than pants as part of her uniform").

Accordingly, Plaintiffs' allegations contain no indication that their association with the

Indigenous team names, logos, and mascots are "relat[ed] to any matter of political, social, or

other concern to the community."[25] *Piscottano*, 511 F.3d at 253, 270, 274–76 (finding that "the

nature and character of the Outlaws [criminal organization] is a topic of public concern" and that

plaintiffs, who were correctional officers, engaging "in expressive conduct approving of the

Outlaws," such as wearing Outlaw colors and denying Outlaws chapters have engaged in

criminal activity, merit First Amendment protections (citing *Connick*, 461 U.S. at 146)); *see also*

*Latino Officers Ass'n, N.Y., Inc.,* 196 F.3d at 466, 468–69 (finding that "plaintiffs' interest in

communicating ethnic pride as members of the NYPD is not necessarily a matter only of private

---

[25] In their opposition, Plaintiffs argue that "wear[ing] Chiefs, Warriors, or Thunderbirds apparel to school events" is now a "political protest due to Part 123." (Pls.' Opp'n 34.) The Second Circuit has recognized that protests by government employees may constitute matters of public concern. *See, e.g.*, *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 207 (2d Cir. 2004) (holding that the "New York Police Department's parade policy likely ran afoul of the First Amendment by preventing the plaintiffs . . . from marching in parades while wearing their police uniforms to protest discrimination and misconduct within the police force"); *Zalewska v. County of Sullivan,* 316 F.3d 314, 320 (2d Cir. 2003) ("The Supreme Court has been careful to distinguish between communicative activity with a clear contextual message, such as the wearing of a black armband in protest during the Vietnam War, compared with other types of activity, like choosing what to wear in the ordinary course of employment.") (citing *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 507–08 (1969)). However, Individual Board Member Plaintiffs cannot amend their Complaint through their motion papers. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (rejecting claim raised for the first time in plaintiff's brief in opposition to the defendant's motion to dismiss); *D'Alessandro v. City of New York*, 713 F. App'x 1, 10 n.12 (2d Cir. 2017) (explaining that a court will "test the sufficiency of *a complaint* in response to a Rule 12(b)(6) motion to dismiss" and that a plaintiff is "not entitled to amend its complaint through statements made in motion papers." (first citing *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 94 (2d Cir. 2017); then quoting *Wright*, 152 F.3d at 178); *Haczynska v. Mount Sinai Health Sys., Inc.,* 738 F. Supp. 3d 300, 317 n.11 (E.D.N.Y. 2024) (explaining that "[i]t is axiomatic that the [c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss." (alteration in original) (collecting cases)); *Trooper 1 v. N.Y. State Police*, No. 22-CV-893, 2024 WL 3401196, at *5 (E.D.N.Y. July 12, 2024) (declining to address a hostile work environment argument because it was an "argument advanced only in [plaintiff's] opposition brief").

concern" where the police department "authorize[d] other groups such as the Hispanic Society to march in uniform," but sought to prohibit members of the New York Police Department's Latino Officers Association from doing the same); *Rys v. Grimm*, No. 19-CV-1251, 2021 WL 827671, at *7 (N.D.N.Y. Mar. 4, 2021) (noting that the plaintiff failed to allege "anything indicating that her 'association with an "openly gay" student' was intended to convey a public message or 'advance a political or social point of view beyond the employment context' that would make it a public concern"); *Medici v. City of Chicago*, 144 F. Supp. 3d 984, 978–88 (N.D. Ill. 2015) (finding constitutional a policy requiring on-duty police officers to cover up tattoos and explaining that "[p]laintiffs' tattoos are a form of personal expression, and not a form of speech on matters of public concern" because "[w]hen an individual decides to place a symbol, a set of words, or a design on his or her body, he or she is engaging in a form of personal expression, rather than a form of commentary on the interests of the public.").

Since Plaintiffs have not spoken on a matter of public concern and therefore their conduct is not protected by the First Amendment, the Court does not reach the merits of their free speech claims or whether Part 123.5 constitutes a content- or viewpoint-based prior restraint on free speech. The Court grants Defendants' motion to dismiss Individual Board Member Plaintiffs First Amendment free speech claims and grants them leave to amend to allege specific facts supporting their claims.[26]

---

[26] The Court notes that, as alleged, Individual Board Member Plaintiffs have only challenged Part 123.5 as violating the First Amendment. (Am. Compl. ¶¶ 150–71.) Accordingly, even if Individual Board Member Plaintiffs amend their Complaint to state a plausible First Amendment challenge to Part 123.5, a finding that Part 123.5 is unconstitutional would not affect Part 123.3, which requires schools to eliminate prohibited Indigenous names, logos, and mascots no later than the end of the 2024–2025 school year. 8 NYCRR § 123.3.

### iv.  Constitutional separation of powers claims

Plaintiffs attempt to allege a separation of powers claim under the New York State Constitution,[27] (Am. Compl. ¶¶ 126–31), but for the reasons explained below, the Court declines to exercise supplemental jurisdiction over the claim.

