# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------

MASSAPEQUA UNION FREE SCHOOL DISTRICT,
MASSAPEQUA UNION FREE SCHOOL DISTRICT
BOARD OF EDUCATION, JEANINE CARAMORE, *in
her capacity as a Resident/Parent of the School
Community*.

Plaintiffs,

-against-

LESTER W. YOUNG, JR., in his official capacity as
Chancellor of the New York State Board of Regents,
JOSEPHINE VICTORIA FINN, in her official capacity as
Vice Chancellor of the New York State Board of Regents,
ROGER TILLES, in his official capacity as a member of
the New York State Board of Regents, CHRISTINE D.
CEA, in her official capacity as a member of the New
York State Board of Regents, WADE S. NORWOOD, in
his official capacity as a member of the New York State
Board of Regents, KATHLEEN M. CASHIN, in her
official capacity as a member of the New York State
Board of Regents, JAMES E. COTTRELL, in his official
capacity as a member of the New York State Board of
Regents, JUDITH CHIN, in her official capacity as a
member of the New York State Board of Regents,
CATHERINE COLLINS, in her official capacity as a
member of the New York State Board of Regents,
ELIZABETH S. HAKANSON, in her official capacity as
a member of the New York State Board of Regents, LUIS
O. REYES, in his official capacity as a member of the
New York State Board of Regents, SUSAN W.
MITTLER, in her official capacity as a member of the
New York State Board of Regents, FRANCES G. WILLS,
in her official capacity as a member of the New York
State Board of Regents, ARAMINA VEGA FERRER, in
her official capacity as a member of the New York State
Board of Regents, SHINO TANIKAWA, in her official
capacity as a member of the New York State Board of

Docket No. 23-cv-07052
(SJB) (LGD)

**PROPOSED SECOND
AMENDED COMPLAINT**

1

Regents, ROGER P. CATANIA, in his official capacity as
a member of the New York State Board of Regents,
ADRIAN I. HALE, in his official capacity as a member of
the New York State Board of Regents.

Defendants.

-----------------------------------------------------------------------

   Plaintiffs MASSAPEQUA UNION FREE SCHOOL DISTRICT, MASSAPEQUA

UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, and JEANINE CARAMORE,

as and for their Second Amended Complaint, state and allege the following as against Defendants

LESTER W. YOUNG, JR., in his official capacity as Chancellor of the New York State Board of

Regents, JOSEPHINE VICTORIA FINN, in her official capacity as Vice Chancellor of the New

York State Board of Regents, ROGER TILLES, in his official capacity as a member of the New

York State Board of Regents, CHRISTINE D. CEA, in her official capacity as a member of the

New York State Board of Regents, WADE S. NORWOOD, in his official capacity as a member

of the New York State Board of Regents, KATHLEEN M. CASHIN, in her official capacity as a

member of the New York State Board of Regents, JAMES E. COTTRELL, in his official capacity

as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as

a member of the New York State Board of Regents, CATHERINE COLLINS, in her official

capacity as a member of the New York State Board of Regents, ELIZABETH S. HAKANSON, in

her official capacity as a member of the New York State Board of Regents, LUIS O. REYES, in

his official capacity as a member of the New York State Board of Regents, SUSAN W. MITTLER,

in her official capacity as a member of the New York State Board of Regents, FRANCES G.

WILLS, in her official capacity as a member of the New York State Board of Regents, ARAMINA

VEGA FERRER, in her official capacity as a member of the New York State Board of Regents,

SHINO TANIKAWA, in her official capacity as a member of the New York State Board of

2

Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents:

## PRELIMINARY STATEMENT

1.      This is a declaratory judgment action seeking to annul *Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools* (hereinafter "Part 123") and enjoin its enforcement.

2.      The declaratory judgment action presents a facial and as-applied challenge to the constitutionality of Part 123 under the First and Fourteenth Amendments to the United States Constitution; for violations of the Commerce Clause under Article I, Section 8 of the United States Constitution (both Dormant and Indian Commerce Clauses); for violations of the State-Bill-of-Attainder Clause under Article I, Section 10 of the United States Constitution; for violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and for violations of 42 U.S.C. § 1981. Plaintiffs seek declaratory and injunctive relief on the grounds that Part 123 is unconstitutional and discriminatory. Defendants should be enjoined from enforcing it.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 3613.

4.      Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY TRIAL DEMAND

5.      Plaintiffs demand a trial by jury.

## PARTIES

6.      Plaintiff Massapequa Union Free School District (the "District") is a K-12 public school district located in Massapequa, New York that currently serves approximately 6,564 students in nine schools: Unqua Elementary, McKenna Elementary, Lockhart Elementary, Fairfield Elementary, East Lake Elementary, Birch Lane Elementary, Berner Middle School, Massapequa High School – Main, and Massapequa High School – Ames.  District administrative offices are located at 4925 Merrick Road, Massapequa, New York 11758.

7.      Plaintiff Massapequa Union Free School District Board of Education ("Massapequa Board") is the duly elected governing body of the District. The Massapequa Board is comprised of five residents of the community who serve three-year terms as representatives in all matters concerning the school district.

8.      Plaintiff Jeanine Caramore is Vice President of the Board of Education, a resident of the Massapequa School District, and a parent of a current District student.

9.      The New York State Board of Regents ("Board of Regents") sets education policy for the State of New York and oversees both the University of the State of New York and New York State Education Department (hereinafter "NYSED").

10.     Defendant Lester W. Young, Jr. ("Chancellor Young") is the duly appointed Chancellor of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

11.      Defendant Josephine Victoria Finn ("Vice Chancellor Finn") is the duly appointed Vice Chancellor of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy

for New York State, including those complained of herein.

12.    Defendant Roger Tilles is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

13.    Defendant Christine D. Cea is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

14.    Defendant Wade S. Norwood is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

15.    Defendant Kathleen M. Cashin is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

16.    Defendant James E. Cottrell is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

17.    Defendant Judith Chin is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged

with recommending and setting education policy for New York State, including those complained of herein.

18.     Defendant Catherine Collins is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

19.     Defendant Elizabeth S. Hakanson is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

20.     Defendant Luis O. Reyes is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

21.     Defendant Susan W. Mittler is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

22.     Defendant Frances G. Wills is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

23.     Defendant Aramina Vega Ferrer is a duly appointed member of the Board of

Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

24.     Defendant Shino Tanikawa is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

25.     Defendant Roger P. Catania is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

26.      Adrian I. Hale is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

## LEGAL FRAMEWORK

27.     For school districts located in the State of New York, the determination as to whether to conduct an interscholastic sports program lies within the authority and discretion of the board of education, as does the manner in which any such program is to be conducted. *See Appeal of Tobin*, 25 Ed. Dept. Rep. 301 (Decision No. 11,591).

28.     Additionally, a board of education has discretion as to how to conduct an interscholastic sports program, which includes determining "the propriety of a sports team name, mascot, or logo." *Id.* Such decisions "will be set aside only upon a showing that the Board has

abused its discretion." *Id.*

## FACTS AND PROCEDURAL HISTORY
## UNDERLYING THIS PROCEEDING

**A. The Names of Many Municipalities, Bodies of Water, and Other Cherished Landmarks Throughout the State of New York Derive From Native American Culture**

29.     Long Island's rich history originates from the Native American tribes who live and once lived in the area. These historical roots live on in the names of municipalities, school districts, public parks, bodies of water, and various historical landmarks, which are derived from the names of local tribes, famous Native Americans, and Algonquin phrases.

30.     According to reports from early settlers, there were 13 tribes of the Algonquin Family, now known as the "13 Tribes of Long Island," at the time of European settlement. According to early accounts from European settlers, these tribes included the Canarsie, Rockaways, Merricks, Massapequas, Matinecocks, Nissaquogues, Setaukets, Corchaugs, Secatogues, Unkechaugs, Shinnecock, Montaukett, and Manhansets.

31.     Several of these tribe names may look familiar as they inspired the names of municipalities throughout Long Island, including the Rockaways, Merrick, Massapequa, Setauket, Shinnecock, Montauk, Amagansett, and Manhasset.

32.     Other examples of municipal names derived from Native American language and people include Wyandanch, Patchogue, Mattituck, Ronkonkoma, Quogue, Yaphank, Cutchogue, Copiague, Commack, Nyack, Mecox, Noyac, Moriches, Sagaponack, Tuckahoe, Ponquogue, and others.

33.     Even the name Manhattan is of Native American Lenape origin. It comes from the Lenape word "Manhatta," which has been translated to "the place where bows are from" or "hilly

island."

34.     These Native American historical roots extend far beyond Long Island. In fact, the names of counties all over the State of New York originate from Native American tribes, people, and phrases. For instance, Allegany County derives its name from a Lenape word. Cayuga County was named after the Cayuga tribe of Native Americans. Other examples of county names derived from Native American tribes or phrases include, but are not limited to, the Counties of Chautauqua, Chemung, Oneida, Onondaga, Oswego, Otsego, Saratoga, Seneca, and Tioga.

35.     There are also various bodies of water named after Native American tribes or phrases including the Ashokan Reservoir, Seneca Lake, Cayuga Lake, and Lake Ronkonkoma.

**B.  The Name and Logo of Massapequa and Its School District Derive from the Area's Rich Local Native American History**

36.     Massapequa is a hamlet of Nassau County located in the Town of Oyster Bay. Massapequa Park is an incorporated village located within the Town of Oyster Bay. Collectively, Massapequa and Massapequa Park are known as the Massapequas. The District is located in Massapequa but serves both Massapequa and Massapequa Park.

