# EXHIBIT 1



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

26 FEDERAL PLAZA, SUITE 31 - 100
NEW YORK, NEW YORK 10278

REGION 2

NEW JERSEY
NEW YORK
PUERTO RICO
U.S. VIRGIN ISLANDS

September 13, 2024

Sent via email only to:

Superintendent of Schools
    School District

Re:    Case Number            School District

Dear Superintendent

This letter is to notify you of the determination made by the U.S. Department of Education (the Department), Office for Civil Rights (OCR), with respect to the complaint filed against the _____ School District (the District). The Complainant alleged that during school year 2014-2015, and thereafter, the District discriminated on the basis of national origin (Native American) by failing to take prompt and effective action to end and prevent the recurrence of a hostile environment created by the use of a _____ as its mascot, and the display of related imagery throughout District schools.

OCR enforces Title VI of the Civil Rights Act of 1964 (Title VI), as amended, 42 U.S.C. §§ 2000d *et seq.*, and its implementing regulations at 34 C.F.R. Part 100, which prohibit discrimination on the bases of race, color, and national origin in programs and activities receiving federal financial assistance. As a recipient of federal financial assistance from the Department, the District is subject to Title VI.

As discussed below, before OCR completed its investigation of the allegation, the District expressed a willingness to resolve the complaint. OCR determined that resolution is appropriate under Section 302 of OCR's Case Processing Manual (CPM) (July 18, 2022) to resolve OCR's concerns regarding the District's response to the possible existence of a hostile environment that violates Title VI for students and other individuals that was created by the use of the former mascot and related imagery. OCR has determined that the District did not respond to all complaints of harassment or fully redress the possible effects of a hostile environment. On September 12, 2024, the District signed the enclosed resolution agreement to address OCR's concerns under Title VI and its implementing regulations.

I.   **Legal Standards**

The regulations implementing Title VI, at 34 C.F.R. § 100.3(a), provides that no person shall, on the basis of race, color, or national origin, be excluded from participation in, be denied the

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

000160

benefits of, or otherwise be subjected to discrimination under any program to which Title VI applies. The existence of a hostile environment that is created, encouraged, accepted, tolerated, or left uncorrected by a recipient constitutes discrimination on the basis of race, color, or national origin in violation of Title VI.

To establish a violation of Title VI under the hostile environment theory, OCR must find that: (1) a hostile environment based on race, color, or national origin existed; (2) the recipient had actual or constructive notice of the hostile environment; and (3) the recipient failed to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

OCR interprets Title VI to mean that the following type of harassment based on race, color, or national origin creates a hostile environment: unwelcome conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from a recipient's education program or activity. Harassing acts need not be targeted at the complainant in order to create a hostile environment. The acts may be directed at anyone, and the harassment may also be based on association with others of a different race, color, or national origin (e.g., the harassment might be referencing the race of a sibling or parent that is different from the race of the person being harassed whose access to the school's program is limited or denied).

The harassment must in most cases consist of more than casual or isolated incidents to establish a Title VI violation. Whether harassing conduct creates a hostile environment must be determined from the totality of the circumstances. OCR will examine the context, nature, scope, frequency, duration, and location of harassment based on race, color, or national origin, as well as the identity, number, age, and relationships of the persons involved. If OCR determines that the harassment was sufficiently severe or pervasive that it would have limited or denied the ability of a reasonable person, of the same age and race, color, or national origin as the victim, under similar circumstances, from participating in or enjoying some aspect of the recipient's education program or activity, OCR will find that a hostile environment existed.

A school may be found to have violated Title VI if it has effectively caused, encouraged, accepted, tolerated, or failed to correct a hostile environment based on harassment of which it has actual or constructive notice. A recipient is charged with constructive notice of a hostile environment if, upon reasonably diligent inquiry in the exercise of reasonable care, it should have known of the discrimination. In other words, if the recipient could have found out about the harassment had it made a proper inquiry, and if the recipient should have made such an inquiry, knowledge of the harassment will be imputed to the recipient.

Once a recipient has actual or constructive notice of a hostile environment, the recipient has a legal duty to take reasonable steps to eliminate it. OCR evaluates the appropriateness of the responsive action by assessing whether it was reasonable, timely, and effective. The appropriate response to a hostile environment based on race, color, or national origin must be tailored to redress fully the specific problems experienced as a result of the harassment.

## II. Investigation

During its investigation, OCR reviewed documentation that the Complainant and the District submitted. OCR also interviewed the Complainant and District staff and reached out to the President of the        Nation of Indians and the Chief of the                                    to solicit their views as well as those of other members of the        Nation, including any Nation children who attended school in the District. On October 27, 2016, OCR conducted an on-site inspection of several District schools. OCR also contacted former students alleged to have reported harassment on the basis of Native American ancestry.