Defendants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' New York Constitution separation of powers claim pursuant to 28 U.S.C. § 1367(c)(1), and if the Court does exercise supplemental jurisdiction, the Court should nevertheless find that Plaintiffs have failed to state a valid claim.[28] (Defs.' Mem. 16, 18–19.) In

---

[27]  Plaintiffs also allege a separation of powers claim under the United States Constitution.  (Am. Compl. ¶¶ 125–31.)  Although Individual Board Member Plaintiffs have capacity to bring such a claim in their personal capacity, (*see supra* n.10), Plaintiffs have not made any arguments to support this claim, and in any event, cannot state such a claim.  (Pls.' Opp'n 1, 49–59.)  "[T]he separation-of-powers principles that the Constitution imposes upon the Federal Government do not apply against the states."  *Stop the Beach Renourishment, Inc. v. Fla. Dept. of Envt. Prot.*, 560 U.S. 702, 719 (2010)); *see also Consolidated Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 343, 346 n.4 (2d Cir. 2002) (noting that "the federal Constitution does not impose any particular separation of powers requirement on state governments . . . . "); *Friedman v. Beame*, 558 F.2d 1107, 1111 n.8 (2d Cir. 1977) (noting as dicta that "[t]he check on the authority of the executive branch of the federal government, flowing from the 'delegation' doctrine, derives from the separation of powers and is not enforceable against the states" (citations omitted)); *Gray v. Nordstrom*, No. 18-CV-1402, 2019 WL 2193463, at *5 (D. Conn. May 21, 2019) ("[T]he separation of powers doctrine, as embodied in the federal Constitution, is not binding on state or municipal governments." (citation omitted)); *De La Garza v. Lantz*, No. 08-CV-15, 2010 WL 2825818, at *2 (D. Conn. July 15, 2010) (noting that, "as the Supreme Court has explained, the separation-of-powers principles that the Constitution imposes upon the Federal Government do not apply against the States" (internal quotation marks and citations omitted)).  Because Plaintiffs cannot assert a valid separation of powers challenge to Part 123 pursuant to the United States Constitution, the Court grants Defendants' motion to dismiss Individual Board Member Plaintiffs' federal separation of powers claim.

[28]  Defendants argue that if the Court exercises supplemental jurisdiction over this claim, it should find that Plaintiffs "fail to state a claim that Part 123 is an unconstitutional usurpation of the Legislature's non-delegable legislative powers."  (Defs.' Mem. 20.)  In support, Defendants argue that: (1) the New York Legislature "expressly delegated broad authority to both SED and its Commissioner to implement rules and regulations to advance state policy goals for

support of their argument that the Court should decline to exercise supplemental jurisdiction,

Defendants argue that Part 123 is a developing state legal issue ill-suited for relief in federal

courts.  (*Id.* at 19 (citing *Donohue v. Mangano*, 886 F. Supp. 2d 126, 148 (E.D.N.Y. 2012);

*Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 307–08 (2d Cir. 2003); *Giordano v. City of New

York*, 274 F.3d 740, 754 (2d Cir. 2001); *Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1998)).)

Defendants argue that Part 123's validity under the New York Constitution is "purely a matter of

state law" and the regulation "involves matters of state governance" including "state oversight of

its public school districts and efforts to further a state policy of ensuring safe and discrimination-

free learning environment."  (*Id.* (citing *K.W. ex rel. Brown v. City of New York*, 275 F.R.D. 393,

400 (E.D.N.Y. 2011)).)

     Plaintiffs argue that the Court should exercise jurisdiction over this claim because

"[their] federal and state law claims are based on the same set of events and derive from a

common nucleus of operative fact."  (Pls.' Opp'n 52.)  Plaintiffs contend that the exception for

declining to extend supplemental jurisdiction over novel or complex issues outlined in "28

U.S.C. [§] 1367(c)(1) does not apply."  (*Id.*)  In support, Plaintiffs argue that, "[w]hile Part 123

itself may be novel, Plaintiffs' challenges of Part 123 do not turn on novel or unresolved

---

learning environments within New York public schools," (*id.* at 21); (2) Part 123 falls within the
scope of DASA, (*id.* at 22–23); (3) the Legislature's efforts to codify an Indigenous mascot ban
do not constitute sufficient "vigorous debate" to limit SED's rulemaking authority, (*id.* at 23);
and (4) SED's use of special expertise in enacting Part 123 weighs strongly in their favor, (*id.* at
23–24).  *See Boreali v. Axelrod*, 71 N.Y.2d 1 (1987) (providing the framework for evaluating
whether an act of administrative rulemaking has exceeded its regulatory authority).  Plaintiffs
argue that Defendants "exceeded their rule-making authority" in enacting Part 123, by making
impermissible value judgments, exceeding the reach of DASA as an enabling statute after
unsuccessful attempts by the Legislature to reach meaningful agreement on the issue, and relying
on an "Indigenous Advisory Group" rather than the SED's own expertise.  (Pls.' Opp'n 57–59.)
Because the Court declines to exercise supplemental jurisdiction over this claim, the Court does
not decide whether Plaintiffs have stated a claim.

questions of state law" because "[t]he 'separation of powers' [doctrine] is a well-settled

doctrine," as are "Article 78 challenges," and "the requirements of SAPA." (*Id.* at 52–53.)