37.     The Massapequas' name and history—like many other municipalities throughout the State of New York—come from Native American roots. The name Massapequa is derived from the Native American term "Marspeag" or "Mashpeag," which translates to "great waterland."

38.     The area now known as Massapequa was occupied by Native American tribes for thousands of years. Before the European settlement of Long Island, it was occupied by one of the 13 Tribes of Long Island, which was an Algonquin-speaking group called the Lenape.

39.     The European settlement of Massapequa occurred in 1658 when a group of Quaker settlers, who had previously settled in America and formed a farming community in Oyster Bay, purchased the land from the local tribe, which at the time was led by their chief, Sachem

9

Tackapausha. At the time, Sachem Tackapausha led one of the 13 tribes of Long Island known as the Massapequas.

40.    Sachem Tackapausha was a Lenape, or Chief, who was instrumental in forming an alliance with sachems from other Native American tribes to represent the Algonquian-speaking people during negotiations with the Dutch settlers. He is known as one of the most powerful Algonquian leaders on Long Island, the other being Chief Wyandanch.

41.    The Quaker settlers had friendly dealings with Sachem Tackapausha after purchasing the land. Every year, Sachem Tackapausha would return to Massapequa to accept a tribute, which was typically a new coat, among other goods. When Sachem Tackapausha died, the settlers continued to pay tribute to his brother.

42.    Although he was sachem of many areas of Long Island, no community has revered Sachem Tackapausha more than the Massapequas. To this day, the Massapequa community continues to pay homage to him. His memory has lived on, not just in the District's name and logo, but throughout the Village as a whole.

43.    In 1925, the Massapequa Avenue School opened its doors with five classrooms, five teachers, and 100 students. This school served grades K-8 only and it was the first school built in Massapequa. The District, like the municipality it serves, uses the name "Massapequa" because of its Native American roots. The "Chiefs" mascot logo was created around this time and could be found on students' gym apparel.

44.    Massapequa High School opened its doors in September 1955 and has continued to use the "Chiefs" name and logo ever since.

45.    Below is an image of the District's logo and "Chiefs" name and mascot logo, which is an image depicting Sachem Tackapausha himself. The District's High School has no mascot

outside of its logo. In other words, there is no Chiefs costume.

 

46.     The Incorporated Village of Massapequa Park was founded in 1931. The Village seal (depicted below) also includes an image of Sachem Tackapausha, as well as his name:



47.     This same image can be found on a sign welcoming visitors and residents to Massapequa Park, located in downtown Massapequa Park, as depicted below, as well as on a plaque located in front of Village Hall.



48.     And just behind that Village welcome sign, is James AltaDonna Jr. Village Square,

where you can find the Village seal displayed on a plaque, as well as in a clock tower, as depicted below:

 

49.    Sachem Tackapausha's image can also be found on a sign placed by the local Chamber of Commerce welcoming visitors and residents to Massapequa, as depicted below.



50.    Sachem Tackapausha's image is also displayed on the building of the Massapequa Fire Department, on every fire truck, and on the sleeve of every volunteer firefighter.



51.     Images of Sachem Tackapausha are also displayed in murals and other street art located throughout the community.

52.     At any school or community function, you will see most people sporting "Chiefs" apparel, which is not only sold in the Massapequa High School Chiefs Apparel Store, but also in other privately-owned businesses around town. And the phrase "Once a Chief, always a Chief" can be heard throughout the schools and community at large.

53.     As various adult and student Massapequa residents explained in a video prepared by the District entitled "MSD: Once a Chief, Always a Chief," the "Chiefs" mascot is not just a school sports logo, it is a mindset that unifies the Massapequa community and encourages it to strive for excellence. This video is available at https://www.youtube.com/watch?v=iOTBTo1xvzc. The District created it and posted it publicly on YouTube in June 2023 in direct response, and as a form of protest to, Part 123.

54.     A "Chief" is defined as the leader of a group or body of people. The name is used in various contexts, and usually symbolizes a form of leadership. Examples include a Chief Judge, Chief of Police, Fire Chief, and even the United States of America's Commander-in-Chief.

55.     The word Chief is consistent with the District's vision and mission statement, which

is very leadership-driven. As indicated on the District's website, it strives to create "leaders one child at a time." The District's mission and vision statement can be found on the "About Our District" page of the District's website, which is available at https://www.msd.k12.ny.us/page/about-our-district.

56.     The District envisions a learning community comprised of Massapequa leaders (and learners) who exhibit certain qualities one of which is to be a "goal directed, resilient, and courageous leader." (*Id.*) When students and members of the school community (including Plaintiff Caramore) put on their Chiefs apparel, they are not just showing support for their sports teams. They are identifying themselves as a Massapequa Chief, someone who embodies the core principles inherent in the District's mission and vision statement.

57.     As the Board explained in an April 18, 2023 letter to the Massapequa community:

> The Chief is more than a symbol to Massapequa—it celebrates the rich history of our town and honors Chief Tackapausha, who, according to local history sources, sold the area now known as Massapequa Park to a group of settlers in 1658. To understand our local history, all one needs to do is look around our community. From our very name of Massapequa to the many historical plaques located throughout town, we pay our respects to 365 years of history.

58.     The "Chiefs" logo is—and has always been—about honor and respect. It is meant to honor the area's Native American roots, and particularly, to honor the great Sachem Tackapausha, who has a direct and strong connection to the area.

59.     Notably, the wall of the New York State Department of Motor Vehicles office in Massapequa displays a mural of Long Island designating Massapequa with a gold star and an image of a Native American man donning an Indian headdress, demonstrating that the State honors Massapequa's Native American history as the District does.

14



**C. New York State's Dignity for All Students Act**

60.     In September 2010, the New York State Legislature enacted the Dignity for All Students Act (hereinafter "DASA") which took effect in July 2012. New York's Education Law was amended to create a new Article 2 entitled "Dignity for All Students."

61.     DASA prohibits bullying, harassment, discrimination, and cyberbullying against students in school or at school functions based on their actual or perceived membership in a protected class. *See* N.Y. Educ. Law § 12.

62.     The legislation was designed to prevent incidents of discrimination or harassment, including bullying, taunting, or intimidation, through the institution of preventive, educational measures. *See* N.Y. Educ. Law § 10; *see also* New York Bill Jacket, 2010 A.B. 3661, Ch. 482.

63.     Prior to the enactment of DASA, New York was one of only eight states without anti-bullying legislation.

64.     As reflected in the legislative history of the act, the State Legislature felt it important to create state-wide anti-bullying legislation to combat bullying and harassment in schools. The Bill Jacket for DASA provides, "Although school yard bullies have long had a

presence on public school grounds, this bill will help ensure that school administrators and educators have the tools and resources in place to afford all students – and particularly those who are targeted by such bullies – an educational environment in which they can thrive." *See* New York Bill Jacket, 2010 A.B. 3661, Ch. 482.

65.    This sentiment was reiterated in a Senator's July 16, 2010 letter to then-Governor Paterson (which is also part of the Bill Jacket): "[t]he implementation of DASA will provide clear direction to school districts and reduce the incidents of harassment and discrimination which are now an epidemic in our schools." *Id.*

**D.  Part 123 of the Regulations of the Commissioner of Education**

66.    This lawsuit challenges the enactment of *Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools* (hereinafter "Part 123"), 8 NYCRR 123.1 *et seq.*

67.    Part 123 prohibits public schools in the State of New York from utilizing or displaying any Indigenous name, logo, or mascot other than for purposes of classroom instruction. (8 NYCRR 123.2.)

68.    Part 123 defines "Indigenous name, logo, or mascot" as "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such school sports teams." (8 NYCRR 123.1.) This definition excludes a public school, school building, or school district named after an Indigenous tribe. (*Id.*)

69.    Part 123 provides for certain exceptions to this rule. First, a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation is not

prohibited from choosing to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including a tribal school or intramural league. (8 NYCRR 123.4(a).)

70.     Second, Part 123 does not apply where a written agreement exists between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe. (8 NYCRR 123.4(b).)

71.     Under this provision of Part 123, the NYSED only acknowledges written agreements submitted before May 3, 2023, and therefore rejects any written agreements submitted after that date. Part 123 does not provide for any extensions of this arbitrary deadline.

72.     Part 123 also requires public schools to prohibit school officers and employees from utilizing or promoting any Indigenous name, logo, or mascot, while on school property or at a school function, except for school officers or employees who are members of a tribal nation and are utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation. (8 NYCRR 123.5.)

73.     Part 123 required boards of education to commit, via resolution, to eliminating the use of all Indigenous names, logos, and mascots by the end of the 2022-2023 school year. (8 NYCRR 123.3(a).) And it required those resolutions to identify a plan to eliminate all use of the prohibited name, logo, or mascot by the end of the 2024-2025 school year. (*Id.*) Part 123 allows the commissioner to grant an extension of these timelines "[u]pon a showing of good cause." (8 NYCRR 123.3(b).)

74.     Because the NYSED will not provide any funding to support its mandate, school districts are also forced to redistribute their educational funds to finance this unfunded mandate on their own.

**E.  History of Implementation of Part 123**

75.     In April 2001, then-Commissioner of Education Richard Mills released a memorandum to all public school districts in the State of New York outlining his position on public schools' use of Native American names, symbols, and mascots and asking boards of education to end the use of Native American mascots as soon as possible.

76.     The NYSED did not issue any Commissioner's regulations or mandatory guidelines to this effect after the Commissioner of Education released his April 2001 memorandum.