### A. Composition of the District

The District is a public school district in        New York serving students from kindergarten through twelfth grade, including the area surrounding        , New York. The District includes eight schools, which OCR will refer to as Schools 1-8. During school year 2015-2016, 5,751 students were enrolled in the District. The District reported that 18 of these students identified as American Indian/Alaskan Native, approximately 0.31%. The District employed approximately 900 staff members. According to data available in the New York State Education Department Student Information Repository System, during school year 2022-2023, the District enrolled 5,347 students, 90% (4,815) of whom were White, 1% (66) of whom were Black or African American, 3% (186) of whom were Hispanic or Latino, 2% (112) of whom were Asian or Native Hawaiian/Other Pacific Islander, and 0.002% (11) of whom are American Indian or Alaska Native.

### B. The District's Policies Prohibiting Discrimination and Harassment of Students

The District's policies for addressing allegations of harassment are found in Board Policies 3420, Non-Discrimination and Anti-Harassment in the School District, (Board Policy 3420), Dignity for All Students Act (DASA) (Board Policy 7550), Bullying: Peer Abuse in the Schools (Board Policy 7552), and Board Policy 7553, Hazing of Students (Board Policy 7553), which prohibit discrimination, including harassment, on multiple protected bases including race, color, and national origin, by employees, school volunteers, students, and non-employees such as contractors and vendors as well as any third parties who are participating in, observing, or otherwise engaging in activities subject to the supervision and control of the District. In addition, the District's Code of Conduct prohibits intimidation, harassment, or discrimination against any person based on, among other things, actual or perceived race, color, or national origin, by employees or students on school property or at a school-sponsored function.

Board Policy 7550 sets forth the District's process for responding to complaints alleging harassment and bullying on a number of protected bases including race, color, and national origin. Pursuant to Board Policy 7550, "School personnel who witness or receive a report of harassment, bullying, or discrimination must promptly orally notify the Principal, Superintendent or designee within one school day, and must file a written report within two school days." The District has designated a DASA Coordinator at each of its schools to investigate such complaints. The District's DASA complaint form states that employees, students,

parents/guardians, community members, and others associated with the District may file complaints alleging harassment/bullying.

### C. The Complaint Allegations

The Complainant alleged that at the time she filed her complaint with OCR in 2015, she lived in the District and had children who attended school in the District. The Complainant described the District as "98% white" as of 2015 and alleged that the term            had been freely used by students, teachers, coaches, and parents in the District for decades. She also stated that the use of that term combined with the            imagery on the walls, floors, doors, and on apparel worn by students and staff created an "unwelcoming, racially hostile learning environment that [was] detrimental for all students . . . ." For example, the Complainant stated that over the years, District staff told Native American students who reported being offended by the imagery displayed during spirit week that they could exclude themselves by staying in a separate room while spirit week activities were ongoing. The Complainant asserted that one student had "repeatedly addressed the issue with the [District] and the student was taunted in the halls by students stating,            The Complainant reported that the student told the District: "You're dehumanizing a group of people" and "It really hurts me inside. Especially when I go to spirit week. Every day I go to school, a little piece of me dies." The Complainant further asserted that after the District's Board of Education (the Board) voted to discontinue use of the old mascot, a student required the use of a "bodyguard" to ensure the student's personal safety while on campus. In the complaint to OCR, the Complainant also stated that Native American alumni reported having been repeatedly called            and '            when they were students.

The Complainant further alleged that during school year 2015-2016, even though the District had already announced its retirement of the            mascot in March 2015 and had "gradually minimize[d] the use of the            term/imagery" by not including it on new sports uniforms and facilities and by discontinuing the appearance of a stereotyped costumed mascot at sports events, the District had failed to eliminate the hostile environment that existed through the previous use of the            mascot. Specifically, the Complainant stated that during school year 2015-2016, a District employee reported noticing that other District staff continued to wear apparel that had the old            mascot on it. The Complainant also provided links to several news articles that covered the District's mascot issue and she attached several photographs of            magery on display at School 1, including hall boards/murals that stated, "Once a            Always a            and '            Forever." Some of these images also depicted caricatures of Native-Americans.

On June 6, 2017, the Complainant informed OCR that a District employee had informed her that they believed the District was actively seeking to undermine the decision to remove the mascot by continuing to "spread new copies of the old            image throughout the upstairs [of School 1]; and by "preserving the old mascot as the centerpiece flooring of the [new] athletic center." In an email dated September 21, 2018, the Complainant informed OCR that a newly constructed floor had been placed in the newly built athletic department conference room, and it was freshly painted with a large            depiction. The Complainant stated that this contradicted what the District had previously communicated, which was that a portion of the old

[School 1] gym floor was going to be placed in the newly built athletic department conference room for "historic preservation" purposes.