Plaintiffs also argue that the cases relied on by Defendants, *Donahue* and *K.W. ex rel. Brown*, are

factually distinguishable. (*Id.* at 53–54 (citing *Donohue*, 886 F.Supp. 2d at 133, 148; *K.W. ex*

*rel. Brown*, 275 F.R.D. at 400).)

     "It is a principle of first importance that the federal courts are tribunals of limited subject

matter jurisdiction." *Wright v. Musanti*, 887 F.3d 577, 583 (2d Cir. 2018) (citation omitted).

"Under 28 U.S.C. § 1367(a), district courts 'shall have supplemental jurisdiction over all other

claims that are so related to claims in the action within such original jurisdiction that they form

part of the same case or controversy.'" *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d

321, 332 (2d Cir. 2011) (quoting 28 U.S.C. § 1367(a)). "[A] district court cannot exercise

supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction."

*Cangemi v. United States*, 13 F.4th 115, 134 (2d Cir. 2021) (internal quotation marks omitted)

(quoting *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 399 (2d Cir. 2017)); *see also Montefiore*

*Med. Ctr.*, 642 F.3d at 332 ("In order to exercise supplemental jurisdiction, a federal court must

first have before it a claim sufficient to confer subject matter jurisdiction." (citing *United Mine*

*Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966))). Both the claim conferring subject matter

jurisdiction and the supplemental claim "must stem from the same 'common nucleus of operative

fact'; in other words, they must be such that the plaintiff 'would ordinarily be expected to try

them all in one judicial proceeding.'" *Id.* (quoting *Gibbs*, 383 U.S. at 725); *see also Treglia v.*

*Town of Manlius*, 313 F.3d 713, 723 (2d Cir. 2002) (stating that supplemental jurisdiction is

proper where a state law "claim arises out of approximately the same set of events as [the]

federal . . . claim"). However, a district court may decline to exercise supplemental jurisdiction

over a claim for a number of reasons, including: "(1) the claim raises a novel or complex issue of

State law, (2) the claim substantially predominates over the claim or claims over which the

district court has original jurisdiction, (3) the district court has dismissed all claims over which it

has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons

for declining jurisdiction." 28 U.S.C. § 1367(c).

A district court may decline to exercise supplemental jurisdiction over a claim if "the

claim raises a novel or complex issue of [s]tate law." 28 U.S.C. § 1367(c)(1). "Where a pendent

state claim turns on novel or unresolved questions of state law, especially where those questions

concern the state's interest in the administration of its government, principles of federalism and

comity may dictate that these questions be left for decision by the state courts." *Valencia*, 316

F.3d at 306 (finding that the district court had abused its discretion by exercising supplemental

jurisdiction over state law claims because, at the time of the dismissal of federal claims, no

judicial opinions had been issued on the "novel and complex issues of state law" involving the

city's ability to create a "special relationship" with the plaintiff by failing to enforce local laws

(citing *Seabrook*, 153 F.3d at 72)); *Norton v. Town of Brookhaven,* No. 22-1015, 2023 WL

3477123, at *4 (2d Cir. May 16, 2023) (vacating the district court's decision to exercise

supplemental jurisdiction "where at least one of the remaining state law claims raised an

unresolved question of state law" and therefore comity counseled "strongly against the exercise

of supplemental jurisdiction."); *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 81 (2d

Cir. 2018) (same); *Ash v. Jacobson*, No. 16-CV-9548, 2020 WL 2848178, at *6 (S.D.N.Y. June 1,

2020) (same); *Shariar v. Smith & Wollensky Rest. Grp, Inc.*, 659 F.3d 234, 245–56 (2d Cir. 2011)

(affirming the district court's decision to exercise supplemental jurisdiction in part because the

state law claims did not raise complicated or novel issues of state law); *cf. Winter v. Northrup*,

334 F. App'x 344, 345–47 (2d Cir. 2009) (finding that the district court did not abuse its discretion in retaining jurisdiction over state law claims, "given that (1) discovery had been completed, (2) the state claims were far from novel, and (3) the state and federal claims were substantially identical"); *see also Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (explaining that courts must balance "values of judicial economy, convenience, fairness, and comity . . ." when determining whether to exercise supplemental jurisdiction over state law claims).