77.     While a bill seeking to amend the Education Law to prohibit public schools from using a Native name, logo, or mascot was presented to the State Assembly during its 2021-2022 Legislative Session, it was referred to the Assembly Committee on Education and remains there for review.[1] A similar bill was introduced in the 2023-2024 session.[2] Simply put, there were three separate bills introduced in two successive Legislative sessions without any successful enactments by either the Assembly or Senate. To this day, the State Legislature has never enacted a law banning Indigenous names, logos, and mascots.

78.     Twenty-one years after the April 2001 memorandum was released, James Baldwin, the Senior Deputy Commissioner for Education Policy at the NYSED, released a memorandum on November 17, 2022 in which he declared that public school districts were prohibited from using Native American mascots and threatened removal of school officers and withholding of State aid if school districts did not affirmatively commit to replacing their Native American team name, logo, and/or imagery by the end of the 2022-2023 school year.

79.     This November 17 memorandum referenced regulations that were being developed

---

[1] *See* Senate Bill No. 1549 and Assembly Bill No. 5443 in the 2021-22 session.
[2] *See* Senate Bill No. 4-52 introduced in the 2023-24session.

18

by the NYSED, couching them as regulations that would clarify school districts' obligations.

80.    Mr. Baldwin made this across-the-board directive to all public school districts before Part 123 was even drafted, much less subjected to a 60-day public comment period or actually promulgated in accordance with the State Administrative Procedure Act (hereinafter "SAPA").

81.    The State created a statutory scheme for administrative agencies to promulgate rules and regulations, and this November 17 memorandum was a blatant departure from those requirements. Neither Mr. Baldwin, nor the Commissioner of Education herself, has the authority to adopt an across-the-board directive without first formally adopting a regulation or rule to that effect.

82.    On December 1, 2022, the Board of Regents indicated they anticipated the proposed amendment would be presented for permanent adoption at the April 2023 Regents meeting, and become effective as a permanent rule on May 3, 2023, after publication of the proposed amendment in the State Register and expiration of the 60-day public comment period required under SAPA.

83.    Accordingly, even prior to the public comment period, the NYSED made it clear it planned to adopt Part 123 before the public comment period even began. To make matters worse, the November 17th memorandum made it clear the NYSED planned to adopt Part 123 before it even finished preparing a draft of it. In other words, the NYSED's compliance with SAPA was mere window dressing, as the NYSED was just going through the motions before reaching a conclusion that was already pre-ordained. This is further evidenced in the NYSED's *Assessment of Public Comment*, which was released in April 2023. There, the NYSED acknowledged it provided school districts with advance notice of its intentions in Mr. Baldwin's November 17,

2022 memorandum. Again, the NYSED declared its intentions to enact a regulation that was still in the works and had not undergone the requisite "notice-and-comment" requirements of SAPA.

84.    On December 28, 2022, the NYSED released a draft of Part 123, which triggered the beginning of the 60-day public comment period.

85.    After publishing the proposed amendment in the State Register, the NYSED received various comments during the 60-day public comment period; some were supportive of the proposed changes and others were strongly opposed to it.

86.    After the public comment period, the NYSED made two revisions to the proposed amendment, which they characterized as non-substantial.

87.    On April 18, 2023, the Board of Regents voted to adopt Part 123 which took effect on May 3, 2023.

88.    Part 123 set a June 30, 2023 deadline for boards of education to first self-determine if their names, logos, or mascots even fall within the scope of Part 123 and, if so, to commit, via resolution to eliminate such names, logos, and mascots by the end of the 2022-2023 school year. In order to comply with the June 30, 2023 deadline imposed by Part 123, the District Board of Education passed a resolution with a plan to eliminate the use of prohibited Indigenous names, mascots, and logos by the end of the 2023-2024 school year. The resolution makes clear, however, that the Board of Education's compliance shall in no way serve as a waiver or be construed as a waiver of the District's right to, among other things, challenge (a) whether the use of the "Chiefs" name does in fact constitute a prohibited "Indigenous name, logo or mascot" pursuant to Part 123, and (b) whether Part 123 should be repealed and/or determined to be unenforceable by the Commissioner and/or any court of competent jurisdiction.

89.    This forced resolution was passed by the Board of Education on June 22, 2023.

This action followed.

### F. Part 123 Contains Vague Language, Which Makes It Difficult for School Districts to Navigate a Regulation That Is Designed to Be Self-Policing

90.     Part 123 is a self-policing regulation; the NYSED has left it up to boards of education to determine whether their team names, logos, or mascots are prohibited by Part 123—which appears to prohibit any name or item that is, or was at any point in time, loosely tied to Indigenous people. In other words, it is up to the school district to decide where the Board of Regents drew its proverbial line.

91.     However, Part 123 fails to include any standards or criteria for school districts to determine the meaning, scope, and application of the regulation and its prohibition against the use of names, logos, and mascots by public schools.

92.     Part 123 does not adequately define what constitutes an Indigenous custom, symbol, or tradition.

93.     Part 123 also fails to describe the difference between a stereotypical aspect of Indigenous culture, as opposed to a representation that is accurate and respectful.

94.     Persons of common intelligence must necessarily guess at the meaning, scope, and application of Part 123.

95.     Additionally, the Board of Regents and NYSED never issued a list of schools that it considered to violate the new regulation. Nor was the State particularly forthcoming in responding to inquiries about the scope of the regulation.

96.     There is no evidence the Board of Regents conducted any review, much less an extensive one, of New York public school logos to see if they might refer to a Native American tribe or individual. Rather, the Board of Regents issued a sweeping regulation prohibiting any non-exempt use of an Indigenous name, logo, or image, without taking into account their origin.

97.     As set forth above, school districts are exempted from Part 123 where an agreement exists between a federally or state-recognized Indian tribe and a public school. (8 NYCRR 123.4(b).)

98.     The exception to Part 123 allowing public schools to use Indigenous names, logos, or imagery that would otherwise violate the regulation absent the existence of an agreement between a federally or state-recognized Native American tribe and public school, is also problematic.

99.     For instance, under Part 123 as it was enacted, one school district's use of an Indigenous name, mascot, or logo would not violate the regulation if the school district obtained a written agreement with a federally or state-recognized Native American tribe prior to May 3, 2023, while another school district's use of the exact same Indigenous name, mascot, or logo would be deemed a violation if it had no written agreement. It simply makes no sense how one school district's conduct could be characterized as a DASA violation while another school district's same conduct would not.

### G.  The District's Agreement with the Native American Guardian's Association

100.    On May 15, 2025, Plaintiffs entered into a legally binding, written agreement (the "MSD-NAGA Agreement") with the Native American Guardian's Association and the Board of Directors of the Native American Guardian's Association (collectively, "NAGA").

101.    As stated in the MSD-NAGA Agreement, the "NAGA is a tax-exempt, non-profit organization pursuant to 26 U.S.C. § 501(c)(3), and a Native advocacy group recognized by the Bureau of Indian Affairs, United States Department of the Interior, advocating for increased education about Native Americans and Indigenous peoples, especially in public educational institutions, and greater recognition of Native American and Indigenous Heritage through high

profile venues of sports and other public platforms, pursuant to which NAGA supports the respectful use of Native American and Indigenous names and imagery in sports, education, and public life[.]"

102.    As stated in the MSD-NAGA Agreement, the "NAGA is a collective of American Indian enrolled members and tribal descendants who support the artistry of native identifiers in sports and the mainstream[.]"

103.    As stated in the MSD-NAGA Agreement, "the Board of Directors of NAGA is comprised of, and represents, members of federally recognized tribal nations and Indigenous groups[.]"

104.    As stated in the MSD-NAGA Agreement, the "NAGA and the Board of Directors of NAGA permit, consent to, support, and authorize the District's continued use of the Indigenous names, imagery, and logos, as such symbols are culturally affiliated with NAGA, the Board of Directors of NAGA, and NAGA's component American Indian enrolled members and tribal descendants[.]"

105.    The MSD-NAGA Agreement defines NIL as "name, image, and likeness" (hereinafter "NIL").

106.    As stated in the MSD-NAGA Agreement, "the parties wish to memorialize these terms and conditions pursuant to which NAGA and the Board of Directors of NAGA permit, consent to, support, and authorize the District's continued use of the Indigenous NIL representations[.]"

107.    As stated in the MSD-NAGA Agreement, Plaintiffs and NAGA agreed to exchange the following consideration and things of value:

> So long as the District continues its current educational programming and instruction concerning Native American history and culture as outlined in

23

the attached Exhibit "A" and the obligations outlined in this Agreement, NAGA and the Board of Directors of NAGA fully permit, consent to, support, and authorize the District in its continued use of the District's Indigenous NIL for all school-related purposes, including but not limited to educational uses, athletic uses, community uses, and in any new programs hereafter developed. The District shall meet with a NAGA representative, either in person or remotely, at least once per year to review and discuss the educational programming and instruction. In exchange for NAGA's and the Board of Directors' permission, consent, support, and authorization of the District's use of the Indigenous NIL, the District also commits that it will continue to use the "Chiefs" name and logo as the District's official name and logo for all school-related purposes, including but not limited to educational uses, athletic uses, community uses, and in any new programs hereafter developed. In the event that the District discontinues all the educational programing outlined in the attached Exhibit "A" or fails to continue using the "Chiefs" name, mascot, and logo, NAGA's and the Board of Directors' permission, consent, support, and authorization for the District's continued use of its Indigenous NIL rights will automatically be withdrawn by operation of this Agreement.  In such an event, NAGA and the Board of Directors of NAGA will have no cause of action of any kind and nature to compel or require the District to provide any kind of educational programing or instruction.