### D. District's Responses to Alleged Hostile Environment

The District informed OCR that according to a local historian, the first appearance of the            mascot was in School 1's yearbook during school year 1954-1955. Prior to that, the District's mascot was the            The District informed OCR that the            mascot had been the official mascot of School 1 but there was also            imagery in other locations in the District, including at Schools 2 and 3. According to the District, Schools 4, 5, 6, and 7 did not contain any Native American imagery or use of the term

The District told OCR that during school year 2014-2015, the Superintendent and Board members discussed the District's            mascot. The District stated that following this conversation, representatives of some members of the      Nations (which includes the            tribes), professors, radio personalities, and other members of the Native American community discussed the matter in an open forum. The District also informed OCR that during school year 2014-2015, three area school districts –            – had boycotted School 1's lacrosse games scheduled during spring 2015, because of the District's use of the            mascot.

On March 3, 2015, the District held a public forum and community engagement session, during which the more than 100 people in attendance debated a proposal to change School 1's mascot. Thereafter, on March 16, 2015, the Board held a special hearing to discuss the mascot issue and hundreds of community members reportedly protested the decision to change the mascot, with some chanting, "Let's go,           Let's go!" Several participants reportedly turned their backs on the Board members during this protest.

The District informed OCR that on that same day, March 16, 2015, after open discussion during the District's Board meeting, the Board voted unanimously (7-0) in favor of retiring and discontinuing the use of            as its name and its mascot for School 1. The District stated that after conducting research, holding public forums, and eliciting input from the community and other interested parties outside of the District, including representatives from various Native American tribes, it determined to discontinue its use of the mascot because the use of the word            could potentially have a negative connotation and impact on some Native American individuals. According to the District, following the Board's decision in March 2015, it did not promote or promulgate the use of any            mascot or imagery during school year 2015-2016 or thereafter.

The District informed OCR that following the Board's vote, the District established a Leadership Academy and directed the Student Union to engage students in a process to select a new mascot. In March 2015, the District gave a student-led committee of 21 students (the Student Committee) the opportunity and responsibility of choosing a new sports team name and mascot for the District. The Student Committee included representatives from all groups/grade levels within School 1. The District created a process within Schools 1 and 2 by which each student in grades 7-12 was permitted to submit a potential new mascot/logo for School 1.

The District stated that it undertook a "rebranding/marketing" campaign to explain the reason for the change to students and parents in the community, and to inform them of the process the District planned to use to select a new mascot. Students then voted on the new mascot and ultimately selected the          " mascot with a symbol of a knight, which was to go into effect beginning in school year 2015-2016. In addition, the District adopted a staff member's idea to create t-shirts bearing the statement,          – we are all one," to promote District-wide unity. At a Board meeting held on June 8, 2015, the Board voted unanimously to adopt the "          " mascot and logo.

The District informed OCR that following the Board's decision in March 2015 to change the mascot, there was "mass disruption" in the community, and hundreds of individuals appeared at subsequent Board meetings to protest the decision to change the District's mascot. According to the District, those in favor of retaining the          mascot harassed Native-Americans (and those supporting Native Americans) in the community by following them, heckling them, and spitting on them. The District did not provide the names of any individuals who were allegedly harassed, nor did the District indicate whether or not any of the individuals were students or the parents/guardians of students enrolled in the District. However, the District described one incident, discussed in further detail below, wherein a "pro-          District parent yelled at and charged toward a woman of Native American ancestry immediately after a Board meeting held to discuss the mascot issue. The District informed OCR that the Superintendent was also spit on by an individual(s) who opposed the mascot change, and at Board meetings, certain individuals turned their backs on those who supported the adoption of a new mascot, which included all the members of the Board. According to media reports, hundreds of students who disagreed with retiring the          mascot staged a walk-out of School 1 several days after the Board's decision to discontinue it. Also during this time, local residents erected a banner on private property in the community stating, "Once a          always a          " or words to that effect.

The District stated that following the selection of the new mascot in or around summer 2015, the District began its efforts to remove any imagery of the old mascot around school campuses, including stereotypes of Native Americans, but the District had not completed an inventory of all imagery/references to the mascot. For example, School 1 removed a flag depicting          imagery from its campus. The District also stated that until September 2015, it allowed individuals to dress up as Native-Americans during events such as athletic contests and pep rallies.