Where a district court has dismissed all claims over which it has original jurisdiction, it "must reassess its jurisdiction over the remaining state law claims by considering 'judicial economy, convenience, fairness, and comity.'"  *Morton v. County of Erie*, 796 F. App'x 40, 44 (2d Cir. 2019) (quoting *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004); *Jordan v. Chase Manhattan Bank*, 91 F. Supp.3d 491, 511 (S.D.N.Y. 2015) (considering whether to exercise supplemental jurisdiction after dismissing plaintiff's federal claims, and ultimately declining to exercise supplemental jurisdiction over plaintiff's state law claims because "no circumstances counsel in favor of the [c]ourt's exercising supplemental jurisdiction."); *J.E. ex rel. Edwards v. Center Moriches Union Free Sch. Distr.*, 898 F. Supp. 2d 516, 559–60 (E.D.N.Y. 2012) (granting defendants' motion for summary judgment as to the federal claims, and declining to exercise supplemental jurisdiction over plaintiff's state claims because the federal claims were dismissed before trial and because "comity suggests that this case would be better litigated in state court where the conduct of state actors can be adjudicated by the state court under state law"  (citing *Saggio v. Sprady*, 475 F. Supp. 2d 203, 212–13 (E.D.N.Y. 2007))); *Baptiste v. W. Hotel*, No. 04-CV-5544, 2005 WL 1020779, at *5 (S.D.N.Y. Apr. 27, 2005) (declining to exercise supplemental jurisdiction after finding there were "no special

circumstances" mitigating in favor of retaining federal jurisdiction in a case after dismissing the plaintiff's federal claims and plaintiff's remaining claims "solely sound[ed] in state law.").

Although all of Plaintiffs' state and federal claims arise from a common nucleus of operative facts, because Plaintiffs' New York Constitution separation of powers claim challenging Part 123 presents novel and unresolved questions of state law, the Court declines to exercise supplemental jurisdiction over the claim. *See Valencia*, 316 F.3d at 301–02, 307 (finding that the district court abused its discretion by exercising supplemental jurisdiction over a state law claim that turned on issues the Second Circuit considered novel and "unsettled" despite the New York Court of Appeals opining on the issue in a previous case). No court has decided whether Part 123 is valid under the New York Constitution, and therefore, Plaintiffs' challenge to Part 123 presents novel and unresolved questions of state law. *See Cambridge Cent. Sch. Dist. v. N.Y. State Educ. Dep't*, 200 N.Y.S.3d 804, 804–05 (App. Div. 2023) (holding, that Part 123 "render[ed] th[e] appeal moot" because the petitioner sought to continue using the "Indians" nickname and imagery prohibited by Part 123, but not deciding its constitutionality); *see also Valencia* at 306 (finding the state law issues that the district court exercised supplemental jurisdiction over were novel and "unsettled" despite the New York Court of Appeals having addressed them in a single previous case, because state courts had not yet had the opportunity to apply that precedent, and, as a result, the limited state caselaw on the matter left the issue unsettled and the district court's conclusions on "[un]sure footing"); *Blume v. Navient Corp*, No. 23-CV-1159, 2024 WL 2923704, at *4 (N.D.N.Y. June 10, 2024) (declining to exercise supplemental jurisdiction over plaintiff's state claims as "implicating unsettled questions of state law" because the state law in question "was only enacted in 2019 . . . and there is little case law addressing [it]"); *Piechowicz v. Lancaster Cent. Sch. Dist.*, No. 17-CV-845, 2022 WL 22782841,

at *17, *19 (W.D.N.Y. Jan. 18, 2022) (declining to exercise supplemental jurisdiction over plaintiff's claims under New York Civil Rights Law § 79-n, and in the alternative dismissing them, because § 79-n "presents a novel question of law not yet considered by New York courts," as it "'is a relatively new law' which New York courts have not had much opportunity to consider such that 'there is little guidance' as to its applicability . . . [and] courts that have considered § 79-n have not done so in the context of school bullying or harassment as is alleged in the instant case." (quoting *Spring v. Allegany-Limestone Cent. Sch. Dist*., No. 14-CV-476, 2017 WL 6512858, at *8 (W.D.N.Y. Dec. 20, 2017)), *report and recommendation adopted*, 2022 WL 17540648 (W.D.N.Y. Dec. 8, 2022)).  Because Part 123's constitutionality and scope present unresolved questions of state law, the Court declines to exercise supplemental jurisdiction over this claim.