108.    As stated in the MSD-NAGA Agreement, "Each Party acknowledges that the promises and covenants exchanged under this Agreement constitute good, valid, and sufficient Consideration, the receipt and adequacy of which are hereby acknowledged. Each Party also acknowledges that the promises and covenants exchanged under this Agreement constitute good, valid, and sufficient Things of Value, the receipt and adequacy of which are hereby acknowledged. Capitalized terms 'Consideration' and 'Thing of Value' shall have the meanings ascribed to them under New York law, including as defined in 8 NYCRR § 123.4(b)."

109.    As stated in the MSD-NAGA Agreement, "This Agreement is made and entered into in the State of New York and will be interpreted, enforced, and governed by the laws and regulations of the State of New York and applicable federal laws and regulations, except for the State of New York's choice of law provisions, regardless of the present or future residence and/or domicile of any of the parties."

24

110.    The MSD-NAGA Agreement is an agreement entered into by all parties knowingly and voluntarily, and under no coercion or duress of any kind, and is a valid agreement under New York law.

111.    To satisfy their contractual obligations under the MSD-NAGA Agreement, the Plaintiffs **must continue** to use the Chiefs name and logo. Meanwhile, Part 123 forces the Plaintiffs to terminate the use of the Chiefs name and logo, solely on the basis that the NAGA's name, image, and likeness are affiliated with Indigenous names, logos, and imagery.

112.    Part 123 also forces the Plaintiffs to terminate and violate their contractual obligations to the NAGA solely based on the fact that the NAGA is comprised of Indigenous and tribal persons and groups.

113.    Indeed, Plaintiffs are free to contract with any other individual or group of any race, national origin, color, or ethnic background on the same subject matter. Part 123 solely targets and excludes Indigenous and tribal members from entering into agreements with Plaintiffs and other school districts.

114.    If Plaintiffs are compelled to comply with Part 123, they will incur significant harm, including (a) the substantial costs of replacing the "Chiefs" name and logo; (b) the erosion of community identity and tradition; and (c) legal exposure for breaching their contractual obligations under the MSD-NAGA Agreement and for discriminating in violation of state and federal law.

115.    As applied here, Part 123 is unconstitutional because it forces the Plaintiffs to discriminate against the NAGA in violation of Title VI, 42 U.S.C. § 1981, and the Fourteenth Amendment. Part 123 is constitutionally preempted by federal law.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

**(Part 123 Is Impermissibly Overbroad in Violation of the
First Amendment of the U.S. Constitution)**

116.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

117.    Part 123 is unconstitutionally overbroad under the First Amendment both facially and as applied to Plaintiff Caramore.

118.    The First Amendment doctrine of overbreadth provides that a law is unconstitutionally overbroad if it punishes a substantial amount of protected free speech, judged in relation to its legitimate sweep. *See Virginia* v. *Hicks*, 539 U.S. 113, 122, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003).

119.    In determining whether a regulation is substantially overbroad, a court may examine possible applications of the regulation in factual contexts other than those of the plaintiff in the instant case. *See NAACP v. Button,* 371 U.S. 415, 432–33, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Overbreadth challenges are based upon the hypothetical application of a regulation to third parties. *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006). In fact, overbreadth challenges are an exception to the general rule against third-party standing, allowing a plaintiff to ask that a law be struck down based not on how it affects the plaintiff but on how it might be applied to third parties not before the court. This is based on a recognition that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992).

120.    Under the third-party standing exception, this case is not just about Plaintiff Caramore's right to engage in First Amendment expressive activity, or her fellow Board members' ability to do so. Part 123 stands to chill the expressive activity of many more individuals. The

26

District has approximately 650 employees, all of whom will also be prohibited from wearing Chiefs apparel on school property come June 30, 2025.

121.    But Part 123's prior restraint strays far beyond that. It will also chill the expressive activity of every future District employee or official, so long as it is in effect. Those potential future employees could be current students or recent graduates who have gone off to college with the intent to someday return to the Massapequa and serve as a District employee or official—just like Plaintiff Caramore.

122.    Part 123's reach goes even further than current and future District employees or officials. Part 123 is a state-wide ban that affected 13 public school districts on Long Island and about 60 public school districts throughout New York State. The chilling effect of Part 123 is immense.

123.    Part 123 should be invalidated as substantially overbroad because it reaches a substantial amount of constitutionally protected First Amendment activity through viewpoint and/or content-based restrictions that cannot survive strict scrutiny, as discussed in further detail below. In other words, Part 123 is unconstitutionally overbroad because a substantial number of its applications are unconstitutional, judged in relation to its purported plainly legitimate sweep.

124.    Part 123 lacks any tailoring to Defendants' purported goal, which is to prevent DASA violations. Part 123 does not even provide a mechanism to determine whether a DASA violation has occurred, or is likely to occur, in a particular school district so as to warrant a team name, logo, or mascot change. Rather, it creates a sweeping, policy-based determination that strays far beyond the scope of the enabling statute (DASA) and in doing so creates an unnecessary risk of chilling the speech and expression of school employees, and the school community at large, in violation of the First Amendment.

125.    Not only did Part 123 fail to provide a mechanism to determine whether a DASA violation ever occurred in the District (or at any other) in relation to its sports team name or logo, but the NYSED has no evidence of any such violations occurring in the District, and never made attempts to collect such evidence. And as discussed above, none exists. On the contrary, in the 70 years the Chiefs name and logo has been in use, the District has never received a complaint about its team name and logo, in the context of a DASA complaint or otherwise. The NYSED (through sworn testimony given by Assistant Commissioner of Education David Frank) conceded that before enacting Part 123, the NYSED only informally surveyed tribal nations about the use of team names, mascots, and logos, but did not survey any school districts or students.

126.    Plaintiffs are entitled to a final judgment declaring that Part 123 is unconstitutionally overbroad because a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep.

### AS AND FOR A SECOND CAUSE OF ACTION ASSERTED BY JEANINE CARAMORE IN HER INDIVIDUAL CAPACITY AGAINST THE INDIVIDUAL DEFENDANTS

### (Violation of First Amendment Right to Freedom of Speech)

127.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

128.    The First Amendment of the United States Constitution, through the Fourteenth Amendment, restricts the States from unlawfully compelling speech and impairing the right to free speech. The First Amendment generally prevents governments from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. As the U.S. Supreme Court held in *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015), under the Free Speech Clause of the First Amendment, a government "has no power to restrict expression because of its message,

its ideas, its subject matter, or its content." Such content-based and/or viewpoint-based regulations are presumptively invalid.

129.    Content-based restrictions on speech—those that target speech based on its communicative content—are presumptively unconstitutional and subject to a strict scrutiny standard. Under this exacting standard, governmental regulation of speech is enforceable only if it is the least restrictive means for serving a compelling government interest.

130.    Viewpoint discrimination—which occurs when the government within the relevant subject category has singled out a subset of messages for disfavor based on the views expressed—is an "egregious form of content discrimination" and is also "presumptively unconstitutional." *Reed*, 576 U.S. at 163.

131.    Part 123 constitutes a prior restraint, as it suppresses speech based on its content and before its actual expression. Part 123 imposes a viewpoint-based prohibition of speech before its expression.

132.    As a content and viewpoint-based prior restraint on expression, Part 123 is presumptively unconstitutional and triggers strict scrutiny review.

133.    Part 123 overreaches; it is not narrowly tailored to advance its interest, and it impermissibly restricts expressive conduct protected by the First Amendment. It fails strict scrutiny. Plaintiff Caramore and other District employees and officials engage in First Amendment-protected expressive activity when they wear their Chiefs apparel on school property for the purpose of attending school functions, including sports games, concerts, and other events as parents and members/residents of the school community.

134.    When Plaintiff Caramore and other District employees and officials wear their Chiefs apparel, they engage in expressive activity that intends to convey a particularized message.

135.    When Plaintiff Caramore and other District employees and officials wear their Chiefs apparel, they engage in activity as citizens and members of the public on matters of public concern.

136.    The protections of the First Amendment are not limited to spoken words, but also include gestures and other expressive conduct, even if offensive to some.

137.    Part 123 prohibits school officers and employees from utilizing or promoting any Indigenous name, logo, or mascot, while on school property or at a school function. (8 NYCRR 123.5.) Because Part 123 is a content-based and viewpoint-based prior restraint, it is subject to strict scrutiny.

138.    This enforcement provision of Part 123 unlawfully restricts individuals' free speech in violation of the First Amendment. Specifically, it prohibits District officials and employees, like Plaintiff Caramore, from engaging in expressive conduct through wearing Chiefs apparel, regardless of whether they are acting as a citizen and a member of the public.

139.    Plaintiff Caramore is not only the Vice President of the Board of Education. She is a life-long resident of Massapequa who attended the District from Kindergarten through 12th grade.

140.    During her tenure as a high school student in the District, Plaintiff Caramore was Captain of the High School Varsity Volleyball team, President of student government, and intimately involved in various other extracurriculars, school functions, and community volunteer efforts.

141.    To Plaintiff Caramore, a Massapequa Chief is a leader; she affiliates the name with pride and respect. As a student, Plaintiff Caramore tried to embody a Massapequa Chief by taking on various leadership roles during her high school career.

142.    Plaintiff Caramore is also a parent within the school community. Before graduating

in 2022, her daughter played sports for the District. Her son, who currently plays varsity soccer and tennis for the District's high school, is expected to play sports for the District's high school until graduating from there. Prior to playing for high school sports teams, Plaintiff Caramore's son played soccer for the District's middle school.

143.    In addition to attending her own children's sports games, Plaintiff Caramore attends other school games, including but not limited to, homecoming, football games, and various playoffs. She also attends track meets for special education students.

144.    School sports are a popular pastime in Massapequa. The majority of the community attends school games while sporting their Chiefs apparel.