The District reported that it did not receive any written complaints or reports of bullying or harassment of any student on the basis of Native American ancestry, since the start of school year 2014-2015 through December 2018. However, OCR determined that a student of Native American ancestry spoke publicly at a Board meeting in school year 2014-2015, about the District's continued use of the          mascot and that the imagery was offensive. Additionally, the District confirmed that a student of Native American ancestry, enrolled in School 1, had previously orally notified the District on several occasions that the use of the          mascot had made the student uncomfortable. Specifically, the District reported that in school year 2013-2014, the student told a guidance counselor (the Counselor) that the student felt that the          mascot was disrespectful toward Native Americans, and the student did not want to attend an upcoming pep rally because of the          mascot and imagery that was

present at pep rallies. According to the District, the Counselor informed the student that the student could choose to go to the Counseling Center during the pep rally if the student liked, and the student indicated that the student would do so. The Counselor then reportedly contacted the student's mother regarding the student's statements, and the next day, the student's mother informed the Counselor that the student was "completely fine" and would like to go to the pep rally.

The District also informed OCR that during a meeting between the student and the Counselor in school year 2014-2015, the student requested permission to sit in School 1's Counseling Center during the upcoming pep rally because the student felt uncomfortable attending it. OCR reviewed the Counselor's contemporaneous log reflecting this conversation and determined that the Counselor gave the student permission to do so. However, the District reported that during the pep rally, the Counselor observed the student standing in the doorway to the gym (named the Java Gym) in School 1, watching the pep rally with his friends. The District further reported that the Counselor spoke with the student privately in the hall near the     Gym and reportedly asked the student why the student had not come to the Counseling Center during the pep rally. The District reported that the student stated that the student was "fine" and wanted to watch the rally.

The principal (Principal 1) of School 1 stated that from 2011 (when he became principal of School 1) through November 2016, School 1 had not received any written complaints alleging discrimination or harassment on the basis of Native American ancestry made by parents/legal guardians, students, faculty, and/or visitors. However, Principal 1 confirmed the information the District reported regarding the student, as discussed above. Principal 1 added that the Counselor of School 1 reported that the student had informed her that the student felt uncomfortable attending the pep rally based on the conduct of other students at a previous pep rally that was directed towards the student's Native American ancestry but could not recall what was alleged to have occurred at any previous pep rally. Principal 1 also informed OCR that the student has since graduated from School 1. The evidence OCR obtained during its investigation indicated that the District did not consider any of the student's reports as complaints of harassment on the basis of Native-American ancestry.

The principal (Principal 2) of School 2 stated that he was not aware of any formal or informal complaints alleging discrimination or harassment on the basis of Native American ancestry made by parents/legal guardians, students, faculty, and/or visitors between school year 2014-2015 and December 2016, although he had received complaints filed by students of other races (African-American and Asian) alleging harassment. Principal 2 stated that between January and March 2015, when the District was deliberating changing School 1's team name/mascot from the             to the "           ," at least one student had reported to School 2 staff that the student felt "uncomfortable"; however, School 2 did not treat this as a formal complaint and Principal 2 did not provide any other information to OCR regarding this incident.

The principal (Principal 3) of School 3 stated that she was not aware of any formal or informal complaints alleging harassment or discrimination on the basis of race, color, or national origin, including any complaints on the basis of Native American ancestry, made by parents/legal guardians, students, faculty, and/or visitors between school year 2014-2015 and December 2016.

The principal (Principal 4) of School 4 denied that School 4 had received any formal complaints of harassment/bullying on the basis of race, color, or national origin, including any complaints on the basis of Native American ancestry, made by parents/legal guardians, students, faculty, and/or visitors, between school year 2014-2015 and December 2016. However, Principal 4 informed OCR that a District employee had previously expressed concerns to her related to the District's           mascot. Principal 4 stated that the employee had stated that they hoped that the District would change the mascot because the employee found the use of the           mascot to be offensive to people of Native American ancestry. Principal 4 stated that she did not investigate this as a formal complaint and could not provide any other information to OCR regarding this incident.

The principal (Principal 5) of School 5 informed OCR that she had never received any formal or informal complaints of bullying/harassment on any basis from parents/legal guardians, students, faculty, and/or visitors, since she became principal in approximately 2012, through December 2016.

The District confirmed that in March 2015, it received a letter (the Letter) from a member of the           community (the Community Member) describing an incident that occurred on March 9, 2015, at a Board meeting held in the School 1 auditorium. According to the Letter, a District parent who was running as a candidate for the Board at the time (Parent 1) charged at the Community member, verbally attacked her, and threatened to assault her. According to the District, the Letter was forwarded to the District's Superintendent by a Cultural and Resource Specialist who was designated by the                      Nations, Council of Chiefs to represent the Nations' interests on the school mascot issue and school logos depicting Native American themes.