Plaintiffs' attempts to distinguish *Donohue* and *K.W. ex rel. Brown* are not persuasive. (Pls.' Opp'n 52–53 (citing *Donohue*, 886 F. Supp. 2d at 133, 148; *K.W. ex rel. Brown*, 275 F.R.D. at 396).)  In *Donohue*, the court declined to exercise supplemental jurisdiction over the plaintiffs' challenge to a county local law's impact on their ability to negotiate salaries and benefits because of a parallel, ongoing state action, and to "avoid making a determination as to novel and complex questions concerning the New York Constitution," including the "dispute as to the proper application of various nuanced New York statutes."  *Donohue*, 886 F. Supp. 2d at 132–33, 148.  Similarly, in *K.W. ex rel. Brown*, the court declined to exercise supplemental jurisdiction because bullying in public schools was a "developing" issue in state law, and noted that state and local governments are "better suited" to creating policy than federal courts when bullying interferes with learning.  *K.W. ex rel. Brown*, 275 F.R.D. at 400.  Although Plaintiffs argue that the Court should examine the separation of powers doctrine, which is not novel, rather

than the novelty of Part 123, the courts in *Donohue* and *K.W. ex rel. Brown* relied on the novelty of the state and local laws and policies in declining to exercise supplemental jurisdiction over the plaintiffs' state law claims. *See K.W. ex rel Brown*, 275 F.R.D. at 400 ("[T]he subject of bullying in New York public schools is a developing state legal issue"); *Donohue*, 886 F. Supp. 2d at 148 (finding the state law claims turned on whether a new county law conflicted with state laws and thus "putting aside the . . . constitutional question, what remains is a dispute as to the proper application of . . . [state] statutes."). Accordingly, the Court declines to exercise supplementary jurisdiction over Plaintiffs' claim that Defendants passed Part 123 in violation of the New York State Constitution separation of powers doctrine.[29]

### c.  Preliminary injunction

Plaintiffs seek a preliminary injunction. In support, Plaintiffs argue that (1) they will suffer irreparable harm if they are forced to use tax-payer dollars to retire the Indigenous names, logos, and mascots; (2) they are likely to succeed on the merits; and (3) the balance of hardships weighs in the Plaintiffs' favor because the potential injury to Defendants is "non-existent." (Pls.' Conf. Mem. 2–3.)

---

[29] The Court also declines to exercise supplemental jurisdiction because it dismisses all of Plaintiffs' federal claims. *Garrasi v. Wells Fargo Bank, N.A.*, No. 22-921, 2024 WL 191802, at *2 (2d Cir. Jan. 18, 2024) (upholding a district court's dismissal of state law claim where the court also dismissed plaintiff's federal claim (citing *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006))); *Fernandez v. Zoni Language Ctrs., Inc.*, 858 F.3d 45, 46 n.1 (2d Cir. 2017) (affirming district court's decision declining to exercise supplemental jurisdiction over state law claims after dismissing plaintiffs' federal claims); *All. of Auto. Mfrs., Inc. v. Currey*, 610 F. App'x 10, 14 (2d Cir. 2015) (holding it was "not improper for the court to decline to exercise its supplemental jurisdiction" after it properly dismissed the plaintiff's federal claims); *One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims[.]" (citing *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 52 (2d Cir. 2009))).

Defendants argue that Plaintiffs have failed to satisfy the elements necessary for a preliminary injunction.  (Defs.' Conf. Mem. 2–3.)

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *see also Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2021) (same).  The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held."  *Benisek*, 585 U.S. at 161 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  A party seeking a preliminary injunction "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest."  *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273–74 (2d Cir. 2021); *see also Mendez v. Banks*, 65 F.4th 56, 63–64 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 559 (2024) (explaining that the traditional preliminary injunction standard requires plaintiffs to show (1) "a likelihood of success on the merits or sufficiently serious questions going to the merits . . . ," (2) "that [the plaintiffs] are likely to suffer irreparable injury in the absence of an injunction," (3) "that the balance of hardships tips in [the plaintiffs'] favor," and (4) "that the public interest would not be disserved by the issuance of a preliminary injunction." (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (internal quotation marks and citations omitted)); *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (noting that to obtain a preliminary injunction, "the movant has to 'show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the

preliminary relief'" (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010), *cert. denied*, 141 S. Ct. 1075 (2021))).

> ### i. Likelihood of success or sufficiently serious questions going to the merits

Plaintiffs argue that "[they] are likely to succeed on the merits of their [A]mended [C]omplaint." (Pls.' Conf. Mem. 2–3.) Plaintiffs contend that, in the context of the First Amendment, "likelihood of success on the merits is the dominant, if not dispositive, factor." (Pls.' Inj. Mem. 1 (quoting *Alexander v. Sutton*, 747 F. Supp.3d 520, 543 (E.D.N.Y. 2024)).) Defendants argue that Plaintiffs "cannot show any likelihood of success on the merits of their claims." (Defs.' Conf. Mem. 2.)

To justify a preliminary injunction "the movant must establish '(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183–84 (2d Cir. 2019) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009)). "The 'serious questions' standard permits a district court to grant a preliminary injunction . . . where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.,* 120 F.4th 59, 82–83 (2d Cir. 2024) (quoting *Citigroup*, 598 F.3d at 35); *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (quoting same). "The 'serious questions' standard allows courts to 'asses[] the merits of a claim at the preliminary injunction stage' by affording considerable 'flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation.'" *State Farm*, 120 F.4th 83 (quoting

*Citigroup*, 598 F.3d at 35); *see also Gov't Emps. Ins. Co. v. Beynin*, No. 19-CV-6118, 2021 WL 1146051, at *6 (E.D.N.Y. Mar. 25, 2021) ("The value of an approach encompassing the serious questions standard 'lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation.'"). "Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citing *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)); *Joelner*, 378 F.3d at 620 ("When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor." (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998))).