145.    Chiefs apparel also correlates with fundraising efforts. For example, members of the school community, including Plaintiff Caramore, will wear pink Chiefs apparel when fundraising for breast cancer, and they will often wear Chiefs apparel with an American flag to recognize 9/11.

146.    Wearing specialty apparel intended to show that the school community is united in supporting such fundraising efforts constitutes expressive activity warranting First Amendment protection.

147.    Plaintiff Caramore, like other District officials and employees, considers herself to be a lifelong Massapequa Chief. She wears her Chiefs apparel to support not only student athletes, but the school and town community as a whole.

148.    As parents, Plaintiff Caramore and her husband wear their Chiefs apparel while attending their son's school games and other school functions.

149.    When Plaintiff Caramore, and other District officials or employees, attend school sports games and other functions wearing clothing and accessories that bear the Chiefs team name

31

and logo, they intend to convey a particularized message: that they identify as members of, and associate with, the Massapequa Chiefs (not the opposing team), that they support their school athletes, and that they embody the core principles that their school team name represents.

150.    When Plaintiff Caramore and other District officials and employees wear their school apparel, they don a symbol that signifies their group and viewpoint association.

151.    Team names, logos, and/or mascots are a common symbol of group or viewpoint association; after all, mascots are a cherished tradition in sports that are intended to facilitate a sense of pride and unity among the team and fans.

152.    When Massapequa Chiefs wear their apparel, they send a message of solidarity and support for their community and the symbol that represents this community, which would be readily understood by those viewing it—particularly when school sports are a popular pastime in the community where the bleachers are filled with students, parents, and faculty members wearing Chiefs apparel in solidarity.

153.    Since the inception of Part 123 in 2023, Plaintiff Caramore and other District officials and employees have donned Chiefs apparel for another reason: to protest Part 123 and fight for their First Amendment right to express themselves as members of the Chiefs community. As a Massapequa alumnus, parent, long-time resident, and an American citizen, Plaintiff Caramore fundamentally believes she has a First Amendment right to wear her Chiefs apparel even though Defendants (through the implementation of Part 123) have prohibited her from doing so.

154.    Plaintiff Caramore and other District officials and employees continue to wear their Chiefs apparel to support the District's ongoing fight to maintain the Chiefs name and logo. This type of expressive activity hits at the very core of the First Amendment.

155.    By wearing their Chiefs apparel for this purpose, Plaintiff Caramore and other

District officials and employees have engaged, and continue to engage, in First Amendment protected activity in protest of Defendants' implementation and enforcement of Part 123, which itself restricts their fundamental First Amendment rights to freedom of expression.

156.    By engaging in such protected First Amendment activity, the residents of Massapequa were able to get the attention of the President of the United States, Donald Trump publicly expressed his support for the Plaintiffs' right to maintain the Chiefs' name and logo in an April 21, 2025 post on his Truth Social account, in which he referred to Part 123 as "ridiculous" and posted the following on his Truth Social account:



157.    The apparel President Trump can be seen holding in the photo below is specialty Chiefs apparel designed to protest Part 123. It contains the contents of Donald Trump's tweet on the back.



158.    When Plaintiff Caramore wears her Chiefs apparel to protest Part 123 and to support the District's ongoing fight to keep its team name and logo, she undoubtedly engages in expressive activity on a matter of public concern.

159.    When Plaintiff Caramore and other District officials and employees wear their Chiefs apparel to protest Part 123 and support the District's ongoing fight to keep its team name and logo, they undoubtedly engage in expressive activity on a matter of public concern.

160.    Their speech involves matters of political, social, and other concerns to the community, and are the subject of legitimate news interests of value and concern to the public.

161.    The issues in this case are not only matters of public concern within the Massapequa school community, they have become matters of nationwide interest involving not only school mascots but professional sports teams.

162.    Various news media outlets have reported on the matter, including the New York Times, CNN, Fox News, NBC, ABC7, News 12, Newsday, Newsweek, The Hill, The Morning

34

Call, The New York Post, The Long Island Press, The Massapequa Herald, and many other outlets. Even before garnering national attention, it was a matter of public concern throughout the State of New York. After Defendants announced their intent to implement Part 123, various news media outlets wrote about the regulation, with most of the articles calling out the District by name as one of the school districts implicated by the regulation.

163.    The fact that Part 123 is an unfunded mandate for which noncompliance threatens the removal of school officials and state funding that makes it a matter of public concern. District officials and employees have a First Amendment right to wear their Chiefs apparel in any context. There is no compelling government interest to prohibit such expressive conduct.

164.    In fact, Commissioner Mills's letter from 2001[3], which set off the movement that led to Part 123, stated, "School mascots are intended to make a statement about what the the (sic) school values."

165.    Commissioner Mills further stated, "The use of Native American names, symbols, and mascots is such a significant issue that it is being looked at in other states, in professional sports, at the collegiate level, as well as at the local level in some New York school districts."

166.    Commissioner Mills continued, "Our review confirmed that the use of Native American symbols is part of time-honored traditions in some of our communities, and that there are deeply felt, albeit conflicting, ideas about them." And this issue has led to "extensive statewide discussion of this issue."

167.    As exemplified by Commissioner Mills's comments, this issue is significant and implicates time-honored, statewide matters of public concern.

---

[3] Richard P. Mills, *Public Schools Use of Native American Names, Symbols, and Mascots*, N.Y. State Educ. Dep't (Apr. 5, 2001), https://www.nysed.gov/sites/default/files/programs/indigenous-education/public-schools-use-of-native-american-names-symbols-and-mascots.pdf.

## AS AND FOR A THIRD CAUSE OF ACTION ASSERTED BY ALL PLAINTIFFS AGAINST THE INDIVIDUAL DEFENDANTS

### (Part 123 Violates the First Amendment Rights of Incumbent and Non-Tribal Member Candidates)

168.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

169.    Part 123 is unconstitutional because it violates the First Amendment rights of incumbent school board members, as well as district employees and officers who are running for the school board and are not members of a tribal nation.

170.    Under Part 123, school officers and employees—including incumbent board members—are prohibited from "utilizing or promoting any Indigenous name, logo, or mascot" while on school property or at school functions, unless they are members of a tribal nation. This restriction applies even when the Indigenous name or logo is historically associated with the school and is a core part of the board member-candidate's political campaign message and identity.

171.    This restriction prevents incumbent school board members (who are not members of tribal nations) from engaging in protected political expression during campaigns, including wearing apparel (e.g., jackets, hats, pins, or team gear) bearing the school's Indigenous name or logo during school events such as football games, which are traditional campaign forums in local elections.

172.    This restriction also prevents school employees and officers (who are not members of tribal nations) from engaging in protected political expression if they run for school board, including wearing apparel (e.g., jackets, hats, pins, or team gear) bearing the school's Indigenous name or logo during school events.

173.    Part 123 does not apply to school board candidates who are not current district

36

employees, officers, or board members. Nor does it apply to board members, officers, or employees who are members of a tribal nation. These candidates may freely attend the same school functions wearing Indigenous-branded apparel of their school or distributing campaign materials bearing Indigenous names and logos to advance their campaign messaging. This creates a content-based, speaker-based, and viewpoint-based asymmetry in school board elections.

174.    This asymmetrical restriction operates to chill the protected speech of incumbent candidates and candidates who are school employees and officers (who are not members of tribal nations). As in *Davis v. FEC*, 554 U.S. 724 (2008), where the Supreme Court struck down a statute that gave preferential fundraising rights to non-self-financing candidates, the Defendants here impose a structural burden on First Amendment rights, giving non-incumbent candidates, non-district-employed candidates, and tribal nation member candidates a constitutionally impermissible advantage.

175.    In *Davis*, the Supreme Court emphasized that a candidate cannot be forced to "choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations." *Davis v. FEC*, 554 U.S. 724, 739 (2008). Yet that is precisely what Part 123 imposes here: a government-forced decision between exercising First Amendment rights or compliance with a discriminatory ban.

176.    For example, if a school board candidate forum were held on school property in Massapequa School District, only the incumbents would be forced to remove "Chiefs" apparel, while challenging candidates (not employed by the District) and tribal nation candidates would be free to use and promote the "Chiefs" name and logo to advance their political and campaign messaging.

177.    By suppressing one class of speakers (incumbents and district-employed

37

candidates) based on their status and content of their message (supporting the continued use of Indigenous names/logos), the regulation is not narrowly tailored to any compelling governmental interest.

178.    As applied here, Plaintiff Caramore is an incumbent member of the Massapequa Board of Education and intends to seek re-election during the next eligible election cycle. She is not a member of a tribal nation and is subject to Part 123's prohibition on "utilizing or promoting any Indigenous name, logo, or mascot" on school property or at a school function.

179.    In connection with her campaign, Plaintiff Caramore plans to engage in expressive and speech conduct by wearing apparel bearing the "Chiefs" name and logo—representing the school's historical identity—and by distributing campaign materials featuring the same. She also plans to use slogans like "Once a Chief, Always a Chief." She intends to do so at school-sponsored events and on school property, including football games, concerts, ceremonies, and other public functions that serve as traditional forums for candidate engagement and voter outreach.

180.    Part 123 prohibits her from engaging in this protected expression solely because of her status as a school officer and non-tribal member, thereby infringing her First Amendment rights.

181.    Accordingly, Part 123 is unconstitutional under the First and Fourteenth Amendments.

182.    Plaintiffs are entitled to a declaratory judgment that Part 123 is unconstitutional and to a permanent injunction enjoining its enforcement against them.