The Letter stated that Parent 1, who was with an unidentified individual, yelled at the Community Member, who was carrying her ten-month old baby strapped to her back, and called her and those supporting the District's plan to change the mascot, "[f]ilthy bullies." Parent 1 also reportedly yelled, "How dare you come in here and make me feel like a racist! I am not a racist! You cannot do that!" According to the Letter, Parent 1 also reportedly stated, "You're not even from here!" and then physically approached the Community Member. The Community Member ran with her baby away from Parent 1 and requested assistance from a law enforcement officer (the Officer) inside the auditorium because she feared for the safety of herself and her child. According to the Letter, the Officer told everyone to disperse while Parent 1 continuously yelled, "Let's take it outside!" and "We'll take care of them outside!" In the Letter, the Community Member further stated that she would be willing to return to the District to attend any future events related to the District's use of the           mascot, but that she requested that Parent 1 "be banned or highly supervised by a police officer," given her previous conduct.

The District confirmed that the Superintendent received the Letter on March 12, 2015, but did not take any action to investigate the matter. The District further stated that, as reflected in the Letter, the Community Member was aware that she could file criminal charges against Parent 1. OCR determined that Parent 1 was elected to the Board in or around May 2015, and served as a member of the Board until school year 2018-2019.

### E. OCR's Onsite

The Superintendent informed OCR that after receiving notice of OCR's investigation, in July 2016, he directed each school principal to conduct a walkthrough of their campus to identify any old imagery or remnants of the　　　　　mascot. The Superintendent asserted to OCR that the District decided which imagery should be removed based on whether or not the content reflected historical significance. Prior to OCR's visit to the District on October 27, 2016, the District provided a list of the specific locations throughout the District where imagery related to the District's　　　　mascot appeared as of August 2016, along with photographs of the images.

On October 27, 2016, OCR conducted a site visit of the District. OCR visited the four schools the District identified in its data response as containing　　　　　imagery, Schools 1, 2, 3, and 8. OCR's case team was accompanied by the District's superintendent, legal counsel, and several of the respective school principals at each school visited. The case team observed　　　　imagery in all four buildings it visited, some examples of which are described below.

#### 1. School 1

- Various banners, photos, and artistic works referencing/displaying the old　　　　mascot in the boys' varsity locker room and coach's space within School 1's Garage/Transportation Area.
- Hallway murals referencing the old '　　　　mascot that were painted by graduating classes in the 1980s.
- A large image of the old　　　　mascot depicted on the center of the hardwood floor of the　　gym.

#### 2. School 2

- Approximately 90 chairs in the boys' locker room that included a depiction of the old　　　　　mascot, which were used by the boys' athletic teams and as additional seating during school activities such as sixth-grade orientation and school concerts.
- Stickers with the　　　　logo on the door and walls of the area where the chairs were stored.

#### 3. School 3

- An L-shaped image on the wall that included a portrait of the old　　　　mascot.
- A physical education instructor wearing a t-shirt with the old　　　　logo on it, while teaching a class.

#### 4. School 8

- A painted image of feathers surrounding an electrical outlet in the gym at the　　　Avenue School building.

OCR determined that prior to July 2016, the District began construction of an athletic department conference room in School 1 as part of an ongoing capital project. Initially, the District had planned to remove the　　　　mascot logo from the　　　gym floor in School 1 and relocate

it to the athletic department conference room at the request of many alumni who believed it was important for "historical preservation." However, the District stated that the removal and restoration process proved impossible since the contractor the District hired was unable to remove the mascot logo without destroying it. The District stated that it, therefore, directed the contractor to instead install a new floor in the athletic department conference room that replicated the logo of the original          mascot with a feather headdress. The District stated that as of December 28, 2018, it had completed its construction of this conference room, which is used for certain athletic department meetings and events for student athletes. The District provided photographs of the completed conference room, which includes the          logo on the floor.

The Superintendent informed OCR that the District also intended to preserve the hallway murals in School 1 that were created by past graduates because of the murals' importance to the alumni community. The Superintendent stated that the District intended to display that imagery in a primarily "historical" manner by digitally reproducing the murals and relocating them to the "Senior Hall" in School 1.

OCR determined that several of the District's publications used during school year 2014-2015 depicted the          mascot or imagery, including the 2014-2015 District calendar, the School 1 yearbook, the School 2 yearbook, and an annual football program. In addition, prior to and throughout school year 2014-2015, the School 1 newsletter, which was published approximately five times per year, was known as the "The          Reporter." The District informed OCR that beginning with school year 2015-2016, the official newsletter for School 1 was renamed the          . Newsletter." In addition, the District asserted that during school year 2015-2016, no District publication included          mascot or related imagery.

During various extracurricular events held during school years 2014-2015 and 2015-2016, some of which were planned by District students, attendees displayed or wore imagery related to the          mascot. These events included regularly scheduled athletic events/competitions; marching band events and competitions; class ring orders (a ring with the          logo was still an option for purchase); School 1 freshman mixer; School 1 courtyard dance; sales of          apparel at the school store (open during the school day and at open house); homecoming week events held each September, such as a bonfire, a powder puff game, pep rallies, and motorcade/parade; football games during which the          logo was displayed on the field throughout the season; homecoming dance; school spirit week events held each March; and sports tournaments and banquets.