As discussed *supra*, (*see supra* sections II.iii.–iv.), Plaintiffs have not plausibly alleged that Part 123 is facially overbroad, facially vague, or infringes the First Amendment rights of New York public school employees and officials. *See Farrell*, 449 F.3d at 496 ("Facial vagueness challenges may go forward only if the challenged regulation 'reaches a substantial amount of constitutionally protected conduct.'" (quoting *Kolender*, 461 U.S. at 358 n.8)); *Church of Am. Knights of the Ku Klux Klan*, 356 F.3d at 200, 207–08 (finding that the First Amendment was not implicated in challenge to New York's anti-mask law where the uniform's mask "ha[d] no independent or incremental expressive value"); *Kennedy*, 597 U.S. at 514, 529 (finding that a school coach "demonstrated that his speech was private speech, not government speech," when he quietly uttered prayers on the football field after games); *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 172 (2d Cir. 1999) (denying a motion for a preliminary injunction where the government's interest in "staying informed of police officers' public statements about the

Department" outweighed the employees' interest "in the unfettered dissemination of their views regarding the police department"). Accordingly, Plaintiffs have neither demonstrated a likelihood of success on the merits or sufficiently serious questions going to the merits.

### ii. Irreparable harm

Plaintiffs argue they will suffer irreparable harm if forced to comply with Part 123. First, Plaintiffs argue it would be "a huge waste of energy, resources and taxpayer dollars" to retire their Indigenous names, logos, and mascots if Plaintiffs later prevail in the lawsuit. (Pls.' Conf. Mem. 3; *see also* Pls.' Inj. Mem. Reply 2.) In support, Plaintiffs argue that removing traces of Indigenous names, logo, and imagery will require "precious time and staffing resources." (Pls.' Inj. Mem. 2.) Plaintiffs argue that while ordinary compliance costs are typically insufficient to satisfy the irreparable harm requirement, this case "presents extensive and atypical compliance costs to the public that warrant preliminary injunctive relief." (Pls.' Inj. Mem. Reply 2.) Second, Plaintiffs argue that since compliance with Part 123 would require public schools to impair the First Amendment rights of Individual Board Member Plaintiffs "and all other District officials and employees, Plaintiffs readily meet the irreparable harm prong." (Pls.' Inj. Mem. 2.) In support, Plaintiffs argue that violating Plaintiff's First Amendment rights "for even [a] minimal period[ ] of time, unquestionably constitutes irreparable injury" and that "presumption of irreparable injury flows from a violation of constitutional rights." (*Id.* at 1 (first citing *Sutton*, 747 F. Supp. 3d at 543; then citing *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 390 (E.D.N.Y. 2021); and then citing *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020)).) Finally, Plaintiffs argue that compliance with Part 123 by removing the Indigenous names, logos, and mascots at issue will harm the culture of the school community. (*Id.* at 2–3.)

Defendants argue that Plaintiffs have failed to identify irreparable harm. (Defs.' Conf.

Mem. at 2–3.)  First, Defendants argue that "the mere allegation of a constitutional infringement in and of itself does not constitute irreparable harm" and that Plaintiffs "must first show they are likely to succeed on the merits of their First Amendment claims."  (Defs.' Inj. Mem. 1–2 (quoting *Pinckney v. Bd. of Educ. of Westbury Union Free Sch. Dist.*, 920 F. Supp. 393, 400 (E.D.N.Y. 1996)).)  Defendants also argue that, since their First Amendment claims challenge "only 8 NYCRR § 123.5, even if [Plaintiffs] could demonstrate a constitutional harm (which they cannot), such a harm" would have no relevance "to the enforcement of the other provisions of Part 123, including § 123.3 (requiring that Indigenous names and imagery be retired by the end of the 2024–25 school year)."  (*Id.* at 2.)  Second, Defendants argue that "courts have repeatedly rejected claims . . . that irreparable harm would result from having to devote resources to complying with a government regulation."  (*Id.*)  Defendants also argue that Plaintiffs' resource argument is "merely a variation on an argument that implementing Part 123 will involve financial loss" and that such harms are reparable through money damages.  (*Id.*; *see also* Defs.' Conf. Mem. at 3.)

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  *State Farm*, 120 F.4th at 80 (quoting *Faiveley Transp. Malmo AB*, 559 F.3d at 118); *Gov't Emps. Ins. Co. v. Barakat*, 709 F. Supp. 3d 93, 100 (E.D.N.Y. 2024) ("The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." (quoting *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 221 (E.D.N.Y. 2013))).  To establish irreparable harm, "the moving party 'must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'"  *State Farm*, 120 F.4th at 80 (alteration in original) (quoting *Faiveley Transp.*

*Malmo AB*, 559 F.3d at 118).  Absent "extraordinary circumstances," injunctions are also

unavailable "[w]here there is an adequate remedy at law, such as an award of money damages."