**AS AND FOR A FOURTH CAUSE OF ACTION BY PLAINTIFFS THE DISTRICT, BOARD OF EDUCATION, AND CARAMORE (IN HER OFFICIAL CAPACITY) AGAINST ALL DEFENDANTS**

**(Part 123 Violates Title VI of the Civil Rights Act of 1964)**

183.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

184.    Title VI provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

185.    Title VI prohibits intentional discrimination based on race, color, and national origin in any program that receives federal funding. *See id.*

186.    The Defendants are, and operate, programs that receive federal funding.

187.    The District, and other similarly situated school districts in New York, also receive federal funding through the Defendants.

188.    Title VI applies to both the Plaintiffs and Defendants.

189.    Part 123 violates Title VI in three independent respects: (1) it compels school districts to eliminate Indigenous names, logos, and mascots—targeted symbols of a protected racial and national-origin group; (2) it coerces districts into discriminatory contracting practices by invalidating or forbidding agreements with Indigenous individuals and organizations; and (3) it mandates adverse treatment of certain Indigenous school officers and employees by barring their use or promotion of culturally affiliated imagery on school property.

190.    First, Part 123 violates Title VI by discriminating on the basis of race and national origin because it compels public schools to remove Indigenous names, logos, and mascots—

symbols of a protected group—while leaving intact imagery representing any other racial or national-origin group. School districts can display the names, symbols, and logos of any individual, group, or peoples of any racial or national origin group—except for Indigenous peoples.

191.    For example, Part 123 targets and requires the removal of Indigenous symbols—including the Plaintiffs' "Chiefs" name and logo in Massapequa—while allowing all other names, logos, and mascots of other racial and national origin groups to remain in place, such as the "Fighting Irish" or "Vikings."

192.    By compelling Plaintiffs and other districts to abandon their Indigenous names and logos, Part 123 singles out and burdens Indigenous peoples—members of a protected racial and national-origin group—in direct violation of Title VI.

193.    Indigenous groups nationwide have opposed Part 123. For example, a Department of Education Office for Civil Rights complaint filed by the NAGA—a collective of "American Indian enrolled members and tribal descendants" who "stand united to preserve the rich legacy of our ancestors and ensure that American Indian names, symbols, and traditions are honored"[4]–catalyzed a Title VI investigation by the Department of Education.

194.    Second, Part 123 violates Title VI by discriminating on the basis of race and national origin because it bars public school districts from contracting with Indigenous individuals or organizations, while permitting identical contracts with groups of any other race or national-origin background.

195.    Part 123.4(b) offers only a narrow carve-out—preserving pre-May 3, 2023 written agreements with recognized tribes—while flatly forbidding any new agreements thereafter. By

---

[4] Native American Guardians Ass'n, *Native American Guardians Association*, https://www.nagaeducation.org/ (last visited May 2, 2025).

categorically denying Indigenous groups the ability to contract after that date regarding their NIL, the regulation effectively singles out and penalizes Indigenous peoples, imposing a race- and national-origin-based bar on their contractual rights that no other group faces.

196.    Moreover, even the narrow exception allowing school districts and tribes to contract before May 3, 2023, discriminates on the basis of race and national origin by limiting contractual rights only to "federally recognized tribal nations within New York or New York State–recognized tribes." Part 123.4(b). Indigenous individuals and groups lacking formal tribal affiliation are categorically excluded, underscoring the regulation's impermissible targeting of a protected class.

197.    By contrast, school districts are free at any time to enter into identical NIL agreements with individuals or groups of any other race or national origin—none of whom must demonstrate formal affiliation with a recognized tribe or meet any analogous criterion. This disparate treatment is a textbook facial violation of Title VI, depriving Indigenous peoples of the same contracting opportunities afforded to all other groups.

198.    As applied to Plaintiffs, the MSD–NAGA Agreement is a valid, post–May 3, 2023 written contract between the Plaintiffs and a consortium of Indigenous nations, tribes, and individuals that expressly permits and obligates Plaintiffs to continue using the "Chiefs" name and logo. Because Part 123 categorically bars any such agreement after May 3, 2023, Plaintiffs face an impossible choice—comply with the regulation or discriminate against the NAGA and fail to satisfy their contractual obligations—creating a direct conflict that violates Title VI.

199.    By forcing Plaintiffs to abandon their contractual obligations solely because the NAGA is composed of Indigenous nations and individuals and because the agreement involves Indigenous-based NIL, Part 123 compels a breach of the MSD-NAGA Agreement and

discriminates against the NAGA on the basis of race and national origin, in direct violation of Title VI.

200.    Had Plaintiffs entered into identical NIL agreements with any non-Indigenous group or individual, Part 123 would impose no prohibition on those contracts and would not force Plaintiffs to breach their obligations.

201.    Furthermore, for agreements signed with tribal nations prior to May 3, 2023, Part 123.4(b) provides that "[a] public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement." This provision expressly prohibits school districts from compensating Indigenous groups and individuals for the use of their names, mascots, or logos—compensation that would otherwise be available to any other racial or national origin group in similar contractual arrangements.

202.    By excluding Indigenous and tribal nations from consideration in such agreements, the regulation imposes a facially discriminatory restriction that violates Title VI. It deprives Indigenous groups and individuals of equal access to contractual rights.[5]

203.    As applied in this case, the MSD-NAGA Agreement expressly states that the Plaintiffs provide "Consideration" and "Things of Value" to the NAGA, including commitments

---

[5] This is not a theoretical concern. In 2023, the Salamanca City Central School District entered into an agreement with the Seneca Nation of Indians to continue using its "Warrior" nickname and logo. Yet under direct instruction from New York State, through Part 123.4(b), the district was prohibited from providing any form of compensation to the Seneca Nation for the use of its name and logo. This compelled denial of consideration is not only discriminatory but ongoing—and highlights the real-world impact of the regulation. In addition to violating Title VI, this provision constitutes an unconstitutional restraint on trade and a direct interference with the sovereign right of tribal nations to contract freely and equally with public institutions receiving federal funding. Associated Press, *Seneca Nation Approves Western NY School's 'Warrior' Nickname, Logo*, New York Upstate (May 17, 2023), https://www.newyorkupstate.com/native-american-news/2023/05/seneca-nation-approves-western-ny-schools-warrior-nickname-logo.html.

to educational programming and the Plaintiffs' continued use of the "Chiefs" name and logo.

204.    Because the MSD-NAGA Agreement provides "Consideration" and "Things of Value," Part 123.4(b) forces the Plaintiffs to breach their contractual obligations and discriminate against the NAGA solely on the basis of their Indigenous race and national origin.

205.    Had the Plaintiffs entered into a similar agreement with any other racial or national origin group—and provided consideration—there would be no such prohibitions and breach. By excluding Indigenous peoples and groups from consideration in such agreements, the regulation imposes a facially and as-applied discriminatory restriction that violates Title VI.

206.    In fact, Part 123.4(b)'s blanket ban on "any money, consideration, or thing of value"—which also applies to all pre-May 3, 2023 agreements—effectively precluded school districts from forming valid contracts with Indigenous groups. Under New York law, contract formation requires offer, acceptance, consideration, mutual assent, and intent to be bound. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) ("To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." (quotation marks omitted)); *Doctor's Assocs. v. Alemayehu*, 934 F.3d 245, 252 (2d Cir. 2019) ("The requirement that a contract be supported by consideration has continued, with slight modification, into the present, where it remains an essential element of contract formation: 'Where no consideration exists, and is required, the lack of consideration results in no contract being formed in the absence of a substitute for consideration' such as estoppel.") (citations omitted)).

207.    Because Part 123.4(b) bans the offer and acceptance of consideration, it prevents any enforceable agreement between school districts and Indigenous parties, thereby discriminating on impermissible grounds.

208.    Third, Part 123 is unconstitutional because Part 123.5 discriminates against

Indigenous school officers and employees who are not members of a tribal nation by prohibiting them from "utilizing or promoting any Indigenous name, logo, or mascot" on school property or at school functions—a facial violation of Title VI.

209. Part 123.5 states: "Public schools shall prohibit school officers and employees when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot." It then carves out a narrow exception for *only tribal members*, providing: "This provision shall not apply to any school officer or employee *who is a member of a tribal nation* and is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation." Part 123.5 (emphasis added).

210. This arbitrary distinction means that Indigenous school personnel who are not formally affiliated with a tribal nation are barred from expressing or honoring their own culture, heritage, or identity. No other racial, ethnic, cultural, or national origin group is subject to such a "tribal affiliation" requirement or subsequent prohibition. By creating this discriminatory restriction, Part 123 imposes a discriminatory burden that directly violates Title VI.

211. Part 123 also inflicts concrete harm on the Plaintiff District's operations, its compliance policies, its relationship with staff, and exposes the Plaintiff District to legal liability from Title VI claims. Under Part 123, the Plaintiff would also incur substantial expenses to redesign and replace the name, logo, uniforms, signage, websites, and other branded materials to comply with the ban.

212. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law preempts any state regulation that conflicts with or stands as an obstacle to the enforcement of Title VI.

213. Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted by Title VI, and to a permanent injunction barring its enforcement against them.

## AS AND FOR A FIFTH CAUSE OF ACTION BY PLAINTIFFS THE DISTRICT, BOARD OF EDUCATION, AND CARAMORE (IN HER OFFICIAL CAPACITY) AGAINST ALL DEFENDANTS

### (Part 123 Violates Title VII of the Civil Rights Act of 1964)

214.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

215.    Part 123 facially violates Title VII because it directs school districts to discriminate against certain Indigenous people with respect to the terms, conditions, and privileges of their employment because of their race and national origin.