In May 2023, the New York State Education Department (NYSED) issued Part 123 of the Regulations of the Commissioner of Education (CR 123), banning public schools in New York state from using Native American names, mascots, or logos for athletic teams, and requiring school districts to eliminate the use of such team names, mascots, and logos by June 30, 2025. The NYSED issued a guidance document in May 2023, entitled, "Background and Frequently Asked Questions Regarding Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools" (the NYSED FAQ Guidance), which clarified that imagery connected to Native Americans, in the past or present, including symbols like feathers, tomahawks, spears, "or logos utilizing

stylization generally attributable to or in association with Indigenous peoples" are prohibited. The NYSED FAQ Guidance further states that while school districts are not required to remove "historical artifacts" including legacy or memorial items such as plaques or trophies from District premises, NYSED encourages districts to locate such artifacts in areas conducive to conversation regarding "the impact such team names, mascots, or logos have on Indigenous peoples as well as the history and cultures of such peoples and nations." *Id.* The NYSED FAQ Guidance further states that CR 123 prohibits school district employees from "displaying paraphernalia or clothing associated with their own school district's retired Indigenous team name, logo, or mascot."

### III. Analysis and Conclusion

Based on the above, OCR determined that between September 2014 and March 2015, at least two students, and one employee reported concerns related to the District's use of the          mascot to staff in Schools 1, 2, and 4. The Superintendent also reported to OCR that following the Board's decision to remove the old mascot in March 2015, there was an "explosion of hate" within the community, which included community members who wanted the District to retain the mascot engaging in conduct that included following, heckling, and spitting on supporters of retiring the          mascot, including members of the Native American community. Further, the District confirmed receipt of the Letter dated March 9, 2015, in which the Community Member reported being harassed and threatened on the basis of her Native American ancestry, while attending an event on District property. The evidence OCR reviewed to date did not indicate that the District investigated these incidents or evaluated the existence of a hostile environment for any of the affected individuals.

OCR recognizes that since school year 2014-2015, the District has taken steps to change its former mascot and remove certain Native American imagery. However, during its investigation OCR obtained evidence indicating that the District may not have fully eliminated the use of the          mascot. OCR reviewed various photographs the District provided documenting the continued use of the previous          mascot on campus. While conducting its onsite visit to several District schools in October 2016, after the mascot had been retired one year prior, OCR observed numerous depictions of the District's former          mascot and imagery still on display. OCR also observed a District employee teaching a class while wearing a shirt bearing the former mascot. Additionally, the District informed OCR that in 2018, its contractor completed the installation of a new floor in the athletic department conference room with a replication of the previous          mascot.

Based on the evidence produced to date, OCR has concerns that a hostile environment may have existed for students, employees, and community members engaged in District-sponsored activities of Native American ancestry during at least school years 2013-2014 through 2014-2015, and that the District's continued use and/or display of the former          mascot and related imagery might have perpetuated a hostile environment for students and others in the District. OCR recognizes that the steps the District has taken to date, combined with those it is expected to take to comply with CR 123's prohibition against using Native American names, mascots, and logos after June 30, 2025, partly address or will address concerns OCR identified regarding the existence of a hostile environment at District schools.

Prior to the completion of OCR's investigation, the District signed the attached Agreement to voluntarily resolve the remaining compliance concerns OCR has identified to date, as detailed above, under Section 302 of OCR's *CPM*.

## IV.  Obligations Under the Agreement

Under the Agreement, the District will discontinue use of            (its previous logo/mascot, retired in March 2015) on and off the campus of the District's school buildings except for "legacy or memorial items" located at School 1, as specified in the Agreement, and will display a plaque next to each legacy or memorial item denoting it as such. The District will also incorporate the protected categories of race, color, and/or national origin/ethnicity into the discrimination and harassment training it already provides to all District administrators and staff who are directly involved in processing, investigating, and/or resolving such reports and complaints regarding how to recognize harassment based on race, color, and/or national origin, and the District's responsibilities to address such discrimination and harassment under Title VI.

The District will also ensure that the training and initiatives it already provides to all students will cover: Title VI's prohibition against discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity; examples of the range of behaviors that constitute discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity; examples of interim and remedial measures that may be taken in response to such harassment; the disciplinary sanctions applicable to students who engage in discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity; where, how, and to whom students should report instances of discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity; and the prohibition against retaliation for complaining of discrimination, including harassment, based on race, color, and/or national origin/ethnicity. Further, the District will provide OCR with documentation of the District's responses to all complaints and oral reports alleging discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity at School 1 during school years 2024-2025, and 2025-2026.