*Id.* (quoting *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005)).  "The loss

of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes

irreparable injury."  *N.Y. Progress & Prot. PAC*, 733 F.3d at 486 (quoting *Elrod v. Burns*, 427

U.S. 347, 373 (1976); *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d

342, 349 (2d Cir. 2003) ("Where a plaintiff alleges injury from a rule or regulation that directly

limits speech, the irreparable nature of the harm may be presumed.").

     Plaintiffs' harms are not irreparable.  As a threshold matter, Plaintiffs could seek an

extension of the compliance deadline, which would remedy any of Plaintiffs' alleged harms.[30]

*See* 8 NYCRR § 123.3(b) ("Upon a showing of good cause, the commissioner may grant an

extension of the timelines prescribed in subdivision (a) of this section.").  Regardless, since

Plaintiffs have not plausibly alleged a violation of the First Amendment, the harm to Plaintiffs

and the school community is too conjectural.  *See N.Y. Progress & Prot. PAC*, 733 F.3d at 487

(finding irreparable harm where there was a "direct restriction on political expression"); *Safir*,

170 F.3d at 171 (finding that possible chilling effect of a rule requiring police officers to notify

the police department they intend to speak to an audience was a "conjectural chill" and "[was]

not sufficient to establish real and imminent irreparable harm" (citations omitted)); *Blakeman*,

2024 WL 3201671, at *18 ("[A] bare assertion of a constitutional injury, without evidence

---

[30]  At oral argument, the Court asked whether Defendants could delay the deadline to comply with Part 123 until the resolution of Defendants' motion to dismiss and Plaintiffs' motion for preliminary injunction.  (Hr'g Tr. 63:12–23.)  Defendants later informed the Court in writing that, while "[t]he Board of Regents does not intend to modify the compliance deadline in 8 NYCRR § 123.3(a), . . . school districts who have demonstrated good cause toward meeting these goals may request an extension from the Commissioner under subsection (b) [of Part 123]."  (Letter dated Oct. 23, 2024, Docket Entry No. 50.)

'*convincingly show[ing]*' the existence of noncompensable damages, is insufficient to automatically trigger a finding of irreparable harm." (citing *KM Enters. v. McDonald*, No. 11-CV-5098, 2012 WL 540955, at *4 (E.D.N.Y. Feb. 16, 2012))).  Further, any compliance or resource costs are entirely compensable through money damages and are not "irreparable" as a matter of law.  *Moore*, 409 F.3d at 510 ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." (citations omitted)); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("[O]rdinary compliance costs are typically insufficient to constitute irreparable harm." (citations omitted)); *SymQuest Grp., Inc. v. Canon U.S.A., Inc.*, No. 15-CV-4200, 2015 WL 6813599, at *9 (E.D.N.Y. Aug. 7, 2015), (holding that a requirement to drive sixty miles for access to technical support services was a "mere inconvenience" and "insufficient to establish irreparable harm"), *report and recommendation adopted*, 2015 WL 6813494 (E.D.N.Y. Aug. 28, 2015); *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, No. 19-CV-9193, 2023 WL 5498962, at *6 (S.D.N.Y. Aug. 25, 2023) ("Even in the context of a government agency, courts routinely find 'meritless' the argument 'that potentially wasted and diverted staff resources constitute[s] irreparable harm.'" (alteration in original) (quoting *Shays v. Fed. Election Comm'n*, 340 F. Supp. 2d 39, 48 (D.D.C. 2004)).

### iii.  Balance of harms

Plaintiffs argue that the balance of hardships weighs in their favor in part because "[c]ompared with the irreparable harm [P]laintiffs will face if forced to comply with Part 123 prior to the outcome of this case, the potential injury on the other side of the equation is non-existent."  (Pls.' Conf. Mem. 3.)  In support, Plaintiffs argue that, since Defendants "have allowed school districts to continue to use their school names, logos, and mascots until the end of

the 2024–2025 school year," a brief extension of time that would allow the Court to rule on the merits would "make no difference" and would result in no hardship.  (*Id.*)

Defendants argue that the balance of hardships weighs in their favor because the inconvenience and cost of retiring the Indigenous names, logos, and mascots "weigh[s] lightly against the public interest in furthering a discrimination- and harassment-free learning environment."  (Defs.' Conf. Mem. 3.)

Under the third prong, a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *State Farm*, 120 F. 4th at 84 (quoting *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020)).  If there are "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation," courts inquire into whether there is "a balance of the hardships tipping decidedly in favor of the moving party."  *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 43 (2d Cir. 2020) (quoting *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)); *see also State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 234 (E.D.N.Y. 2018) ("Because the [c]ourt finds that there are 'serious questions going to the merits' in lieu of a 'likelihood of success on the merits,' it must further inquire as to whether . . . there is a 'balance of hardships tipping decidedly' in [the plaintiff's] favor." (quoting *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979))); *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 526–27 (S.D.N.Y. 2020) ("Plaintiffs must establish that the balance of hardships tips in their favor regardless of the likelihood of success." (citing *Salinger*, 607 F.3d at 79–80)).