216.    Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

217.    Title VII applies to state, local, and federal governments with at least 15 employees. *Mount Lemmon Fire Dist. v. Guido*, 586 U.S. 1, 4 (2018) ("The 1972 amendment to Title VII thereby extended the statute's coverage to state and local government entities by defining them as 'person[s].' In turn, as 'person[s],' these entities meet Title VII's definition of 'employer' and are subject to liability only if they have at least 15 employees.")

218.    The District is a local government employer with at least 15 employees and is thus subject to Title VII.

219.    Defendants are also a state employer with at least 15 employees and is thus subject to Title VII.

220.    Part 123.5 requires public schools to prohibit school officers and employees from "utilizing or promoting any Indigenous name, logo, or mascot" on school property or at school

functions.

221.    Part 123.5 provides an exception for "any school officer or employee who is a member of a tribal nation and is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation."

222.    Although the regulation includes an exception for employees and officers who are *members* of a tribal nation, it flatly prohibits all other Indigenous employees and officers— including those with Indigenous cultural, familial, or ancestral ties—from engaging in the same expression. In doing so, Part 123 discriminates against Indigenous employees and officers based on their race and national origin.

223.    This discriminatory restriction directly affects the terms, conditions, and privileges of employment for a subset of Indigenous individuals on the basis of their race and national origin. It creates a discriminatory requirement based on their tribal affiliation.

224.    No other racial, cultural, or national origin group is subject to a comparable term or condition on the expression of their own culture or identity in the workplace.

225.    The District employs numerous staff whose race and national origin it does not— and cannot reasonably—ascertain without impermissibly probing into protected classifications. Under Part 123's blanket bar, the Plaintiff District must treat every employee as if they might be non-tribal unless that individual affirmatively demonstrates membership in a tribal nation—a status the District has no reliable, non-invasive way to verify.

226.    To comply with Part 123, the Plaintiff District would have to single out and restrict the protected expression of any Indigenous employee not proven to be a tribal member— effectively disciplining or censoring Indigenous staff while allowing non-Indigenous employees free expression.

227.    Alternatively, if the Plaintiff District permits all employees to use or promote the "Chiefs" name and logo, it risks sanctions under Part 123.

228.    Part 123 inflicts concrete harm on the Plaintiff District's operations, its compliance policies, its relationship with staff, and exposes the Plaintiff District to legal liability from Title VII claims from misidentified and mistargeted employees. Under Part 123, the Plaintiff would also incur substantial expenses to redesign and replace the name, logo, uniforms, signage, websites, and other branded materials to comply with the ban.

229.    Thus, Part 123 violates Title VII.

230.    Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law preempts any state regulation that conflicts with or stands as an obstacle to the enforcement of Title VII.

231.    Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted by Title VII, and to a permanent injunction barring its enforcement against them.

### AS AND FOR A SIXTH CAUSE OF ACTION BY PLAINTIFFS THE DISTRICT, BOARD OF EDUCATION, AND CARAMORE (IN HER OFFICIAL CAPACITY) AGAINST ALL DEFENDANTS

### (Part 123 Violates 42 U.S.C. § 1981)

232.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

233.    Part 123 is unconstitutional under 42 U.S.C. § 1981 because it (a) bars every public school from entering into contracts with Indigenous tribes, and (b) prohibits any "money, consideration, or thing of value" in pre-May 3, 2023 tribal agreements—thereby denying Indigenous peoples the "full and equal benefit of all laws" and the right to contract.

234.    Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue,

be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

235.    This protection extends to all "racial" discrimination in contract formation and enforcement, including on the basis of ancestry, ethnicity, and color. *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts.").

236.    On its face, Part 123.4 prohibits any new contracts between public schools and Indigenous tribes after May 3, 2023, while permitting identical contractual relationships with groups of every other race or national origin.

237.    Part 123.4(b) further bars "any money, consideration, or thing of value" in all pre-May 3, 2023 agreements. That blanket ban renders contract formation with Indigenous parties impossible, as New York law requires offer, acceptance, consideration, mutual assent, and intent to be bound.

238.    By denying Indigenous groups and individuals both the right to enter new NIL contracts and the ability to receive any consideration in existing ones—while imposing no comparable restrictions on any other racial, national origin, or ethnic group—Part 123 discriminates on the basis of race and national origin in NIL contract formation, in direct conflict with Section 1981.

239.    As applied here, the MSD–NAGA Agreement is a valid, post–May 3, 2023 contract between Plaintiffs and the NAGA (a consortium of Indigenous nations and individuals) that obligates Plaintiffs to continue using the "Chiefs" name and logo in exchange for consideration. Part 123's interdiction of such agreements both (i) nullifies Plaintiffs' contractual rights, and (ii)

forces Plaintiffs to breach their contractual obligations solely because of the NAGA's Indigenous status.

240.    Had Plaintiffs entered into an identical NIL agreement with a non-Indigenous individual or group, Part 123 would impose no prohibition and would not compel breach.

241.    If Part 123 invalidates the MSD-NAGA Agreement, the Plaintiffs face the loss of a valid NIL agreement, damage to relationships with tribal partners, and the erosion of the Plaintiff District's reputation and goodwill.

242.    Part 123 also inflicts concrete harm on the Plaintiff District's operations, its compliance policies, its relationship with staff, and exposes the Plaintiff District to legal liability based on breach of contract claims, Title VI claims, and Title VII claims.

243.    Under Part 123, the Plaintiff would also incur substantial expenses to redesign and replace the name, logo, uniforms, signage, websites, and other branded materials to comply with the ban.

244.    Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law preempts any state regulation that conflicts with or stands as an obstacle to the enforcement of 42 U.S.C. § 1981.

245.    Accordingly, Part 123 violates Section 1981 and must be declared unconstitutional.

246.    Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted by Section 1981, and to a permanent injunction barring its enforcement against them.

### AS AND FOR A SEVENTH CAUSE OF ACTION BY PLAINTIFFS THE DISTRICT, BOARD OF EDUCATION, AND CARAMORE (IN HER OFFICIAL CAPACITY) AGAINST ALL DEFENDANTS

### (Part 123 Violates the Dormant Commerce Clause)

247.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

248.    Part 123 violates the Dormant Commerce Clause of the U.S. Constitution (U.S. Const. art. I, § 8, cl. 3) because it discriminates against out-of-state Indigenous tribes while favoring in-state Indigenous tribes.

249.    The Dormant Commerce Clause is a constitutional prohibition. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 364 (2023) ("Assuredly, under this Court's dormant Commerce Clause decisions, no State may use its laws to discriminate purposefully against out-of-state economic interests.").

250.    The Dormant Commerce Clause embodies the "principle that one state in its dealings with another may not place itself in a position of economic isolation." *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 429 (2d Cir. 2013) (citation omitted).

251.    Section 123.4(b) establishes protectionist provisions for New York-based and New York-recognized tribal nations, while excluding all other out-of-state tribes from contracting:

> This Part shall not apply where a written agreement exists prior to the effective date of this part between a federally recognized tribal nation *within the State of New York* or a *New York State recognized tribal nation* and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe. A public school shall not offer or accept any money, consideration, or thing of value pursuant to any such agreement. The tribal nation shall have the right and ability to revoke any such agreement at any time. Upon termination of such an agreement, the public school shall have the remainder of the school year in which such agreement is revoked and one additional school year to discontinue its use of an Indigenous name, logo, or mascot.

Section 123.4(b).

252.    Part 123 draws a discriminatory line between New York's own tribes (allowed to contract) and every other federally recognized tribe (flatly prohibited from contracting within New York). Both on its face and as applied, Part 123 systematically favors in-state tribes while disadvantaging out-of-state tribes, imposing a substantial and unjustified burden on interstate

commerce.

253.    Part 123's burdens on interstate commerce far exceed any marginal benefit in state policy, especially in light of the fact that many tribal nations span across state borders, have been displaced to other states, and have cultures that do not align neatly within New York State's borders.

254.    As applied here, Plaintiffs executed the MSD–NAGA Agreement with NAGA—a consortium of Indigenous tribes, tribal descendants, and individuals—after May 3, 2023, which is rendered invalid by the discriminatory provisions in Part 123. But if this Court were to invalidate only the "effective date" restriction in Part 123.4(b) and leave the rest of Part 123 intact (despite its lack of a severability clause), the regulation would still operate unconstitutionally as applied to the MSD–NAGA Agreement. By blocking post–May 3, 2023 agreements with out-of-state tribes—including with the NAGA—while permitting in-state tribes to contract, Part 123 imposes a substantial, discriminatory burden on interstate commerce in violation of the Dormant Commerce Clause.

255.    Because the MSD–NAGA Agreement includes a consortium of Indigenous tribes, groups, and individuals with some who are either based outside of New York or not formally recognized by New York as a tribe, Part 123's favoritism for in-state tribes imposes a protectionist barrier that unlawfully discriminates against the NAGA and conflicts with federal law.

256.    If Part 123 invalidates the MSD-NAGA Agreement, the Plaintiffs face the loss of a valid NIL agreement, damage to relationships with tribal partners, and the erosion of the Plaintiff District's reputation and goodwill.

257.    Part 123 also inflicts concrete harm on the Plaintiff District's operations, its compliance policies, its relationship with staff, and exposes the Plaintiff District to legal liability

based on breach of contract claims, Title VI claims, and Title VII claims.

258.    Under Part 123, the Plaintiff would also incur substantial expenses to redesign and replace the name, logo, uniforms, signage, websites, and other branded materials to comply with the ban.

259.    Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law preempts any state regulation that conflicts with or stands as an obstacle to the enforcement of the Dormant Commerce Clause.