OCR will monitor the District's implementation of the Agreement until OCR determines that the District is in compliance with the terms of the Agreement, and the Title VI statutory and regulatory obligations that were at issue in this case. At that point, OCR will notify the District that OCR's monitoring is complete and OCR will close the case.

This letter should not be interpreted to address the District's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The Complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a

law enforced by OCR. If this happens, the individual may file a retaliation complaint against the District with OCR.

Under the Freedom of Information Act (FOIA), it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

If you have any questions, please contact          , Senior Compliance Team Attorney, at          ; or          , Compliance Team Leader, at

Sincerely,

Regional Director

Enclosure (the Agreement)

cc:          . (via email only)

# VOLUNTARY RESOLUTION AGREEMENT
## School District
## Case Number

The              School District (the District) agrees to take the actions detailed below in this resolution agreement (the Agreement) to resolve compliance concerns that the U.S. Department of Education (the Department), Office for Civil Rights (OCR), identified during its investigation of a complaint filed on May 23, 2016, Case Number            , concerning Title VI of the Civil Rights Act of 1964 (Title VI) as amended, 42 U.S.C. § 2000d *et seq.*, and its implementing regulations at 34 C.F.R. Part 100, which prohibit discrimination on the bases of race, color, and national origin by recipients of federal financial assistance from the Department. The District is a recipient of such assistance from the Department, is subject to Title IV, and assures OCR that the District will implement this Agreement to comply with its civil rights obligations under Title VI and its implementing regulations.

### ACTION ITEM 1: Removal of Native American Imagery on District Property

A. By September 30, 2024, the District will discontinue use of             (its previous logo/mascot, retired in March 2015) on and off the campus of the District's school buildings except for the following "legacy or memorial items" located at the District's High School (hereinafter referred to as "School 1"): (1) the District's past football championship signs, individual historic photos, and/or a collage of historic photos of student athletes and coaches wearing uniforms or other clothing, using equipment, and/or holding signs or awards with the retired mascot name and/or logo located on the exterior walls of the Athletic Building near the football field and in the football locker room at School 1; (2) a collage of historic photos of student athletes and coaches wearing uniforms or other clothing, using equipment, and/or holding signs with the retired mascot name and/or logo, located in the Athletic Hall near the entrance to School 1's       Gym; and (3) wall murals previously created by past graduating senior classes. The District also agrees to display a plaque next to each above-named legacy or memorial item stating the following: "These historical artifact(s) contain images of the District's previous mascot name and/or associated logos and symbols. In March 2015, the District retired its mascot name and associated logos and symbols and selected the           as its mascot going forward. The District acknowledges the impact that stereotyped indigenous team names, mascots, or logos have on indigenous peoples as well as the history and culture of such peoples and nations."

B. REPORTING REQUIREMENT: By October 31, 2024, the District will provide OCR with an affidavit confirming the District's compliance with Action Item 1.A, attaching photographs and/or videos to this affidavit to demonstrate compliance.

### ACTION ITEM 2: Training for Staff

A. By October 31, 2024, and October 31, 2025, the District will incorporate the protected categories of race, color, and/or national origin/ethnicity into the discrimination and harassment training it already provides to all District administrators and all staff who are directly involved in processing, investigating, and/or resolving complaints of

discrimination and/or harassment. At a minimum, the training (which may be conducted virtually, electronically and/or in person) will cover (i) the District's duties under Title VI not to discriminate based on race, color, and/or national origin/ethnicity; (ii) the definition of harassment based on race, color, and/or national origin/ethnicity; (iii) examples of such harassment and how such harassment can create a hostile educational environment for students; (iv) the District's policies and procedures for resolving complaints of discrimination, including harassment, based on race, color, and/or national origin/ethnicity; (v) the responsibilities of District and school employees to recognize, report, and respond to such complaints, whether written or oral; (vi) how and to whom students may report such discrimination, including harassment; (vii) interim and remedial measures that may be taken in response to alleged discrimination, including harassment (e.g., offers of counseling and class assignment changes); and (viii) the District's prohibition against retaliation for making such complaints, including the responsibilities of District employees to recognize and respond to such protected activity. During the training, the District will provide a website link(s) to and/or copies of its policies and procedures for resolving complaints of discrimination, including harassment, to all attendees or refer them to their location within the publications they already possess.

B. REPORTING REQUIREMENT: By November 30, 2024 and November 30, 2025, the District will provide OCR with documentation demonstrating that it provided training in accordance with Action Item 2.A, including: (a) the name(s) and credentials of the entity and/or individual(s) who conducted the training; (b) a list of the individuals who completed the training and their positions; (c) the date(s) the training was conducted; and (d) copies of any training materials used and/or disseminated.