Plaintiffs have not plausibly alleged a constitutional violation or that the costs to comply with Part 123 would cause irreparable harm to the school community, school district, school board, or public school employees.  In addition, Plaintiffs' claimed cost and inconvenience if

they were to retire all Indigenous names and imagery do not outweigh the public interest in furthering a discrimination- and harassment-free learning environment in all of New York's public schools.  Accordingly, the balance of hardships tips decidedly in Defendants' favor.

### iv.   Public interest

Plaintiffs argue that granting an injunction is also in the public interest.  (Pls.' Inj. Mem. 2–3.)  In support, Plaintiffs argue (1) that "securing First Amendment rights is in the public interest" and (2) that there is no public interest in "maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal."  (*Id.* at 2 (quoting *Sutton*, 747 F. Supp. 3d at 543 (citations omitted)).)

Defendants argue that Plaintiffs cannot prove "that the preliminary injunction is in the public interest."  (Defs.' Conf. Mem. 2.)  In support, Defendants argue that Plaintiffs cannot demonstrate that "the public interest would not be disserved by the issuance of a preliminary injunction."  (*Id.* at 3 (quoting *Mendez*, 65 F.4th 56, 63–64 (citation omitted)).)

In analyzing the public interest prong, a court must consider "the public consequences in employing the extraordinary remedy of injunction," *Yang*, 960 F.3d at 135–36 (quoting *Winter*, 555 U.S. at 24), and ensure that the proposed injunction "does not cause harm to the public interest," *Sec. & Exch. Comm'n v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) (per curiam); *see also State Farm,* 120 F.4th at 85 (explaining that courts "consider whether the preliminary injunction is in the public interest, which concerns the 'public consequences in employing the extraordinary remedy of injunction.'" (quoting *Yang*, 960 F.3d at 135–36)).  Because Plaintiffs have not plausibly alleged Part 123 is unconstitutional, the public interest factor weighs against granting Plaintiffs' motion for a preliminary injunction.  *See Yang*, 960 F.3d at 123–24, 135–36 (finding that a Democratic Party primary presidential candidate, his

pledged delegates, and delegates for another candidate had demonstrated that the public interest would be served by a preliminary injunction requiring the New York State Board of Elections to reinstate qualified candidates on the primary ballot and hold the primary election during the coronavirus pandemic where they had also demonstrated a likelihood of success on the merits of their First and Fourteenth Amendment claims); *N.Y. Progress & Prot. PAC*, 733 F.3d at 488 (explaining that "likelihood of success on the merits is the dominant, if not dispositive factor" in the First Amendment context); *Sutton*, 747 F. Supp. 3d at 554–55 (finding that "the public interest weighs in favor of granting preliminary injunction relief" where the plaintiffs "have shown a clear and substantial likelihood of establishing" that the regulation and challenged policies and practices "violate the First Amendment").

Based on the foregoing, the Court denies Plaintiffs' motion to enjoin the enforcement of Part 123.

### III. Conclusion

For the reasons discussed above, the Court grants Defendants' motion to dismiss. First, the Court grants Defendants' motion to dismiss the constitutional separation of powers claims, as well as the First Amendment and Fourteenth Amendment claims, of School District Plaintiffs, School Board Plaintiffs, and Individual Board Member Plaintiffs suing in their official capacity for lack of capacity. Second, the Court grants Defendants' motion to dismiss Plaintiffs' as-applied and facial vagueness claims for failure to state a claim. Third, the Court grants Defendants' motion to dismiss Plaintiffs' overbreadth claims for failure to state a claim and grants Individual Board Member Plaintiffs leave to amend their Complaints to allege specific facts supporting their First Amendment-based overbreadth claims in their personal capacity. Fourth, the Court grants Defendants' motion to dismiss Individual Board Member Plaintiffs'

First Amendment free speech claims and grants Individual Board Member Plaintiffs in their personal capacity leave to amend their Complaints to allege specific facts supporting their First Amendment free speech claims.  Fifth, the Court grants Defendants' motion to dismiss Individual Board Member Plaintiffs' federal separation of powers claim and declines to exercise supplemental jurisdiction over Plaintiffs' state separation of powers claim.  Any amended complaint must be filed within thirty days of this Memorandum and Order.  If an amended complaint is not timely filed, the Court will direct the Clerk of Court to enter judgment and close this case.  The Court denies Plaintiffs' motion for a preliminary injunction.

Dated: March 27, 2025
        Brooklyn, New York

SO ORDERED:


          s/ MKB
_____
MARGO K. BRODIE
United States District Judge