260.    Accordingly, Part 123 violates the Dormant Commerce Clause and must be declared unconstitutional.

261.    Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted, and to a permanent injunction barring its enforcement against them.

**AS AND FOR AN EIGHTH CAUSE OF ACTION BY PLAINTIFFS THE DISTRICT, BOARD OF EDUCATION, AND CARAMORE (IN HER OFFICIAL CAPACITY) AGAINST ALL DEFENDANTS**

**(Part 123 Violates the Indian Commerce Clause)**

262.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

263.    Part 123 is unconstitutional because it is preempted by the Indian Commerce Clause (U.S. Const. art. I, § 8, cl. 3).

264.    "The Indian Commerce Clause grants the United States Congress the power 'to regulate commerce ... with the Indian tribes.'" *New York v. Mt. Tobacco Co.*, 942 F.3d 536, 544 (2d Cir. 2019) (citing U.S. Const. art. I, § 8, cl. 3).

265.    That power extends beyond mere trade to the broader domain of "Indian affairs," including the regulation of tribal sovereign rights. *See White Mountain Apache Tribe v. Bracker*,

448 U.S. 136, 142, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980) ("Congress has broad power to regulate tribal affairs."); *Haaland v. Brackeen*, 599 U.S. 255, 278 (2023) ("As we already explained, our precedent states that Congress's power under the Indian Commerce Clause encompasses not only trade but also 'Indian affairs.'") (citations omitted); *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1983) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs.") (citation omitted).

266.    Tribal affairs are implicated when a state attempts to regulate "activity undertaken . . . by tribal members." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980).

267.    Courts have observed "that only *Congress*—not the states—may act to diminish tribal sovereignty." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Evers*, 46 F.4th 552, 557-558 (7th Cir. 2022) (citing *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788, 134 S. Ct. 2024, 2030, 188 L. Ed. 2d 1071 (2014).

268.    The U.S. Supreme Court has further emphasized, "While under the Interstate Commerce Clause, States retain 'some authority' over trade, we have explained that 'virtually all authority over Indian commerce and Indian tribes" lies with the Federal Government.'" *Haaland v. Brackeen*, 599 U.S. 255, 273 (2023) (citing *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 62, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996)).

269.    This exclusive federal regulatory domain is reinforced by the "trust relationship" between the United States and Indian tribes. *United States* v. *Mitchell*, 463 U. S. 206, 225-226, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983). The Federal Government owes Indian tribes "moral obligations of the highest responsibility and trust," *United States* v. *Jicarilla Apache Nation*, 564

U. S. 162, 176, 131 S. Ct. 2313, 180 L. Ed. 2d 187 (2011).

270.    In evaluating preemption in this context, "[r]elevant federal statutes and treaties must be examined in light of 'the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.'" *Ramah Navajo Sch. Bd. v. Bureau of Revenue*, 458 U.S. 832, 838 (1982) (citations omitted); *id.* ("ambiguities in federal law should be construed generously, and federal pre-emption is not limited to those situations where Congress has explicitly announced an intention to pre-empt state activity.").

271.    By denying tribal nations the ability to contract with public schools for NIL, imposing rigid temporal cut-offs, and disallowing any "money, consideration, or thing of value" in NIL contracts with tribal nations, Part 123 directly prohibits certain commerce with Indian tribes, infringes upon the sovereignty of tribal nations, and impermissibly regulates in Congress's exclusive domain of tribal affairs.

272.    Because federal law preempts any state regulation that intrudes on tribal affairs and commerce, Part 123 is both field-preempted (Congress occupies the field of Indian-tribal relations) and conflict-preempted (Part 123 frustrates federal objectives).

273.    Part 123 also infringes Congress's "trust responsibility" to protect Indigenous peoples. As detailed above, Part 123 violates Title VI, Title VII, the Due Process Clause, and Section 1981 by discriminating against Indigenous groups and individuals. Taken together with the federal government's unique fiduciary obligations under the Indian Commerce Clause and the trust relationship, this body of federal law preempts Part 123's discriminatory regime.

274.    Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, any state regulation that conflicts with or obstructs Congress's Indian Commerce power and its attendant trust responsibilities is preempted.

275. Part 123 violates the Indian Commerce Clause and must be declared unconstitutional and preempted.

276. Plaintiffs are entitled to a declaratory judgment that Part 123 is preempted by the Indian Commerce Clause, and to a permanent injunction barring its enforcement against them.

## AS AND FOR A NINTH CAUSE OF ACTION BY PLAINTIFFS THE DISTRICT, BOARD OF EDUCATION, AND CARAMORE (IN HER OFFICIAL CAPACITY) AGAINST ALL DEFENDANTS

### (Part 123 Is An Unconstitutional Bill of Attainder)

277. Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

278. Part 123 is an unconstitutional bill of attainder because it legislatively determines guilt and inflicts punishment on public school districts in New York that have Indigenous mascots, logos, or names and imposes penalties without any judicial trial or individualized adjudication.

279. The State-Bill-of-Attainder Clause provides: "No State shall…pass any Bill of Attainder." U.S. Const. art. I, § 10, cl. 1; *Consol. Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 345 ("The Constitution includes two clauses prohibiting enactment of 'bills of attainder': . . . Section 10 [applies] to the states.").

280. "Briefly stated, a constitutionally proscribed bill of attainder is 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Id.* at 346 (citations omitted); *United States v. Lovett*, 328 U.S. 303, 315, 90 L. Ed. 1252, 66 S. Ct. 1073, 106 Ct. Cl. 856 (1946) ("Legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution.")

281.    The Bill-of-Attainder Clause protects individuals, private groups, firms, and corporations. *Consol. Edison Co. of N.Y., Inc*, 292 F.3d at 349 ("We therefore hold that corporations must be considered 'individuals,' . . . that may not be singled out for punishment under the Bill of Attainder Clause in Article I, Section 10."); *id.* at 348 ("[B]ills of attainder historically have targeted corporations as well as natural persons. Con Ed cites several English statutes that imposed disabilities on English boroughs, hardly natural persons. *See, e.g.*, 1 & 2 Geo. 4, c.47 (Eng. 1821).").

282.    "[A] statute can be a bill of attainder only if (1) it 'determines guilt and inflicts punishment,' (2) 'upon an identifiable individual,' and (3) 'without provision of the protections of a judicial trial.'" *Consol. Edison Co. of N.Y., Inc.*, 292 F.3d at 346 (citing *Nixon*, 433 U.S. at 468).

283.    Here, Part 123 was enacted through a regulatory process—not through a legislative process—and thus satisfies the lack of "judicial trial" requirement. *See Consol. Edison Co. of N.Y., Inc.*, 292 F.3d at 346 ("In the present case, the lack of a judicial trial is incontrovertible. Chapter 190 was enacted by the state legislature using purely legislative processes, without any additional protections akin to those present in a judicial trial.")

284.    Part 123 also inflicts guilt and punishment on identifiable individuals: the school districts and school board members of school districts that have Indigenous names, logos, and mascots.

285.    Part 123 prohibits all school districts from utilizing or displaying an Indigenous name, logo, or mascot other than for purposes of classroom instruction—but its true intention is to target the select few schools with such Indigenous names, logos, and mascots.

286.    The NYSED's official *Background and Frequently Asked Questions* document on Part 123 makes clear that the entire regulation is directed at "the limited number of districts" with

Indigenous names, mascots, and logos:

> *The requirements of the regulation* reflect a longstanding Department policy (dating back over twenty-two years) and *are clear in their purpose*. This guidance, in the form of a frequently asked questions document, reinforces such requirements *for the limited number of districts* still using such names, mascots, and logos, or using vestiges of their prior use, and provides an aid to implementation.
>
> *Background and Frequently Asked Questions*, p. 3 (emphasis added).

287.    Further underscoring the targeted nature of the regulation, the *Background and Frequently Asked Questions* document emphasizes: "Those districts that never utilized Indigenous imagery in connection with their team name will not be required to change." *Background and Frequently Asked Questions*, p. 6.

288.    The official April 2023 Meeting of the Board of Regents meeting notes related to Part 123 further targets school districts by name: "Other school districts have not complied. Among them, until recently, was the Cambridge Central School District."

289.    The punitive nature of Part 123 is also clear. The *Background and Frequently Asked Questions* document provides that "[i]f a school district does not comply with this regulation the Department may take several actions as prescribed under the education law including, but not limited to, the removal of school officers, or as a last resort, withholding of State Aid." *Background and Frequently Asked Questions*, p. 6; *see Consol. Edison Co. of N.Y., Inc.*, 292 F.3d at 348 (stating that in the bill of attainder context, "punishment can frequently take the form of economic injury.")

290.    Accordingly, Part 123 violates the State-Bill-of-Attainder Clause and must be declared unconstitutional.

291.    Plaintiffs are entitled to a declaratory judgment that Part 123 is unconstitutional and

to a permanent injunction barring its enforcement against them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment:

292.    Declaring that Part 123 conflicts with governing law and is therefore null and void;

293.    Enjoining Defendants from enforcing Part 123; and

294.    Awarding Plaintiffs such other and further relief as this Court may deem just, equitable, and proper.

Dated: Carle Place, New York
        May 19, 2025

SOKOLOFF STERN LLP
*Attorneys for Plaintiffs*

By: _____
        Steven C. Stern
        Chelsea Weisbord
        179 Westbury Avenue
        Carle Place, New York 11514
        (516) 334-4500
        File No. 230195


HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
*Attorney for Plaintiffs*

By: _____
        Oliver Roberts
        2300 N Street, NW, Suite 643
        Washington, D.C. 20037
        (516) 732-4080