## ACTION ITEM 3: Training for Students

A. The District represents that it provides annual training to students regarding the prohibition against discrimination and harassment on the bases of race, color, and/or national origin/ethnicity. The District further represents that it implements District-wide programs fostering diversity, equity, and inclusion through its Culture, Climate, and Inclusivity Initiative. For school years 2024-2025 and 2025-2026, the District will ensure that the training and initiatives it already provides to students will include: (i) the requirements of Title VI including that discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity is prohibited and will not be tolerated; (ii) the range of behaviors that constitute discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity; (iii) examples of interim and remedial measures that may be taken in response to such harassment (e.g., offering counseling and class assignment changes); (iv) the disciplinary sanctions applicable to students who engage in discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity; (v) where, how, and to whom students should report instances of discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity; and (vi) the prohibition against retaliation for complaining of discrimination, including harassment, based on race, color, and/or national origin/ethnicity.

B. REPORTING REQUIREMENT: By June 30, 2025 and again by June 30, 2026, the District will provide OCR with documentation demonstrating that it provided the training in accordance with Action Item 3.A, including: (a) the name(s) and credential(s) of the

individual(s) who conducted the training; (b) a description of which students attended the training; (c) the date(s) the training was conducted; and (d) copies of any training materials disseminated.

**ACTION ITEM 4:   Reports of Harassment Based on Race, Color, and National Origin/Ethnicity**

A. By July 15, 2025, and July 15, 2026, the District will provide to OCR an electronic sortable spreadsheet or other file of the District's responses to all complaints and oral reports alleging discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity at School 1 during school years 2024-2025, and 2025-2026. At a minimum, the spreadsheet will include separate fields for:

1. the date(s) of receipt of the written complaint or oral report;
2. the name of the person who provided notice to the District ("the reporter");
3. the status of the reporter (e.g., teacher, parent, student, friend);
4. the name of the individual who was allegedly discriminated against/harassed ("the complainant");
5. the status of the complainant (e.g., student, teacher, staff member);
6. the name(s) of the individual(s) who allegedly engaged in discrimination/harassment ("the respondent(s)");
7. the respondent's grade (if a student) or job title (if an employee);
8. the basis or bases of the alleged harassment (i.e., race, color, and/or national origin/ethnicity);
9. the nature of the alleged harassment (e.g., verbal harassment by students using racial slurs);
10. the date(s) of the alleged harassment;
11. the location(s) of the alleged harassment (e.g., school name, parking lot, football field);
12. the names of any witnesses to the alleged harassment;
13. the name(s) and job title(s) of the individual(s) who received and processed the complaint or oral report;
14. the date the investigation commenced;
15. any supportive measures offered to the complainant, respondent, and/or other person;
16. the status of the investigation of the complaint or oral report;
17. the outcome of all completed investigations (i.e., the determination regarding whether discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity took place; and if so, whether the harassment created a hostile environment, and if so, for whom);
18. a description of the disciplinary sanctions imposed, if any, and date imposed;
19. a description of the remedial measures taken, including the remedies offered and provided to the complainant and/or other individual(s);
20. a description of any steps the District took to eliminate and/or prevent the recurrence of a hostile environment created by the incident;
21. the date(s) the District provided written notice of the outcome of the investigation to the parties;

22. the date of any appeal; and
23. the outcome of any appeal.

B. Upon request, the District will provide to OCR within 15 calendar days a copy of the complete investigative file(s), including applicable District records, student disciplinary records, employee disciplinary records, and human resources/personnel files. The data will be produced electronically in a mutually agreed upon format and will be organized and labeled as individual files, with all relevant documents for an incident.

C. REPORTING REQUIREMENT: By July 15, 2025, and July 15, 2026, the District will provide OCR with a copy of the electronic sortable spreadsheet and accompanying documentation as required by Action Item 4. The District will promptly address OCR's feedback, if any, until the District receives notice from OCR that no further reporting is required for Action Item 4.

By signing the Agreement, the District understands and agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this Agreement. Further, the District understands that during the monitoring of this Agreement, if necessary, OCR may visit the District, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the District has fulfilled the terms and obligations of this Agreement.

The District understands that OCR will not close the monitoring of the Agreement until OCR determines that the District has demonstrated compliance with all the terms of the Agreement and is in compliance with Title VI and its implementing regulation, at 34 C.F.R. Part 100, which were at issue in this case.

The District understands that OCR may initiate administrative enforcement proceedings or refer the case to the Department of Justice (DOJ) for judicial proceedings in the event of breach to enforce the specific terms and obligations of this Agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the District written notice of the alleged breach and 60 calendar days to cure the alleged breach.

This Agreement will become effective immediately upon the signature of the District's representative below.

Date: 9/12/24           Sig

School District